1               UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TENNESSEE
2                    GREENEVILLE

3

UNITED STATES OF AMERICA,  .  DOCKET NO. CR-2-12-98
4                       .
        GOVERNMENT,         .
5                       .
           VS.         .  GREENEVILLE, TN
6                     .  JULY 17, 2013
  JOHN FRANKLIN LANDERS, II, .  9:03 A.M.
7                     .
        DEFENDANT.       .
8                     .
  .  .  .  .  .  .  .  .  .  .
9

10

11               TRANSCRIPT OF SENTENCING
        BEFORE THE HONORABLE J. RONNIE GREER
12           UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  FOR THE GOVERNMENT:     U.S. DEPARTMENT OF JUSTICE
                      OFFICE OF U.S. ATTORNEY
16                    HELEN C.T. SMITH, AUSA
                     220 WEST DEPOT STREET, SUITE 423
17                  GREENEVILLE, TN 37743

18  FOR THE DEFENDANT:      LAW OFFICE OF CHARLES R. MARTIN
                     CHARLES R. MARTIN
19                  P.O. BOX 25
                     KINGSPORT, TN 37662
20

21

22  COURT REPORTER:        KAREN J. BRADLEY
                     RPR-RMR
23                  U.S. COURTHOUSE
                     220 WEST DEPOT STREET
24                  GREENEVILLE, TN 37743

25  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
  PRODUCED BY COMPUTER.

1          (CALL TO ORDER OF THE COURT AT 9:03 A.M.)

2               THE COURT:  GOOD MORNING.

3               MS. SMITH:  GOOD MORNING.

4               THE COURT:  ALL RIGHT.  MS. HOPSON, WOULD YOU

5      CALL THE FIRST CASE, PLEASE.

6               THE CLERK:  USA VERSUS JOHN FRANKLIN LANDERS,

7      II, CASE NUMBER CR-2-12-98.

8               THE COURT:  ALL RIGHT.  MR. LANDERS APPEARS

9      BEFORE THE COURT THIS MORNING FOR SENTENCING IN THIS CASE.

10     HE WAS PREVIOUSLY CONVICTED UPON HIS GUILTY PLEA ON A

11     CHARGE OF POSSESSION OF EQUIPMENT, CHEMICALS, PRODUCTS AND

12     MATERIALS WHICH MAY BE USED TO MANUFACTURE

13     METHAMPHETAMINE.

14               THE COURT ORDERED THE PREPARATION OF A PRE-

15     SENTENCE REPORT.  THAT REPORT HAS BEEN PREPARED AND WAS

16     DISCLOSED TO THE PARTIES ON MAY 8, 2013.  BASED ON A TOTAL

17     OFFENSE LEVEL OF 21 AND A CRIMINAL HISTORY CATEGORY OF 6,

18     THE PROBATION OFFICER HAS CALCULATED AN ADVISORY GUIDELINE

19     RANGE OF 77 TO 96 MONTHS, WHICH THE DEFENDANT HAS OBJECTED

20     TO.

21               MR. MARTIN, HAVE YOU RECEIVED A COPY OF THIS

22     PRESENTENCE REPORT?

23               MR. MARTIN:  YES, I HAVE, YOUR HONOR.

24               THE COURT:  AND HAVE YOU READ IT AND DISCUSSED

25     IT FULLY WITH MR. LANDERS?

1    MR. MARTIN:  YES, WE'VE REVIEWED IT

2  THOROUGHLY.

3    THE COURT:  THANK YOU.

4    MR. LANDERS, HAVE YOU RECEIVED AND READ A COPY

5  OF THIS PRESENTENCE REPORT?

6    THE DEFENDANT:  YES, SIR, I HAVE.

7    THE COURT:  HAVE YOU REVIEWED IT AND DISCUSSED

8  IT FULLY WITH YOUR ATTORNEY?

9    THE DEFENDANT:  YES, SIR.

10    THE COURT:  HAVE YOU HAD SUFFICIENT TIME TO

11  REVIEW THIS PRESENTENCE REPORT WITH YOUR ATTORNEY?

12    THE DEFENDANT:  YES, SIR.

13    THE COURT:  THANK YOU.

14    ALL RIGHT, AS I INDICATED, THERE ARE OBJECTIONS

15  BY THE DEFENDANT HERE.  THE DEFENDANT MAKES THREE

16  OBJECTIONS TO THE GUIDELINE CALCULATION:  FIRST OF ALL,

17  THE DEFENDANT SEEKS A DOWNWARD DEPARTURE BASED ON OVER-

18  REPRESENTATION OF CRIMINAL HISTORY; SECOND, THE DEFENDANT

19  ARGUES THAT THE OFFENSE LEVEL, BASE OFFENSE LEVEL SHOULD

20  BE DETERMINED BY REFERENCE TO SECTION 2D1.1(2) OF THE

21  GUIDELINES RATHER THAN SECTION 2D1.1; AND, FINALLY, THE

22  DEFENDANT ARGUES THAT HE SHOULD RECEIVE A MITIGATING ROLE

23  ADJUSTMENT UNDER SECTION 3B1.2 OF THE GUIDELINES.

24    MR. MARTIN, WE'LL TAKE THOSE UP IN ANY ORDER

25  THAT YOU WISH.

1    YOU HAD PREVIOUSLY GIVEN NOTICE OF WITNESSES IN
2  THIS CASE.  YOU HAVE NOW ASKED ME TO VACATE THE ORDER
3  HAVING CERTAIN CODEFENDANTS BROUGHT HERE, ARE THOSE YOUR
4  ONLY WITNESSES?
5    MR. MARTIN:  NO, YOUR HONOR, I HAVE ONE
6  WITNESS.
7    THE COURT:  DOES THAT WITNESS RELATE TO THE
8  OBJECTIONS OR TO THE OVERALL SENTENCE?
9    MR. MARTIN:  MR. LANDERS WOULD LIKE TO TESTIFY,
10 YOUR HONOR.
11    THE COURT:  ALL RIGHT.  THEN LET'S HEAR YOUR
12 WITNESS.
13    IT LOOKS LIKE WITH RESPECT TO THE PROPER BASE
14 OFFENSE LEVEL, I GUESS, MR. MARTIN, THAT'S JUST A LEGAL
15 QUESTION --
16    MR. MARTIN:  I THINK IT IS, YOUR HONOR.
17    THE COURT:  -- TO SOME EXTENT, ALTHOUGH IT'S
18 RELATED TO THE QUESTION OF WHETHER OR NOT METHAMPHETAMINE
19 WAS MANUFACTURED OR ATTEMPTED TO BE MANUFACTURED.
20    MR. MARTIN:  YES, YOUR HONOR.  I THINK THE
21 OFFENSE, I THINK THE OFFENSE LEVEL DOES HAVE A FACTUAL
22 BASIS.
23    THE COURT:  SO IT DOES HAVE A FACTUAL BASIS.
24    MR. MARTIN:  CRIMINAL HISTORY CATEGORY, OF
25 COURSE, I THINK IS JUST LEGAL.

JOHN FRANKLIN LANDERS, II, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   YOUR NAME IS JOHN LANDERS, AND YOU'RE THE DEFENDANT

IN THIS CASE; IS THAT CORRECT?

A.   YES, SIR.

Q.   NOW, I'D LIKE TO ASK YOU SOME QUESTIONS,

MR. LANDERS, ABOUT THE OTHER CODEFENDANTS IN THIS CASE.

I'M PUTTING ON THE PROJECTOR PAGE 2 OF THE

PRESENTENCE INVESTIGATION REPORT WHICH LISTS THE

CODEFENDANTS IN THIS CASE, AND I'LL DRAW YOUR ATTENTION TO

THE LIST OF CODEFENDANTS, AND I'D LIKE TO ASK YOU TAKE

JUST A MOMENT, READ SILENTLY TO YOURSELF ALL THE NAMES OF

THE CODEFENDANTS IN THIS CASE, AND I'D LIKE TO ASK YOU

SOME QUESTIONS ABOUT IT.

HAVE YOU READ THE LIST?

A.   YES, SIR.

Q.   TELL US, PLEASE, MR. LANDERS, WHICH OF THESE PEOPLE,

IF ANY, YOU EVER MET IN YOUR ENTIRE LIFE?

A.   IT WOULD BE TRISTAN ALLYN BREWER.

Q.   ALL RIGHT.  LET ME CIRCLE THAT.  SO YOU'VE MET

TRISTAN BREWER.

AND WHO ELSE?

A.   JAMES SCOTT, JAMES SCOTT WHITE.

Q.   I'M CIRCLING THAT.  AND WHO ELSE?

1  A.    AND LINDSEY RENEE PHIPPS.

2  Q.    SO THE ONLY PEOPLE ON THIS LIST THAT YOU'VE EVER MET

3  IN YOUR LIFE; IS THAT RIGHT?

4  A.    YES, SIR.

5  Q.    NOW, I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT YOUR

6  INVOLVEMENT WITH TRISTAN BREWER.  TELL US, PLEASE, WHEN

7  WAS THE FIRST TIME IN YOUR LIFE YOU EVER MET TRISTAN

8  BREWER?

9  A.    A FEW DAYS PRIOR TO THIS INCIDENT.

10  Q.    WELL --

11  A.    A WEEK, WEEK.

12  Q.    YOU WERE ARRESTED ON OCTOBER 28, 2011, SO ARE YOU

13  TALKING ABOUT THE DAY BEFORE, OCTOBER 27TH?

14  A.    YES, SIR.

15  Q.    A FEW DAYS BEFORE THAT?

16  A.    YES, SIR.

17  Q.    AND TELL US THE CIRCUMSTANCES, PLEASE, UNDER WHICH

18  YOU FIRST MET TRISTAN BREWER.

19  A.    I JUST MET HIM AROUND MY NEIGHBORHOOD, JUST --

20  Q.    IN GENERAL --

21          THE COURT:  TELL ME WHAT THAT MEANS.

22  A.    I JUST -- I GUESS FRIENDS, ACQUAINTANCES.  I JUST --

23          THE COURT:  SOME FRIEND INTRODUCED YOU TO HIM?

24  A.    YES, SIR.  YES, SIR.  SORRY.

25  Q.    AND TELL US WHAT OCCURRED WHEN YOU FIRST MET TRISTAN

1    BREWER.

2    A.    JUST CHITCHAT, TALKING.

3    Q.    JUST CONVERSATION?

4    A.    YES, SIR.

5    Q.    AND WHEN WAS THE NEXT TIME YOU SAW TRISTAN BREWER?

6    A.    THE DAY BEFORE MY ARREST.

7    Q.    SO THAT WOULD HAVE BEEN OCTOBER THE 27TH?

8    A.    YES, SIR.

9    Q.    AND, IN GENERAL, WHAT WAS YOUR RELATIONSHIP WITH

10   TRISTAN BREWER?

11   A.    JUST AN ACQUAINTANCE, FRIEND.

12   Q.    JUST SOCIAL FRIEND, WOULD THAT BE FAIR TO SAY?

13   A.    YES, SIR.

14   Q.    SO THEN I WANT TO ASK YOU A QUESTION ABOUT YOUR

15   INVOLVEMENT WITH LINDSEY PHIPPS, WHICH YOU'VE IDENTIFIED

16   AS SOMEBODY YOU KNOW, WHEN IS THE FIRST TIME YOU EVER MET

17   LINDSEY PHIPPS?

18   A.    ABOUT A WEEK BEFORE OCTOBER 27TH.

19   Q.    AND WHAT WERE THE CIRCUMSTANCES ASSOCIATED WITH YOU

20   MEETING LINDSEY PHIPPS?

21   A.    JUST -- I WENT OVER TO A FRIEND'S HOUSE, AND HER AND

22   JAMES WHITE WERE THERE AND EVERYBODY WAS USING DRUGS.

23   Q.    WHEN WAS THE NEXT TIME YOU SAW LINDSEY PHIPPS?

24   A.    ABOUT A WEEK AFTER THAT.

25   Q.    WOULD THAT BE SOMETIME AROUND OCTOBER 27TH OR --

1   A.    YES, SIR.

2   Q.    ALL RIGHT, AND WHAT WAS YOUR RELATIONSHIP WITH

3   LINDSEY PHIPPS?

4   A.    JUST SOCIAL FRIEND.

5   Q.    WAS THERE ANY ROMANTIC RELATIONSHIP?

6   A.    NO, SIR; NO.

7   Q.    SO THEN, CORRECT, PRIOR TO BE TAKING INTO CUSTODY,

8   YOU ONLY SAW LINDSEY PHIPPS TWO TIMES IN YOUR LIFE?

9   A.    YES, SIR.

10  Q.    NOW, WITH REGARD TO JAMES WHITE, TELL US, PLEASE,

11  THE FIRST TIME YOU EVER MET JAMES WHITE IN YOUR LIFE.

12  A.    THE SAME AS LINDSEY PHIPPS.

13  Q.    IN OTHER WORDS, MAYBE A WEEK OR SO BEFORE YOUR

14  ARREST?

15  A.    YES, SIR.  THEY WERE TOGETHER.

16  Q.    AND UNDER WHAT CIRCUMSTANCES DID YOU MEET JAMES

17  WHITE?

18  A.    SOCIAL FRIEND.

19  Q.    AND WHAT WAS THE NEXT TIME YOU SAW JAMES WHITE AFTER

20  YOU MET HIM THAT FIRST TIME?

21  A.    PROBABLY OCTOBER 27TH.

22  Q.    THE DAY BEFORE YOUR ARREST?

23  A.    YES, SIR.

24  Q.    AND WHAT WAS YOUR RELATIONSHIP WITH HIM?

25  A.    SOCIAL FRIENDS.

1   Q.    AND SO IS IT CORRECT THAT PRIOR TO BE TAKEN INTO

2   CUSTODY ON OCTOBER 28TH, YOU ONLY SAW HIM TWO TIMES IN

3   YOUR LIFE?

4   A.    YES, SIR, IT IS.

5   Q.    NOW, I WANT TO ASK YOU SOME QUESTIONS ABOUT THE

6   CODEFENDANTS WHICH YOU HAVE NOT PREVIOUSLY MET.  I

7   UNDERSTAND THAT YOU'VE NEVER MET THESE PEOPLE, AND I'M NOT

8   ASKING YOU ABOUT WHETHER YOU HAVE MET THEM OR NOT, AND

9   THOSE PEOPLE, OF COURSE, ARE EVERYBODY OTHER THAN THOSE

10  PEOPLE THAT ARE CIRCLED ON THE LIST OF CODEFENDANTS HERE;

11  AND EVEN THOUGH YOU HAVE NEVER MET ANY OF THESE PERSONS IN

12  YOUR LIFE, OTHER THAN THE THREE THAT YOU IDENTIFIED PRIOR

13  TO OCTOBER 28TH, 2011, DO YOU HAVE ANY PERSONAL KNOWLEDGE,

14  UNDERSTANDING AS TO THE ACTIVITIES OF THESE PERSONS

15  REGARDING THE MANUFACTURE OF METHAMPHETAMINE?

16  A.    NO, SIR, I DO NOT.

17  Q.    NOW, I WANT TO ASK YOU A QUESTION, PLEASE, ABOUT THE

18  STRUCTURE OF ANY ORGANIZATION THAT YOU MIGHT KNOW ABOUT.

19  TELL US, PLEASE, WHETHER OR NOT PRIOR TO OCTOBER 28, 2011,

20  YOU HAD ANY PERSONAL KNOWLEDGE OR UNDERSTANDING AS TO HOW

21  THE ACTIVITIES OF THESE PEOPLE WERE STRUCTURED.  IN OTHER

22  WORDS, IS IT CORRECT YOU HAD NO KNOWLEDGE OR UNDERSTANDING

23  AS TO WHO WAS THE RING LEADER OF THIS, WHO WAS TELLING WHO

24  WHAT TO DO?

25  A.    THAT'S CORRECT, I HAD NO KNOWLEDGE.

1  Q.    SO IS IT FURTHER CORRECT THAT YOU HAD NO KNOWLEDGE

2  OR UNDERSTANDING AS TO WHO WAS INVOLVED?

3  A.    THAT'S CORRECT.

4  Q.    WHAT WAS OCCURRING?

5  A.    THAT'S CORRECT.

6  Q.    YOU HAD NO KNOWLEDGE WHEN IT WAS OCCURRING?

7  A.    THAT'S CORRECT.

8  Q.    YOU HAD NO KNOWLEDGE WHERE IT WAS OCCURRING?

9  A.    THAT'S RIGHT.

10  Q.    YOU HAD NO KNOWLEDGE WHY IT WAS OCCURRING?

11  A.    YES, SIR.

12  Q.    YOU HAD NO KNOWLEDGE HOW IT WAS OCCURRING?

13  A.    YES, SIR.

14  Q.    NOW, I'M GOING TO ASK YOU A QUESTION NOT ABOUT

15  STRUCTURE, BUT ABOUT SCOPE.  IS IT CORRECT THAT PRIOR TO

16  OCTOBER 28, 2011, YOU DID NOT HAVE ANY PERSONAL KNOWLEDGE

17  OR UNDERSTANDING AS TO THE SCOPE OF THESE ACTIVITIES?  IN

18  OTHER WORDS, DID YOU HAVE ANY IDEA OF THE NUMBER OF PEOPLE

19  THAT WERE INVOLVED OTHER THAN YOU?

20  A.    NO, SIR, I HAD NO IDEA.

21  Q.    DID YOU HAVE ANY IDEA OF THE SIZE OF THESE

22  ACTIVITIES?

23  A.    NO, SIR, I DIDN'T.

24  Q.    DID YOU HAVE ANY IDEA OF THE DURATION AND TIME THAT

25  WAS INVOLVED IN THIS?

1  A.    NO, SIR, I DIDN'T.

2  Q.    NOW, I'D LIKE TO ASK YOU SOME QUESTIONS,

3  MR. LANDERS, PERTAINING TO YOUR LIVING ARRANGEMENTS PRIOR

4  TO OCTOBER 28, 2011, WHEN YOU WERE TAKEN INTO CUSTODY; AND

5  I'D LIKE TO REQUEST THAT YOU NOT STATE A STREET ADDRESS IN

6  YOUR TESTIMONY HERE TODAY, THE ADDRESS IS OF RECORD IN THE

7  CASE.  SO WITHOUT STATING THE STREET ADDRESS, TELL US,

8  PLEASE, WHERE WERE YOU LIVING PRIOR TO OCTOBER 28, 2011,

9  WHEN YOU WERE TAKEN INTO CUSTODY?

10 A.    I WAS LIVING AT MY HOME, MY HOUSE.

11 Q.    AND IS THIS CORRECT -- IS IT CORRECT THAT THIS IS

12 WHERE YOU WERE ARRESTED?

13 A.    YES, SIR.

14 Q.    AND APPROXIMATELY WHEN DID YOU FIRST COME TO LIVE AT

15 THIS ADDRESS?

16 A.    PROBABLY ABOUT FIVE OR SIX MONTHS PRIOR TO MY

17 ARREST.

18 Q.    NOW, I WANT TO ASK YOU ABOUT YOUR INVOLVEMENT WITH

19 THE CODEFENDANTS THAT YOU KNOW, THAT YOU'VE IDENTIFIED AT

20 YOUR HOUSE.  AND YOU'VE TESTIFIED THAT THE FIRST TIME YOU

21 MET THESE THREE INDIVIDUALS WAS SEVERAL DAYS PRIOR TO

22 OCTOBER 27TH?

23 A.    YES, SIR.

24 Q.    AND YOU'VE TESTIFIED THE NEXT TIME YOU MET THESE

25 THREE INDIVIDUALS WAS AT YOUR HOUSE ON OCTOBER 27TH?

1 A.    YES, SIR.

2 Q.    NOW, IS, IS IT CORRECT THAT PRIOR TO BEING TAKEN

3 INTO CUSTODY, YOU ONLY SAW THESE PERSONS TWO TIMES IN YOUR

4 LIFE?

5 A.    THAT'S RIGHT.

6 Q.    AND IS IT CORRECT THAT PRIOR TO THE FEW DAYS BEFORE

7 OCTOBER 27TH, NONE OF THESE PERSONS HAD EVER BEEN AT YOUR

8 HOME?

9 A.    YES, SIR, THAT'S RIGHT.

10 Q.    NOW, I'M GOING TO ASK YOU ABOUT YOUR ACTIVITIES ON

11 OCTOBER 27TH AND OCTOBER 28TH.  NOW, WHEN YOU WERE TAKEN

12 INTO CUSTODY LATE IN THE DAY ON OCTOBER 28TH, TELL US,

13 PLEASE, WHO WAS AT YOUR HOUSE, WHO WAS THERE?

14 A.    THERE WERE SEVEN, SIX, SEVEN PEOPLE TOTAL.

15 Q.    I MEAN, YOU WERE THERE, OBVIOUSLY?

16 A.    YES.

17 Q.    AND WHO ELSE WAS THERE?

18 A.    SIX OTHER PEOPLE.

19 Q.    DO YOU REMEMBER THOSE NAMES?

20 A.    YES, SIR, I DO.  IT WAS TRISTAN ALLYN BREWER, JAMES

21 SCOTT WHITE, LINDSEY PHIPPS, JOHN MCGUIRE AND DUSTIN CASH

22 AND --

23 Q.    TELL US, PLEASE, WHETHER OR NOT GINGER HOLTSCLAW WAS

24 THERE?

25 A.    YEAH.  GINGER HOLTSCLAW WAS THERE, I'M SORRY, SIR.

1   Q.    AND TELL US WHETHER OR NOT THERE WAS ANYBODY BY THE

2   NAME OF RICHIE OR RICHIE'S GIRLFRIEND OR ANYBODY LIKE

3   THAT?

4   A.    YES.  THEY WEREN'T THERE AT THE TIME OF MY ARREST,

5   BUT THEY WERE THERE PREVIOUS THAT DAY.

6   Q.    NOW, I WANT TO ASK YOU A QUESTION ABOUT WHEN THESE

7   PEOPLE ARRIVED NOW.  TELL US, PLEASE, WHERE GINGER

8   HOLTSCLAW WAS ON THE MORNING OF OCTOBER 27TH.

9   A.    SHE WAS WITH ME.

10  Q.    SO WAS SHE STAYING WITH YOU?

11  A.    YES, SIR.

12  Q.    SO SHE WAS THERE?

13  A.    YES, SIR.

14  Q.    ALL RIGHT.  WHO ARRIVED FIRST OF THESE PEOPLE THAT

15  YOU DESCRIBED?

16  A.    FIRST IT WOULD BE TRISTAN ALLYN BREWER AND HIS, HIS

17  FRIEND.

18  Q.    JOHN?

19  A.    JOHN MCGUIRE.

20  Q.    JOHN MCGUIRE.

21  A.    I THINK HIS NAME --

22  Q.    JOHN SOMETHING.

23  A.    JOHN SOMETHING, I'M NOT SURE ABOUT --

24  Q.    ABOUT WHEN DID THEY ARRIVE?

25  A.    EARLIER THAT AFTERNOON.

1  Q.    SO AS OF THE AFTERNOON, IT'S YOU, GINGER HOLTSCLAW,

2  TRISTAN BREWER AND JOHN SOMEBODY; RIGHT?

3  A.    YES.

4  Q.    ALL RIGHT.  WHO ARRIVED SECOND?

5  A.    SECOND WOULD BE -- WELL, THEY LEFT.  IT WOULD BE

6  JAMES SCOTT WHITE AND LINDSEY RENEE PHIPPS.

7  Q.    AND ABOUT WHEN DID THEY ARRIVE?

8  A.    LATER THAT NIGHT, ABOUT 11:00.

9  Q.    SO SHORTLY BEFORE MIDNIGHT, IT WAS ON OCTOBER

10 27TH?

11 A.    YES, SIR.

12 Q.    AND WHEN DID RICHIE AND HIS GIRLFRIEND ARRIVE?

13 A.    IN THE -- ABOUT, A LITTLE LATER THAN THAT PROBABLY.

14 Q.    ALL RIGHT.  FROM THE TIME TRISTAN BREWER AND JOHN

15 WHATEVER HIS NAME IS ARRIVED IN THE MORNING UNTIL RICHIE

16 AND HIS GIRLFRIEND ARRIVED EARLY IN THE MORNING OF OCTOBER

17 28TH AROUND MIDNIGHT OR WHENEVER IT WAS, WERE YOU UNDER

18 THE INFLUENCE OF DRUGS?

19 A.    BEFORE THEY ARRIVED?

20 Q.    DURING THIS PERIOD OF TIME BETWEEN THE ARRIVAL OF

21 TRISTAN BREWER AND JOHN IN THE MORNING AND LATE IN THE DAY

22 ON THE 27TH OR PERHAPS EARLY ON THE 28TH, WERE YOU UNDER

23 THE INFLUENCE OF DRUGS?

24 A.    NO; NO, SIR.

25 Q.    NOW, I WANT TO ASK YOU ABOUT WHAT OCCURRED AT YOUR

1   HOUSE ON OCTOBER 27TH AND 28TH, AND I WANT TO TALK ABOUT

2   THE TIME PERIOD FROM THE TIME YOU WAKE UP IN THE MORNING

3   TO THE ARRIVAL OF THE FIRST PERSON.  YOU'VE TESTIFIED THAT

4   GINGER HOLTSCLAW WAS STAYING WITH YOU; IS THAT CORRECT?

5   A.    YES, SIR.

6   Q.    AND WHAT WERE YOU DOING DURING THIS PERIOD OF TIME

7   FROM THE TIME YOU WAKE UP UNTIL THE TIME THE FIRST PERSON

8   GETS THERE?

9   A.    JUST CHITCHATTING.

10  Q.    CASUAL CONVERSATION?

11  A.    CASUAL CONVERSATION, YES, SIR.

12  Q.    DID YOU SEE ANY METHAMPHETAMINE BEING MANUFACTURED

13  DURING THIS TIME?

14  A.    NO, SIR.

15  Q.    WERE YOU INVOLVED IN ANY WAY WHATSOEVER IN THE

16  MANUFACTURE OF METHAMPHETAMINE DURING THIS PERIOD OF

17  TIME?

18  A.    NO, SIR.

19  Q.    YOU'VE TESTIFIED THAT TRISTAN BREWER AND JOHN

20  WHATEVER HIS NAME IS ARRIVED SOMETIME IN THE AFTERNOON,

21  OCTOBER 27TH.  NOW I WANT TO TALK ABOUT THE TIME PERIOD

22  FROM THE TIME THOSE PEOPLE ARRIVED, TRISTAN BREWER AND

23  JOHN SOMEBODY, TO THE ARRIVAL OF THE NEXT PEOPLE.

24  A.    YES, SIR.

25  Q.    NOW, WHAT WERE YOU DOING DURING THIS PERIOD OF

TIME?

A.    USING DRUGS WHEN, WHEN THEY -- OH, WELL, I WASN'T
USING DRUGS UNTIL JAMES SCOTT WHITE AND LINDSEY PHIPPS
CAME OVER.

Q.    BUT YOU WERE UNDER THE INFLUENCE OF DRUGS DURING
THIS PERIOD?

A.    YES, SIR.

Q.    NOW, DID YOU SEE ANY METHAMPHETAMINE BEING
MANUFACTURED DURING THIS PERIOD OF TIME?

A.    NO, SIR.

Q.    WERE YOU INVOLVED IN ANY WAY WHATSOEVER IN THE
MANUFACTURE OF METHAMPHETAMINE DURING THIS PERIOD OF
TIME?

A.    NO, SIR.

Q.    ALL RIGHT, SO YOU'VE TESTIFIED THAT LINDSEY PHIPPS
AND JAMES WHITE ARRIVED AROUND MIDNIGHT ON THE 27TH,
SOMEWHERE AROUND THERE?

A.    THAT'S RIGHT.

Q.    I WANT TO ASK YOU ABOUT THE TIME PERIOD FROM THE
ARRIVAL OF LINDSEY PHIPPS AND JAMES WHITE AROUND MIDNIGHT
TO THE ARRIVAL OF THE NEXT PERSON, I THINK YOU SAID THAT
WAS RICHIE?

A.    YES, SIR.

Q.    AND WHAT WERE YOU DOING DURING THIS PERIOD OF
TIME?

1   A.    USING METHAMPHETAMINE.

2   Q.    YOU WERE USING METHAMPHETAMINE.  AND DID YOU SEE ANY

3   METHAMPHETAMINE BEING MANUFACTURED DURING THIS PERIOD OF

4   TIME?

5   A.    NO, SIR.

6   Q.    WERE YOU INVOLVED IN ANY WAY WHATSOEVER IN THE

7   MANUFACTURE OF METHAMPHETAMINE DURING THIS TIME?

8   A.    NO, SIR.

9   Q.    NOW, YOU'VE TESTIFIED THAT SOMEBODY NAMED RICHIE AND

10  I THINK HIS GIRLFRIEND ARRIVED REAL EARLY IN THE MORNING

11  HOURS OCTOBER 28TH; IS THAT RIGHT?

12  A.    YES, SIR.

13  Q.    NOW, WERE YOU UNDER THE INFLUENCE OF DRUGS FROM THE

14  TIME LINDSEY PHIPPS AND JAMES WHITE ARRIVED AROUND

15  MIDNIGHT UNTIL RICHIE AND HIS GIRLFRIEND ARRIVED IN THE

16  EARLY HOURS OF THE 28TH?

17  A.    YES, I WAS.

18  Q.    I WANT TO ASK YOU ABOUT A PERIOD OF TIME FROM WHEN

19  RICHIE AND HIS GIRLFRIEND ARRIVED UNTIL YOU WERE TAKEN

20  INTO CUSTODY, WHICH THE RECORD SHOWS WAS ABOUT 11:00 ON

21  OCTOBER 28TH.  NOW, DURING THIS PERIOD OF TIME, TELL US,

22  PLEASE, WHAT WAS OCCURRING AT YOUR HOUSE?

23  A.    EVERYBODY USING DRUGS.

24  Q.    AND THAT INCLUDES YOU, EVERYBODY?

25  A.    YEAH.  OH, DEFINITELY, YES, SIR.

1  Q.   SO YOU WERE CLEARLY UNDER THE INFLUENCE OF DRUGS

2  DURING THIS PERIOD OF TIME?

3  A.   YES, SIR.

4  Q.   NOW, TELL US PLEASE WHETHER OR NOT DURING THIS

5  PERIOD OF TIME YOU SAW ANYONE IN POSSESSION OF ANY

6  APPARATUS THAT YOU UNDERSTOOD COULD BE USED TO MAKE

7  METHAMPHETAMINE?

8  A.   NOT IN THAT TIME, NO, SIR.

9  Q.   WELL, NOW, THIS IS THE WHOLE DAY.

10  A.   OH, WELL --

11  Q.   THE PERIOD OF TIME WE'RE TALKING ABOUT IS THE VERY

12  EARLY HOURS OF OCTOBER 28TH, WHEN RICHIE AND HIS

13  GIRLFRIEND GOT THERE, TO THE TIME YOU WERE TAKEN INTO

14  CUSTODY, WHICH WAS VERY LATE.

15  A.   YES, SIR, I SAW --

16  Q.   SO YOU DID SEE?

17  A.   YES, SIR.

18  Q.   TELL US, PLEASE, WHAT, WHAT APPARATUS YOU SAW THAT

19  YOU THOUGHT COULD BE USED TO MAKE METHAMPHETAMINE.

20  A.   LIKE SODA BOTTLES, I GUESS, WITH A BUNCH OF STUFF IN

21  THEM, A BUNCH OF CHEMICALS.

22  Q.   WHO DID YOU SEE IN THE POSSESSION OF THE APPARATUS

23  THAT YOU UNDERSTOOD COULD BE USED TO MANUFACTURE

24  METHAMPHETAMINE?

25  A.   IT WAS IN JAMES WHITE'S STUFF, HIS BOOK BAG.  IT

1   WASN'T GOING OR ANYTHING, IT WAS JUST IN THERE.

2   Q.    WAS ANYBODY IN POSSESSION OF IT?

3   A.    YES, SIR.  I GUESS IT WOULD BE JAMES WHITE, YEAH.

4   Q.    SO TELL US, PLEASE, WHAT JAMES WHITE HAD.

5   A.    I GUESS HE HAD CHEMICALS TO MANUFACTURE

6   METHAMPHETAMINE.

7   Q.    WELL, I MEAN, DID YOU SEE CHEMICALS TO MANUFACTURE

8   METHAMPHETAMINE?

9   A.    YEAH; YES, SIR, I DID.

10  Q.    AND WHEN DID YOU FIRST SEE JAMES WHITE WITH THIS

11  APPARATUS?  I MEAN, WAS IT, WAS IT NOON, AFTERNOON, LATE

12  AT NIGHT, OR DO YOU REMEMBER?

13  A.    IT WAS PROBABLY THAT, THAT NOON AFTER HE HAD COME

14  OVER ON OCTOBER 28TH --

15  Q.    NOW --

16  A.    -- AFTERNOON.

17  Q.    TELL US, PLEASE, WHETHER OR NOT JAMES WHITE SAID

18  ANYTHING THAT PERTAINED TO MATERIALS TO MANUFACTURE

19  METHAMPHETAMINE?

20  A.    NOT REALLY, SIR, NO.

21  Q.    DID HE SAY ANYTHING PERTAINING -- TELL US, PLEASE,

22  WHETHER OR NOT HE SAID ANYTHING PERTAINING TO A RAW

23  MATERIAL TO MANUFACTURE METHAMPHETAMINE?

24  A.    NO, SIR.

25  Q.    DID HE SAY ANYTHING ABOUT PSEUDOEPHEDRINE?

1  A.    NO, SIR.  WELL, I TAKE THAT BACK, HE DID.  HE WAS

2  TRYING TO GET SUDAFED FROM TRISTAN ALLYN BREWER AND GINGER

3  HOLTSCLAW.

4  Q.    ALL RIGHT.  TELL US, PLEASE, WHAT, IF ANYTHING,

5  OCCURRED PERTAINING TO OBTAINING PSEUDOEPHEDRINE SO JAMES

6  WHITE COULD MANUFACTURE METHAMPHETAMINE?

7  A.    COULD YOU PLEASE REPEAT IT AGAIN, WHAT DID YOU SAY?

8  Q.    TELL US, PLEASE, WHAT, IF ANYTHING, OCCURRED WITH

9  REGARD TO JAMES WHITE GETTING PSEUDOEPHEDRINE TO

10  MANUFACTURE METHAMPHETAMINE?

11  A.    HE JUST ASKED FOR SUDAFED FROM GINGER HOLTSCLAW AND

12  TRISTAN ALLYN BREWER.

13  Q.    SO DID HE ASK SOMEBODY TO GO GET IT FOR HIM?

14  A.    YES, SIR.

15  Q.    DID YOU GO WITH THEM?

16  A.    YES, SIR, I DID.  I DIDN'T GET IT, I JUST WENT WITH

17  THEM.

18  Q.    RIGHT, I UNDERSTAND.  I'M JUST ASKING WHETHER YOU

19  WENT WITH SOMEBODY TO GET SUDAFED --

20  A.    YES, SIR.

21  Q.    -- FOR JAMES WHITE?  AND HOW DID YOU TRAVEL?

22  A.    IN A CAR, IN JOHN'S CAR.

23  Q.    WHO OWNED THE CAR?

24  A.    JOHN.

25  Q.    JOHN SOMEBODY?

1    A.    YES, SIR.

2    Q.    AND DID YOU DRIVE THE CAR?

3    A.    I DID NOT, SIR.

4    Q.    WHO DROVE THE CAR?

5    A.    JOHN.

6    Q.    DID YOU GIVE ANY INSTRUCTIONS TO THE DRIVER AS TO

7    WHERE TO GO OR WHAT TO DO OR ANYTHING LIKE THAT?

8    A.    NO, SIR; NO, SIR.

9    Q.    IS IT CORRECT THAT YOU WERE NOT INVOLVED IN ANY WAY

10   WITH THE VEHICLE OR ITS OPERATION?

11   A.    THAT'S CORRECT.

12   Q.    BUT YOU WERE A PASSENGER IN THE CAR?

13   A.    THAT'S RIGHT.

14   Q.    TELL US, PLEASE, WHAT HAPPENED DURING THE TRIP IN

15   THE CAR?

16   A.    WE WENT TO, I THINK IT WAS, A CVS, AND A CVS AND

17   ANOTHER DRUGSTORE, WALGREENS, AND WENT BACK TO MY HOUSE.

18   Q.    DID SOMEBODY, WHEN YOU WERE AT THESE LOCATIONS, DID

19   SOMEBODY FROM THE CAR GO INTO THESE FACILITIES?

20   A.    YES, SIR.

21   Q.    AND DID THEY COME BACK TO THE CAR?

22   A.    YES, SIR.  IT WAS TRISTAN ALLYN BREWER AND GINGER

23   HOLTSCLAW.

24   Q.    NOW, DID YOU EVER GET OUT OF THE CAR AT ANY TIME

25   FROM THE TIME YOU LEFT YOUR HOUSE UNTIL THE TIME YOU

1  RETURNED?

2  A.    NO, SIR.

3  Q.    SO YOU DIDN'T GO INTO ANY -- YOU DIDN'T GET OUT OF

4  THE CAR AT ALL?

5  A.    NO, SIR.

6  Q.    NOW, TELL US, PLEASE, WHAT OCCURRED AFTER YOU

7  RETURNED TO YOUR HOUSE?

8  A.    WELL, I RETURNED TO MY HOUSE, AND THERE WAS MORE

9  METHAMPHETAMINE, SO -- AND IT -- THERE WAS A KIND OF WEIRD

10  ODOR TO IT.

11  Q.    WHAT -- TELL US, PLEASE, ANYTHING UNUSUAL THAT

12  OCCURRED WHEN YOU GOT BACK TO YOUR HOUSE?

13  A.    JUST THE ODOR.

14  Q.    SO THERE WAS SOMETHING, SOME FUNNY ODOR?

15  A.    YES, SIR.

16  Q.    ALL RIGHT.  TELL US, PLEASE, WHETHER OR NOT YOU SAW

17  ANYTHING THAT YOU UNDERSTOOD TO BE METHAMPHETAMINE WHEN

18  YOU GOT BACK TO THE HOUSE?

19  A.    YES.  METHAMPHETAMINE WAS THERE.

20  Q.    TELL US, PLEASE, WHETHER OR NOT YOU SAW ANY

21  APPARATUS WHICH YOU UNDERSTOOD COULD HAVE BEEN USED TO

22  MANUFACTURE METHAMPHETAMINE?

23  A.    YES, SIR.  THERE WAS THE BOTTLES I SPOKE OF.

24  Q.    TELL US, PLEASE, WHO YOU SAW IN POSSESSION OF THIS

25  APPARATUS?

1  A.    JAMES WHITE.

2  Q.    AND TELL US, PLEASE, WHETHER OR NOT YOU EVER AT ANY

3  TIME DURING THIS PERIOD ACTUALLY SAW ANY METHAMPHETAMINE

4  BEING MANUFACTURED?

5  A.    NO, SIR.

6  Q.    TELL US, PLEASE, WHETHER OR NOT YOU WERE INVOLVED IN

7  ANY WAY WHATSOEVER WITH THE MANUFACTURE OF

8  METHAMPHETAMINE?

9  A.    OTHER THAN USING THE METHAMPHETAMINE, NO, SIR.

10 Q.    YOU'VE TESTIFIED THAT YOU USED IT, BUT MY QUESTION

11 IS REFINED TO THE MANUFACTURE OF METHAMPHETAMINE.

12 A.    NO, SIR.

13 Q.    THE QUESTION IS WHETHER YOU WERE INVOLVED IN ANY WAY

14 WITH THE MANUFACTURE OF METHAMPHETAMINE?

15 A.    NO, SIR.

16 Q.    I WANT TO ASK YOU SOME FURTHER QUESTIONS PERTAINING

17 TO THE MANUFACTURE OF METHAMPHETAMINE.  SO IT'S MY

18 UNDERSTANDING THAT YOU NEVER ACTUALLY SAW ANY

19 METHAMPHETAMINE BEING MANUFACTURED?

20 A.    THAT'S CORRECT.

21 Q.    BUT IT WAS YOUR UNDERSTANDING THAT THE APPARATUS

22 THAT JAMES WHITE HAD IN HIS POSSESSION COULD BE USED TO

23 MANUFACTURE METHAMPHETAMINE?

24 A.    YES, SIR.

25 Q.    NOW, DID YOU SUPPLY ANY INGREDIENTS WHICH COULD BE

1    USED TO MANUFACTURE METHAMPHETAMINE?

2    A.    NO, SIR.

3    Q.    DID YOU SUPPLY ANY APPARATUS WHICH COULD BE

4    REASONABLY USED TO MANUFACTURE METHAMPHETAMINE?

5    A.    NO, SIR.

6    Q.    DID YOU PURCHASE ANY PSEUDOEPHEDRINE?

7    A.    NO, SIR, I DID NOT.

8    Q.    HAVE YOU EVER IN YOUR LIFE BEEN INVOLVED IN THE

9    MANUFACTURE OF METHAMPHETAMINE?

10    A.    NEVER.

11    Q.    DO YOU KNOW HOW TO MAKE METHAMPHETAMINE?

12    A.    NO, SIR, I DON'T.

13    Q.    IF SOMEBODY GAVE YOU A WHOLE BUNCH OF MONEY RIGHT

14    NOW, WOULD YOU HAVE ANY IDEA HOW TO MAKE

15    METHAMPHETAMINE?

16    A.    NO, SIR, I DON'T.

17    Q.    HAVE YOU EVER DISTRIBUTED METHAMPHETAMINE TO ANYONE

18    IN YOUR ENTIRE LIFE?

19    A.    NO, SIR.

20    Q.    BUT YOU HAVE HAD POSSESSION OF IT?

21    A.    YES, SIR.

22    Q.    AND YOU HAVE USED IT?

23    A.    YES, SIR, A FEW TIMES.

24    Q.    NOW, I'M GOING TO ASK YOU, YOU'VE TESTIFIED ABOUT

25    THE MANUFACTURE OF METHAMPHETAMINE, I WANT TO ASK YOU SOME

1    QUESTIONS ABOUT THE CONTROL OF THE MANUFACTURING PROCESS.

2    MY QUESTION IS DID YOU EXERCISE ANY CONTROL OVER WHO WAS

3    INVOLVED IN MANUFACTURING METHAMPHETAMINE?  IN OTHER

4    WORDS, DID YOU ISSUE ANY INSTRUCTIONS AS TO YOU CAN DO IT

5    OR YOU CAN'T DO IT OR ANYTHING LIKE?

6    A.    NO, SIR.

7    Q.    DID YOU EXERCISE ANY CONTROL OVER THE KIND OF

8    PROCESS THAT WAS GOING TO BE USED?  IN OTHER WORDS, DID

9    YOU SAY, WELL, WE'RE GOING TO USE THIS PROCESS OR NOT?

10   A.    NO, SIR.

11   Q.    DID YOU EXERCISE ANY CONTROL OVER THE MANUFACTURE,

12   ONCE THE MANUFACTURE HAD BEGUN?  IN OTHER WORDS, DID YOU

13   SAY, WELL, LET'S TURN THIS OVER, LET'S TURN THE HEAT UP?

14   A.    NO, SIR, I DID NOT.

15   Q.    DID YOU EXERCISE ANY CONTROL OVER THE LOCATION OF

16   YOUR HOUSE WHERE METHAMPHETAMINE WAS MANUFACTURED?  IN

17   OTHER WORDS, DID YOU ISSUE ANY INSTRUCTIONS --

18   A.    NO, SIR.

19   Q.    -- YOU CAN MAKE METH HERE BUT YOU CAN'T HERE?

20   A.    NO, SIR.

21   Q.    IS IT CORRECT THAT YOU NEVER EXPLICITLY ALLOWED

22   ANYONE TO MANUFACTURE METHAMPHETAMINE?  IN OTHER WORDS, IS

23   IT CORRECT YOU NEVER SAID, IT'S OKAY TO MAKE

24   METHAMPHETAMINE, OR, YEAH, IT WOULD BE OKAY?

25   A.    NO, SIR.  I DIDN'T SAY IT WAS OKAY.

1   Q.   IS IT FAIR TO SAY THAT THESE PEOPLE JUST DID IT?

2   A.   YES, SIR, IF THEY, IF THEY MANUFACTURED.

3   Q.   WELL, YOU ALLOWED THE APPARATUS TO BE IN YOUR HOUSE,

4   AND YOU KNEW THEY WERE MAKING METHAMPHETAMINE?

5   A.   DID I -- NO, SIR.

6   Q.   WELL, YOU KNEW THAT METHAMPHETAMINE HAD BEEN

7   MANUFACTURED IN YOUR HOUSE.  YOU SAW THE APPARATUS.

8   A.   I SAW --

9   Q.   YOU NEVER ACTUALLY SAW IT, BUT YOU --

10  A.   I NEVER SAW IT DONE.  I KNEW THEY HAD THE STUFF TO

11  DO IT WITH.

12  Q.   ALL RIGHT.  I WANT TO ASK YOU ABOUT ANY AGREEMENT OR

13  COMMON OBJECTIVE THAT WAS INVOLVED HERE.  WAS THERE ANY

14  SORT OF COMMON OBJECTIVE WITH ANYONE TO MANUFACTURE

15  METHAMPHETAMINE?

16  A.   NO, SIR.

17  Q.   WAS THERE ANY AGREEMENT OR UNDERSTANDING WITH REGARD

18  TO THE MANUFACTURE OF METHAMPHETAMINE?

19  A.   NO, SIR.

20  Q.   WAS THERE ANY JOINTLY UNDERTAKEN ACTIVITY INVOLVING

21  THE MANUFACTURE OF METHAMPHETAMINE?

22  A.   NO, SIR.

23       MR. MARTIN:  YOUR HONOR, DOES THE COURT HAVE

24  QUESTIONS OF THIS WITNESS PRIOR TO CROSS EXAMINATION?

25       THE COURT:  NOT PRIOR TO CROSS EXAMINATION, NO.

1    Q.    MR. LANDERS, PLEASE ANSWER ANY QUESTIONS MRS. SMITH

2    WISHES TO ASK.

3              MS. SMITH:  THANK YOU, CHARLES.

4    A.    THANK YOU.

5                     CROSS EXAMINATION

6                     BY MS. SMITH:

7    Q.    MR. LANDERS, I COUNTED TEN PEOPLE YOU SAID WERE AT

8    YOUR HOME.  I'M GOING TO GO THROUGH THEM AGAIN WITH YOU

9    JUST TO REMIND YOU.  THAT WOULD BE LINDSEY PHIPPS, JAMES

10   WHITE, TRISTAN BREWER, JOHN SOMETHING, YOU SAID JOHN

11   MCGUIRE, BUT WOULD IT BE MAYBE JOHN HENRY JACKSON?

12   A.    YES.

13   Q.    SO WE DON'T WANT TO GET MR. MCGUIRE IN ANY DEEPER

14   TROUBLE THAN HE MAY ALREADY BE IN.

15   A.    RIGHT, YES, MA'AM.

16   Q.    OKAY, GOOD.  GINGER HOLTSCLAW, WHO LIVED WITH YOU,

17   DUSTIN CASH, YOURSELF, SOMEBODY NAMED RICHIE --

18   A.    YES, MA'AM.

19   Q.    -- AND RICHIE'S GIRLFRIEND.  I GUESS THAT'S NINE

20   BECAUSE I COUNTED YOU TWICE.

21   A.    YES, MA'AM.

22   Q.    SO IT'S NOT REALLY SIX {SIC}, IT'S NINE PEOPLE WERE

23   THERE; RIGHT?

24   A.    YES, MA'AM.

25   Q.    WAS THAT PRETTY COMMON FOR YOU TO HAVE NINE PEOPLE

1   RUNNING AROUND YOUR HOUSE ALL STONED ON METH?

2   A.    NOT ON METH, NO, MA'AM.

3   Q.    BUT THEY WERE STONED ON OTHER DRUGS; WEREN'T THEY?

4   A.    I HAD FRIENDS OVER, YES, SIR.

5   Q.    OKAY, AND WHAT YOU DESCRIBED AS KNOWING PEOPLE

6   SOCIALLY, ALL OF THOSE PEOPLE THAT YOU DESCRIBED KNOWING

7   OR MEETING SOCIALLY --

8   A.    YES, SIR.

9   Q.    -- SOCIAL TO YOU MEANS USING ILLEGAL DRUGS; IS THAT

10  CORRECT?

11  A.    YES, MA'AM.

12  Q.    OKAY, SO, FOR EXAMPLE, WHEN YOU SAID YOU MET TRISTAN

13  BREWER VIA ANOTHER FRIEND A WEEK OR SO BEFORE, THAT MEANS

14  YOU MET TRISTAN AT ANOTHER FRIEND'S HOME WHERE ILLEGAL

15  DRUGS WERE BEING USED; IS THAT CORRECT?

16  A.    YES, MA'AM, THAT IS.

17  Q.    OKAY.  THE SAME FOR LINDSEY PHIPPS?

18  A.    YES, MA'AM.

19  Q.    AND THE SAME FOR JAMES WHITE?

20  A.    YES, MA'AM.

21  Q.    AND YOU TOLD THE PROBATION OFFICER WHEN HE OR SHE

22  PREPARED YOUR PSR THAT GINGER, YOUR GIRLFRIEND WHO LIVED

23  WITH YOU, INTRODUCED YOU TO THE USE OF METH; DIDN'T SHE?

24  A.    YES, MA'AM.

25  Q.    AND HOW LONG HAD SHE DONE THAT PRIOR TO THIS DAY?

1  A.    HOW LONG HAD SHE DONE IT?

2  Q.    NO, HOW LONG HAD YOU BEEN INTRODUCED TO METH.

3  A.    TWO WEEKS, A WEEK.

4  Q.    TWO WEEKS.  AND HOW LONG HAD SHE LIVED WITH YOU?

5  A.    TWO WEEK -- A WEEK AND A HALF.

6  Q.    AND HOW MANY TIMES A DAY DID YOU USE METH IN THAT

7  TWO WEEK PERIOD OF TIME?

8  A.    I ONLY USED IT THE FIRST TIME I MET HER AND THEN I

9  DIDN'T USE IT AGAIN UNTIL THE TIME OF MY ARREST.

10 Q.    OKAY.  I'M GOING TO GIVE YOU A SECOND CHANCE AT THAT

11 ANSWER, MR. LANDERS, BECAUSE THE JUDGE AND I, MR. MARTIN,

12 WE ALL KNOW THAT METH IS THE MOST HIGHLY ADDICTIVE

13 SUBSTANCE THAT EXISTS RIGHT NOW, OKAY.  IT IS A VERY DEEP

14 ADDICTION.  SO YOUR TESTIMONY IS THAT YOU USED METH ONE

15 TIME TWO WEEKS BEFORE THIS DAY, AND THEN YOU DIDN'T USE IT

16 AGAIN UNTIL OCTOBER 28TH, 2011; IS THAT CORRECT?

17 A.    YES, MA'AM.  I DON'T LIKE THE DRUG.  I DON'T --

18 Q.    YOU DON'T LIKE THE DRUG?

19 A.    I MEAN, I LIKE OTHER DRUGS, I'M NOT GOING TO LIE;

20 BUT, YEAH, I DON'T LIKE METH.

21 Q.    AND WHERE DOES METH COME FROM, DO YOU KNOW?

22 A.    SUDAFED, I GUESS.

23 Q.    YEAH.  WELL, THE FIRST TIME YOU TRIED IT, HOW DID

24 YOU GET IT?

25 A.    I GOT IT FROM GINGER.

1  Q.    AND HOW DID SHE GET IT?

2  A.    FROM I'M THINKING JAMES WHITE OR LINDSEY.

3  Q.    JAMES WHITE OR LINDSEY, AND WHAT FORM WAS IT IN.

4  A.    IT WAS IN A POWDER.

5  Q.    IT WAS IN A POWDER.

6  A.    YES, MA'AM.

7  Q.    WELL, DID IT COME IN A PILL BOTTLE?

8  A.    NO, MA'AM.

9  Q.    PIECE OF FOIL, WHAT?  WHAT FORM WAS IT DELIVERED TO

10  YOU?

11  A.    A BAG, I GUESS.

12  Q.    A BAG.  WELL, NO, I'M NOT ASKING YOU TO GUESS, I'M

13  ASKING YOU -- YOU CAN'T REMEMBER --

14  A.    YES, MA'AM.

15  Q.    -- BECAUSE YOU'RE SO STONED; RIGHT?  IS THAT IT?

16  A.    YES, MA'AM, THAT'S TRUE.

17  Q.    AND DID IT -- DO YOU THINK THAT YOU BUY METH LIKE

18  YOU BUY PILLS AT CVS?

19  A.    NO, NOT -- I MEAN, DO I THINK YOU CAN BUY IT LIKE --

20  Q.    WELL, WHERE DO YOU THINK METH COMES FROM?

21  A.    I GUESS PEOPLE THAT MAKE IT.

22  Q.    RIGHT.

23  A.    YES, MA'AM.

24  Q.    RIGHT.  PEOPLE LIKE JAMES WHITE; RIGHT?

25  A.    YES, MA'AM.

1   Q.   AND YOU KNEW THAT FROM THE BEGINNING; DIDN'T YOU?

2   A.   YES, MA'AM, I DID.

3   Q.   OKAY, SO IF YOU -- HOW DID YOU INGEST THAT METH THE

4   FIRST TIME?

5   A.   I INJECTED IT, MA'AM.

6   Q.   YOU INJECTED IT?

7   A.   YES.

8   Q.   IN A HYPODERMIC NEEDLE INTO THE VEIN IN YOUR ARM?

9   A.   YES, MA'AM.

10  Q.   WHO DID THAT FOR YOU?

11  A.   I DID IT MYSELF.

12  Q.   SO YOU HAD DONE WHAT'S NOW CALLED MAIN LINING

13  BEFORE; HADN'T YOU?

14  A.   YES, MA'AM.

15  Q.   OF OTHER DRUGS?

16  A.   YES, MA'AM.

17  Q.   OKAY.  SO THIS WAS JUST ANOTHER DRUG THAT YOU NEVER

18  TRIED BEFORE THAT YOU DECIDED JUST TO PUT IMMEDIATELY INTO

19  YOUR VEINS?

20  A.   YES, MA'AM.

21  Q.   OKAY.  WHERE DID YOU GET THE HYPODERMIC NEEDLE?

22  A.   I GUESS THEY WERE THERE, I HAD IT.  I DON'T QUITE

23  REMEMBER, MA'AM.

24  Q.   OKAY.  YOU HAD HYPODERMIC NEEDLES AT YOUR HOME?

25  A.   YES, MA'AM.

1  Q.    TO USE FOR INGESTING ILLEGAL DRUGS?

2  A.    YES, MA'AM.

3  Q.    OKAY.  GREAT.  YOU THINK MAYBE THAT'S WHY THOSE

4  OTHER EIGHT PEOPLE SHOWED UP AT YOUR HOUSE THAT DAY?

5  A.    YES, MA'AM.

6  Q.    BECAUSE IT WAS A DRUG DEN; WASN'T IT?

7  A.    I MEAN, YES, MA'AM, WE WERE ALL --

8  Q.    IT'S WHERE YOU WENT TO TAKE DRUGS; RIGHT?

9  A.    NOT NECESSARILY, NO, MA'AM.

10  Q.    OKAY.  SO YOU INJECTED METH INTO YOUR VEINS THE

11  FIRST TIME YOU TRIED IT?

12  A.    YES, MA'AM.

13  Q.    YOU SKIPPED ALL THE PRELIMINARY STEPS AND WENT

14  STRAIGHT TO THE HYPODERMIC NEEDLE?

15  A.    YES, MA'AM.

16  Q.    OKAY.  YOU'RE KIND OF PROUD OF YOURSELF FOR THAT

17  TOO; AREN'T YOU, MR. LANDERS --

18  A.    NO.

19  Q.    -- I CAN TELL BY YOUR DEMEANOR?

20  A.    I'M VERY, VERY ASHAMED OF IT, AS A MATTER OF FACT.

21  Q.    ALL RIGHT, SO YOU DIDN'T TRY IT AGAIN FOR ANOTHER

22  TWO WEEKS?

23  A.    YES, MA'AM, THAT'S RIGHT.

24  Q.    DID GINGER CONTINUE TO INGEST METH?

25  A.    NO, SHE DID NOT.  I WOULDN'T -- I MEAN, SHE DIDN'T

1  DO IT AROUND ME.

2  Q.    SO WHAT CHANGED ON OCTOBER 27TH AND 28TH, WHY DID

3  YOU DECIDE TO TAKE METH TWO WEEKS LATER?

4  A.    IT WAS THERE TO DO IT.

5  Q.    AND HOW DID IT GET THERE?

6  A.    JAMES WHITE AND LINDSEY PHIPPS.

7  Q.    AND WHERE DO YOU THINK THEY GOT IT FROM?

8  A.    I'M TAKING IT THEY MADE IT.

9  Q.    THEY MADE IT.  AND WHEN YOU USE IT UP, WHAT DO YOU

10  HAVE TO DO IF YOU WANT SOME MORE?

11  A.    YOU HAVE TO MAKE MORE.

12  Q.    CORRECT.

13  A.    YES, MA'AM.

14  Q.    NOW, IF YOU -- YOU SAID YOU GOT IN A CAR, HOW MANY

15  PEOPLE AT THE MOMENT YOU GOT IN JOHN'S CAR AND WENT TO THE

16  PHARMACY -- I GUESS, FIRST OF ALL, WHY DID YOU GO IF YOU

17  WEREN'T GOING TO BUY SUDAFED?

18  A.    I JUST WENT WITH THEM, MA'AM.  I DON'T, I DON'T

19  KNOW.

20  Q.    AND HOW MANY PEOPLE WERE LEFT AT YOUR HOUSE WHEN YOU

21  LEFT?

22  A.    ONE.

23  Q.    ONE?

24  A.    YES, MA'AM.

25  Q.    AND WAS THAT PERSON USING METH WHEN YOU LEFT?

```
 1   A.    YES, MA'AM.

 2   Q.    OKAY, SO -- AND HAD THEY USED UP ALL THE METH WHEN

 3   YOU LEFT?  WAS IT ALL GONE BY THAT TIME?

 4   A.    I DON'T QUITE REMEMBER.  I DON'T, I DON'T --

 5   Q.    AND THE REASON YOU DON'T REMEMBER IS BECAUSE YOU

 6   WERE SO IMPAIRED; RIGHT?

 7   A.    THAT'S RIGHT; YES, MA'AM.

 8   Q.    OKAY.  ARE YOU AWARE THAT METH ACTUALLY DESTROYS AND

 9   REARRANGES BRAIN CELLS?

10   A.    I'M SURE IT DOES, MA'AM.

11   Q.    ALL RIGHT.  THANK YOU.  HOW DID YOU KNOW -- YOU

12   ANSWERED MR. MARTIN'S QUESTION WHEN HE ASKED YOU ABOUT THE

13   APPARATUS TO MAKE METH, HOW DO YOU KNOW THAT SODA BOTTLES

14   ARE USED TO MAKE METH?

15   A.    WATCHING TV.

16   Q.    WHICH TV ARE YOU TALKING ABOUT?

17   A.    TELEVISION, LIKE DRUG SHOWS AND STUFF WHERE THEY

18   BUST DRUG DEALERS AND --

19   Q.    AND YOU KNEW THAT BEFORE YOU STARTED TAKING METH?

20   A.    YES; YES, MA'AM.

21   Q.    THANK YOU.  WHEN YOU -- YOU SAID WHEN YOU RETURNED

22   TO YOUR HOUSE, YOU NOTICED A FUNNY ODOR?

23   A.    YES, MA'AM.

24   Q.    OKAY.  DID YOU AT ANY TIME ASK ANY OF THOSE PEOPLE

25   TO LEAVE YOUR HOME?
```

1  A.    I DID NOT, MA'AM, NO.

2  Q.    OKAY, AND YOU DIDN'T EVEN MAKE ANY ATTEMPT TO CALL

3  THE POLICE TO GET THOSE PEOPLE TO LEAVE; DID YOU?

4  A.    WELL, NO, MA'AM.

5  Q.    NO, MA'AM.  AND SO DID YOU INJECT METH AGAIN WHEN

6  YOU GOT BACK?

7  A.    YES, I DID.

8  Q.    SO YOU, YOU ACTUALLY TOOK METH TWICE THAT DAY,

9  RIGHT, INJECTED IT DIRECTLY INTO YOUR VEINS?

10  A.    YES, MA'AM, MAYBE MORE THAN THAT.

11  Q.    OKAY.  DO YOU HAVE ANY IDEA HOW MUCH METH YOU

12  INGESTED ON OCTOBER 28, 2011?

13  A.    NO, MA'AM.

14  Q.    OKAY, BUT IT WOULD BE FAIR TO SAY THAT PRETTY MUCH

15  ALL YOU DID THAT DAY WAS HAVE EIGHT OTHER PEOPLE COME OVER

16  TO YOUR HOUSE AND DO METH AND OTHER DRUGS; RIGHT?

17  A.    YES, MA'AM.

18  Q.    AND THAT PRETTY MUCH DESCRIBES YOUR EXISTENCE FOR

19  THAT TWO WEEK PERIOD OF TIME BEFORE AS WELL; RIGHT, YOU

20  WERE JUST ON DRUGS THE WHOLE TIME?

21  A.    FOR THE TWO WEEK PERIOD BEFORE?

22  Q.    YES.

23  A.    I WASN'T ON METH; BUT, YEAH, I GUESS YOU COULD SAY I

24  WAS ON DRUGS, YES, MA'AM.

25  Q.    OKAY.  WELL, I WILL SAY THAT, AND WHICH DRUGS WERE

1  YOU ON, IF YOU REMEMBER?

2  A.    PAIN KILLERS.

3  Q.    WERE THEY PRESCRIBED FOR YOU --

4  A.    NO, MA'AM.

5  Q.    -- OR WERE YOU ABUSING THEM TOO?

6  A.    YES, MA'AM.

7  Q.    ALL RIGHT.  HOW ABOUT HEROIN?

8  A.    NONE AT THAT TIME, NO, MA'AM.

9  Q.    HOW ABOUT COCAINE?

10  A.    NOT THAT I REMEMBER.

11  Q.    OKAY.  NOW, YOU -- THAT OCCURRED ON OCTOBER 28,

12  2011, AND THE POLICE CAME; RIGHT?

13  A.    YES, MA'AM.

14  Q.    AND THEY ARRESTED YOU?

15  A.    YES, MA'AM.

16  Q.    AND DID THEY HAVE TO DO SOMETHING TO YOUR HOME AS

17  REGARDS THE METH STUFF?

18  A.    YES, MA'AM.  THEY TOOK EVERYTHING I OWNED AND

19  QUARANTINED MY HOUSE.

20  Q.    AND THAT'S BECAUSE WHY, DO YOU KNOW?

21  A.    YEAH.  THEY SAID -- WELL, THEY TESTED THE WALLS AND

22  SAID METH WAS NOT COOKED AT MY HOUSE, BUT I GUESS IT WAS

23  BECAUSE THEY FOUND THE METH, THE METH LAB OR THE STUFF TO

24  MAKE IT IN THERE; YES, MA'AM.

25  Q.    BUT JUST A FEW MONTHS LATER, AUGUST 23RD OF 2012,

1  YOU WERE ARRESTED IN HENRICO COUNTY, VIRGINIA; WEREN'T

2  YOU?

3  A.    HENRICO, YES, MA'AM.

4  Q.    AND IT'S RIGHT THERE IN THE PSR?

5  A.    YES, MA'AM.

6  Q.    AND WHAT WERE YOU ARRESTED WITH?

7  A.    I WAS ARRESTED WITH A SPOON THAT HAD COCAINE AND

8  HEROIN IN IT.

9  Q.    COCAINE AND HEROIN --

10 A.    YES, MA'AM.

11 Q.    -- RIGHT?  SO THIS ARREST AT YOUR HOUSE WITH ALL THE

12 METH PEOPLE DIDN'T DETER YOU ONE BIT, DID IT, FROM THIS

13 DRUG LIFESTYLE?

14 A.    YES, MA'AM, IT DID, BUT --

15 Q.    HOW?

16 A.    I MEAN, I'M JUST -- I'M A DRUG ADDICT, YES, MA'AM,

17 THAT'S --

18 Q.    OKAY, AND WHEN MR. MARTIN ASKED YOU WHETHER YOU

19 DIRECTED OR HAD AN AGREEMENT WITH THESE OTHER PEOPLE,

20 WOULD IT BE FAIR TO DESCRIBE YOUR MENTAL STATE ON OCTOBER

21 28TH THAT YOU WERE SO STONED FROM MAIN LINING METH THAT

22 YOU DIDN'T EVEN KNOW WHICH END WAS UP; DID YOU?

23 A.    I WAS DEFINITELY IMPAIRED, YES, MA'AM.

24         MS. SMITH:  THANK YOU.

25         THANK YOU, YOUR HONOR.

1          THANK YOU, MR. MARTIN.

2          MR. MARTIN:  DOES THE COURT HAVE ANY QUESTIONS,

3     YOUR HONOR?

4          THE COURT:  DO YOU HAVE OTHER QUESTIONS?

5          MR. MARTIN:  NO, I HAVE NO REDIRECT, YOUR

6     HONOR.  DOES THE COURT HAVE QUESTIONS?

7          THE COURT:  I DO.

8                         EXAMINATION

9                       BY THE COURT:

10    Q.   MR. LANDERS, TELL ME THE CIRCUMSTANCES AGAIN THROUGH

11    WHICH YOU MET TRISTAN BREWER, LINDSEY PHIPPS AND

12    MR. WHITE.

13    A.   YES, SIR.  I MET THEM ABOUT TWO WEEKS PRIOR TO WHEN

14    I GOT ARRESTED.

15    Q.   I UNDERSTAND THAT.  HOW DID THAT COME ABOUT?

16    A.   A FRIEND -- HONESTLY A FRIEND TOLD ME, YOU SHOULD

17    TRY METH, IT'S REALLY GOOD; AND I MET GINGER HOLTSCLAW AND

18    THEN ME AND HER GOT ROMANTICALLY INVOLVED, SO SHE TOOK ME

19    TO HER HOUSE WHERE I MET JAMES WHITE AND LINDSEY PHIPPS.

20    Q.   ALL RIGHT.  A FRIEND TOLD YOU YOU SHOULD TRY METH?

21    A.   YES, SIR.

22    Q.   SO WERE TRISTAN BREWER AND THESE OTHER PEOPLE AT

23    MS. HOLTSCLAW'S HOUSE?

24    A.   TRISTAN BREWER WAS NOT, NO, BUT LINDSEY PHIPPS AND

25    JAMES WHITE WERE.

1   Q.   ALL RIGHT, AND DID YOU COME TO KNOW THEM AS SOMEBODY

2   WHO COULD SUPPLY METH?

3   A.   YES, SIR, I DID.  I JUST KNEW THEM FOR THAT TIME.

4   THEY WENT TO GEORGIA RIGHT, RIGHT AFTER THAT, AND THEN

5   GINGER GOT KICKED OUT AND MOVED IN WITH ME.

6   Q.   BUT FOR OUR PURPOSES HERE, WHEN YOU FIRST MET THEM

7   ON THAT OCCASION WHEN YOU WERE LOOKING FOR METH, DID YOU

8   IDENTIFY MS. PHIPPS AND MR. WHITE AS SOURCES OF

9   METHAMPHETAMINE?

10  A.   YES, SIR.

11  Q.   ALL RIGHT, AND DID YOU HAVE ANY SENSE ABOUT WHERE

12  THEY WERE GETTING THE METHAMPHETAMINE?

13  A.   NOT AT THAT TIME.

14  Q.   ALL RIGHT.  WHEN DID YOU BECOME AWARE OF THAT?

15  A.   AT MY HOUSE, PRETTY MUCH.

16  Q.   ON THE 27TH OR 28TH?

17  A.   YES, SIR.

18  Q.   CAN YOU BE ANY MORE SPECIFIC ABOUT THAT?

19  A.   WELL, WHEN, WHEN THEY ASKED FOR THE SUDAFED WAS

20  THE -- WHEN I KNEW, YOU KNOW.

21  Q.   AND WHEN YOU GOT IN THAT AUTOMOBILE, YOU KNEW THEY

22  WERE GOING TO GET SUDAFED; CORRECT?

23  A.   YES, SIR, I DID.

24  Q.   WHAT DID YOU THINK THEY WERE GOING TO DO WITH THAT

25  SUDAFED?

1  A.    I DIDN'T THINK THEY WERE GOING TO TRY TO MAKE IT AT
2  MY HOUSE, BUT I KNEW THEY DID HAVE PROBABLY THE STUFF TO
3  MAKE IT WITH.
4  Q.    BUT YOU KNEW THEY WANTED THE PSEUDOEPHEDRINE IN
5  ORDER TO MANUFACTURE METHAMPHETAMINE?
6  A.    YES, SIR.  I MEAN I -- THAT'S --
7  Q.    AND YOU KNEW THAT EVERYTHING ELSE THAT WAS NEEDED TO
8  MANUFACTURE IT WAS THERE PRESENT AT YOUR HOUSE BECAUSE YOU
9  HAD SEEN IT; CORRECT?
10 A.    I SAW IT AFTER THE FACT OF THE SUDAFED; BUT, YEAH,
11 YES, SIR.  AND I TOLD HIM TO TAKE IT OUT OF MY HOUSE TOO,
12 BUT, OBVIOUSLY, THAT DIDN'T WORK.
13 Q.    ALL RIGHT.  WHEN DID YOU TELL HIM TO TAKE IT OUT OF
14 YOUR HOUSE?
15 A.    RIGHT WHEN I SAW IT BECAUSE MY HOUSE, HONESTLY, WAS
16 A, LIKE SHE SAID, A LOT OF PEOPLE DO DRUGS THERE, AND THE
17 POLICE WERE, WOULD COME BY MY HOUSE QUITE FREQUENTLY, SO.
18 I DID TELL HIM, I TOLD HIM TO TAKE IT OUT OF MY HOUSE; AND
19 HE SAID HE DID, HONESTLY.
20 Q.    ALL RIGHT.  TELL ME WHEN THOSE CONVERSATIONS
21 OCCURRED.
22 A.    MIDDAY THAT DAY ON THE 28TH.
23 Q.    SO WHEN YOU FIRST SAW THESE MATERIALS IN THE BACK
24 PACK --
25 A.    YES, SIR.

1  Q.    -- YOU ASKED HIM TO REMOVE THEM FROM YOUR HOUSE?

2  A.    YES, SIR.

3  Q.    TO YOUR KNOWLEDGE DID HE EVER LEAVE YOUR HOUSE THAT

4  AFTERNOON?

5  A.    YES, SIR, HE DID; AND I THOUGHT THAT LEFT WITH HIM,

6  OBVIOUSLY IT DIDN'T.

7  Q.    NOW, YOU SAID MR. WHITE WAS TRYING TO GET

8  PSEUDOEPHEDRINE FROM TRISTAN BREWER AND GINGER HOLTSCLAW.

9  TELL ME SPECIFICALLY WHAT YOU REMEMBER ABOUT THAT.

10  A.    HE ASKED ME TO GET IT FOR HIM TOO, AND I TOLD HIM I

11  CAN'T.

12  Q.    WHY DID YOU TELL HIM YOU COULDN'T DO THAT?

13  A.    BECAUSE I DIDN'T -- I KNEW I COULD GET IN TROUBLE

14  FOR IT.  I KNEW I DIDN'T WANT, YOU KNOW, I DIDN'T WANT TO

15  DO THAT.  I DON'T REALLY EVEN MESS WITH THE DRUG, SO.

16  Q.    IS THAT BECAUSE YOU KNEW IT WAS GOING TO BE USED TO

17  MANUFACTURE METHAMPHETAMINE?

18  A.    YES, SIR.

19  Q.    AND MS. SMITH ASKED YOU WHY YOU TOOK THIS RIDE TO

20  THE PHARMACY.

21  A.    YES, SIR.

22  Q.    TELL ME AGAIN WHY YOU DID THAT?

23  A.    STUPIDITY, I GUESS.

24  Q.    BUT YOU KNEW THE PURPOSE OF THE TRIP WAS TO PICK UP

25  PSEUDOEPHEDRINE?

1   A.    YES, SIR.

2   Q.    WHICH WOULD BE USED TO MANUFACTURE

3   METHAMPHETAMINE?

4   A.    YES, SIR.

5   Q.    WHAT GAVE YOU THE IMPRESSION THAT IT WOULD NOT BE

6   MANUFACTURED AT YOUR HOUSE?

7   A.    BECAUSE I WOULDN'T ALLOW IT TO BE MANUFACTURED AT MY

8   HOUSE.

9   Q.    WHEN YOU GOT BACK FROM THE DRUG STORE, THERE WAS

10  MORE METH PRESENT; CORRECT?

11  A.    THERE WAS METH PRESENT, YES, SIR.

12  Q.    WHAT HAPPENED TO THAT PSEUDOEPHEDRINE THAT WAS

13  GOT -- PURCHASED AT THE CVS AND WALGREENS?

14  A.    IT GOT FOUND AT MY HOUSE, HE DIDN'T USE IT.

15  Q.    IT HAD NOT BEEN USED.

16  A.    YES, SIR.

17  Q.    NOW, WAS MR. WHITE LOOKING FOR PSEUDOEPHEDRINE

18  BECAUSE YOU HAD RUN OUT OF METHAMPHETAMINE?

19  A.    NO, SIR.  I THINK HE PROBABLY JUST HAD SOME PUT AWAY

20  BECAUSE HE NEVER USED THE SUDAFED AND THERE WAS MORE.

21  Q.    NOW, I'M A LITTLE BIT FUZZY ABOUT WHY ALL THESE

22  PEOPLE ASSEMBLED AT YOUR HOUSE ON THE 27TH.

23  A.    YES, SIR.

24  Q.    TELL ME WHAT YOU KNOW ABOUT THAT.

25  A.    HONESTLY, IT WAS JUST SUPPOSED TO BE FOUR OF US ALL

1   GETTING HIGH, AND THEN RICHIE AND HIS GIRLFRIEND AND
2   DUSTIN CASH AND THOSE PEOPLE JUST COME BY TO SEE ME,
3   HONESTLY, THEY -- THAT'S WHY THEY WEREN'T -- WELL, TRISTAN
4   ALLYN BREWER BOUGHT THE SUDAFED; BUT RICHIE AND HIS
5   GIRLFRIEND, DUSTIN CASH, THEY JUST COME BY TO SEE ME, THEY
6   HAD NOTHING TO DO WITH ANYTHING.
7   Q.    WHEN YOU SAY THE FOUR OF YOU WERE JUST THERE TO GET
8   HIGH, YOU'RE TALKING ABOUT YOURSELF, GINGER HOLTSCLAW,
9   TRISTAN BREWER AND HIS FRIEND JOHN?
10  A.    AND JAMES WHITE.  FIVE OF US, I'M SORRY.
11  Q.    NOW, HOW FAR WAS YOUR HOUSE AWAY FROM THE CVS AND
12  THE WALGREENS YOU WENT TO ON THAT EVENING?
13  A.    PROBABLY A FEW MILES, THREE, FOUR MILES, SOMETHING
14  LIKE THAT.
15  Q.    HOW LONG DID THE TRIP TAKE?
16  A.    NOT LONG.
17  Q.    GIVE ME AN IDEA.
18  A.    I'D SAY PROBABLY 20 MINUTES MAYBE, 30 MINUTES.
19  Q.    TELL ME ABOUT THE CONVERSATION AMONG ALL OF YOU IN
20  THE AUTOMOBILE ON THE WAY TO THE PHARMACY AND BACK.
21  A.    HONESTLY, I WAS -- I DIDN'T REALLY TALK, I WAS
22  JUST -- I WAS HIGH ON METHAMPHETAMINE, AND I WAS VERY
23  PARANOID BECAUSE I KNOW THE, I GUESS -- I WAS JUST, I
24  DIDN'T LIKE, I DIDN'T LIKE BEING IN THE CAR EVEN GOING
25  THERE BECAUSE I, YOU KNOW.

1  Q.    DOES THAT MEAN YOU DON'T REMEMBER THE

2  CONVERSATION?

3  A.    YEAH.  WE DIDN'T HAVE CONVERSATION, WE JUST DROVE.

4  Q.    THERE'S A DIFFERENCE.  YOU DIDN'T HAVE ANY OR YOU

5  DON'T REMEMBER?

6  A.    I DIDN'T REMEMBER IT, YES, SIR.  I'M SORRY.

7  Q.    NOW, THE PRESENTENCE REPORT INDICATES THAT WHEN THE

8  OFFICERS CAME TO YOUR HOUSE ON OCTOBER 28TH, THEY FOUND A

9  METHAMPHETAMINE LABORATORY.

10  A.    YES, SIR.

11  Q.    TELL ME WHAT YOUR UNDERSTANDING IS OF WHAT THEY

12  FOUND.

13  A.    I GUESS THE BOTTLES AND STUFF THAT I SAW WOULD BE

14  THAT.

15  Q.    DID YOU SEE WHAT THEY, THEY TOOK?

16  A.    I WAS -- IT WAS DARK.  I WAS IN THE POLICE CAR.  I

17  JUST SAW THEM CARRYING -- THEY WERE IN SUITS GOING IN MY

18  HOUSE AND TAKING STUFF OUT ON A BIG TARP.

19  Q.    SO YOU'RE ASSUMING IT WAS THE BOTTLES AND THE

20  APPARATUS YOU HAD SEEN EARLIER IN THAT BACK PACK?

21  A.    YES, SIR.

22           THE COURT:  ALL RIGHT.  DO EITHER OF YOU HAVE

23  ANY OTHER QUESTIONS?

24           MS. SMITH:  NO, YOUR HONOR.  THANK YOU.

25           MR. MARTIN:  NO REDIRECT, YOUR HONOR.

1    MR. LANDERS, YOU MAY STEP DOWN.

2    THE COURT:  ALL RIGHT, MR. LANDERS, YOU MAY

3  STEP DOWN.

4    ANY OTHER WITNESSES, MR. MARTIN?

5    MR. MARTIN:  NO, YOUR HONOR.

6    THE COURT:  ALL RIGHT.  SECTION 2D1.1(2) IS THE

7  GUIDELINES RANGE THAT APPLIES TO THE OFFENSE FOR WHICH

8  MR. LANDERS WAS CONVICTED.  SUBSECTION C OF THAT SECTION

9  OF THE GUIDELINES PROVIDES, HOWEVER, THAT IF THE OFFENSE

10  INVOLVED UNLAWFULLY MANUFACTURING A CONTROLLED SUBSTANCE

11  OR ATTEMPTING TO MANUFACTURE A CONTROLLED SUBSTANCE

12  UNLAWFULLY, THEN SECTION 2D1.1 SHOULD BE APPLIED; AND THAT

13  IS WHAT THE PROBATION OFFICER DID IN THIS CASE.

14    MR. MARTIN, TELL ME WHY YOU THINK THE CROSS

15  REFERENCE DIDN'T APPLY.

16    MR. MARTIN:  YOUR HONOR, AS AN INTRODUCTORY

17  MATTER, IN THE METHAMPHETAMINE CASE TYPICALLY BEFORE THE

18  CURRENT -- CERTAINLY SENTENCING UNDER 2D1.1 WOULD BE

19  CORRECT; BUT IN THIS CASE, YOUR HONOR, WE SAY THAT SECTION

20  2D1.1(2)(C) PROVIDES, OF COURSE, WITH A CROSS REFERENCE,

21  IF THE OFFENSE INVOLVED UNLAWFULLY MANUFACTURING A

22  CONTROLLED SUBSTANCE.  ON COMMENT 2 DEFINES THAT TERM,

23  OFFENSE INVOLVING UNLAWFULLY MANUFACTURING A CONTROLLED

24  SUBSTANCE; AND COMMENT 2 SAYS, IT MEANS THE DEFENDANT OR A

25  PERSON FOR WHOSE CONDUCT THE DEFENDANT IS ACCOUNTABLE

1    UNDER SECTION 1B1.3, RELEVANT CONDUCT, COMPLETED THE

2    ACTION SUFFICIENT TO CONSTITUTE THE OFFENSE OF UNLAWFULLY

3    MANUFACTURING A CONTROLLED SUBSTANCE.  AND WE CONTEND THE

4    TESTIMONY OF MR. LANDERS HAS ESTABLISHED HE DID NOT

5    COMPLETE THE ACTION SUFFICIENT TO CONSTITUTE THE OFFENSE

6    OF UNLAWFULLY MANUFACTURING A CONTROLLED SUBSTANCE.  AND

7    WE FURTHER CONTEND THAT THE TESTIMONY OF MR. LANDERS

8    ESTABLISHED A FACTUAL BASIS FOR THE COURT TO DETERMINE HE

9    WAS ACCOUNTABLE ONLY FOR HIS OWN CONDUCT, NOT ACCOUNTABLE

10   FOR THE CONDUCT OF OTHER PEOPLE.  AND IF MR. LANDERS DID

11   NOT COMPLETE THE ACTION SUFFICIENT TO CONSTITUTE THE

12   OFFENSE OF UNLAWFULLY MANUFACTURING A CONTROLLED SUBSTANCE

13   AND IS ACCOUNTABLE ONLY FOR HIS OWN ACTIONS, THEN HE

14   BELIEVES HE SHOULD BE SENTENCED UNDER SECTION 2D1.1(2).

15          AND IF THE COURT WISHES, I COULD CONTINUE WITH,

16   WITH ADDITIONAL DETAILS AS TO WHAT WE THINK THE SENTENCE

17   SHOULD BE.

18          THE COURT:  WELL, I HEARD ALL THAT, MR. MARTIN.

19   YOU ALMOST OVERWHELMED ME WITH IT; BUT THE SIMPLE FACT OF

20   THE MATTER IS IF IT'S RELEVANT CONDUCT, THEN THERE WAS --

21   THEN THE CROSS REFERENCE WAS PROPERLY APPLIED HERE;

22   CORRECT?

23          MR. MARTIN:  YES, YOUR HONOR.

24          THE COURT:  ALL RIGHT.  TELL ME WHY THE

25   MANUFACTURING OF METHAMPHETAMINE IS NOT RELEVANT CONDUCT

1   HERE, WHY THIS IS NOT JOINTLY UNDERTAKEN CRIMINAL

2   ACTIVITY.

3           MR. MARTIN:  WELL, YOUR HONOR, WE SAY THAT THE

4   CROSS REFERENCE DOES NOT APPLY FOR THE REASONS I --

5           THE COURT:  DON'T READ THAT TO ME AGAIN,

6   MR. MARTIN, PLEASE.  JUST TELL ME WHY YOU DON'T THINK THIS

7   WAS JOINTLY UNDERTAKEN CRIMINAL ACTIVITY.

8           MR. MARTIN:  WELL, YOUR HONOR, I REFER TO THE

9   ENTIRETY OF MR. LANDERS' TESTIMONY.  HE, HE WAS INVOLVED

10  TO A CERTAIN EXTENT, BUT I DON'T THINK MR. LANDERS' TESTI-

11  MONY ESTABLISHES IT WAS A JOINTLY UNDERTAKEN ACTIVITY.  HE

12  WAS THERE, AND THERE'S NO QUESTION ABOUT THAT; BUT WE

13  DON'T -- WE CONTEND THAT IT WAS NOT, THE TOTALITY OF HIS

14  TESTIMONY INDICATES IT WAS NOT A JOINTLY UNDERTAKEN

15  ACTIVITY.

16          THE COURT:  WELL, THEY WERE ALL TAKING METHAM-

17  PHETAMINE.  MR. WHITE NEEDED PSEUDOEPHEDRINE, ASKED

18  MR. LANDERS FOR PSEUDOEPHEDRINE.  MR. LANDERS APPARENTLY

19  WENT WITH TWO OTHER PEOPLE TO OBTAIN PSEUDOEPHEDRINE,

20  WHICH HE KNEW WOULD -- WAS USED TO MANUFACTURE METHAM-

21  PHETAMINE.  HE SIMPLY SAYS HE DIDN'T THINK IT WOULD BE

22  MANUFACTURED AT HIS HOME; BUT CLEARLY HE ANTICIPATED THAT

23  IT WOULD BE MANUFACTURED; DIDN'T HE?

24          MR. MARTIN:  YEAH, THAT'S CORRECT, YOUR HONOR.

25  AND HE KNEW, HE KNEW THERE WAS METH AT HIS HOME, AND HE,

1    HE -- THE PEOPLE JUST DID IT; AND HE KNEW THAT THEY WERE
2    DOING IT, YES, SIR.
3            THE COURT:  HE MAY HAVE BEEN IMPAIRED, BUT THE
4    MANUFACTURE OF METHAMPHETAMINE AT HIS HOME UNDER THOSE
5    CIRCUMSTANCES WAS CLEARLY FORESEEABLE; WAS IT NOT?
6            MR. MARTIN:  FROM THE TOTALITY OF THE
7    CIRCUMSTANCES, YES, I THINK IT WAS FORESEEABLE THAT METH
8    WOULD BE MANUFACTURED.
9            THE COURT:  ALL RIGHT.  ANYTHING ELSE ON THIS
10   ISSUE?
11           MR. MARTIN:  NO, YOUR HONOR, NOT ON THE CROSS
12   REFERENCE ISSUE.
13           THE COURT:  ALL RIGHT.  MS. SMITH, THE
14   GOVERNMENT'S POSITION, OF COURSE, IS THAT THE CROSS
15   REFERENCE APPLIES.
16           MS. SMITH:  CORRECT, YOUR HONOR.  THANK YOU.
17           THE COURT:  TELL ME WHY.
18           MS. SMITH:  WELL, I DON'T KNOW WHAT ELSE TO
19   SAY.  THIS YOUNG MAN HAS JUST ADMITTED THAT HE WAS HIGHLY
20   ADDICTED TO MULTIPLE, VERY DANGEROUS DRUGS AND THAT FOR
21   ABOUT TWO DAYS THAT'S ALL HE DID WAS -- I'M STILL BLOWN
22   AWAY BY THE FACT THAT HE ADMITS THE FIRST TIME HE TOOK
23   METH HE INJECTED IT DIRECTLY INTO HIS VEINS VIA HYPODERMIC
24   NEEDLE.  HE -- FOR SOMEONE TO THEN SAY HE DIDN'T KNOW
25   WHERE METH CAME FROM OR THAT HE WAS SURPRISED THAT THESE

1  NINE PEOPLE AT HIS HOUSE, WHOM HE ALL MET SOCIALLY, WHICH

2  MEANS VIA ILLEGAL DRUGS, WOULD BE USING OR MANUFACTURING

3  METH, AND HE'S FULLY SUPRISED AND HE HAS NO CULPABILITY

4  FOR THAT, I JUST FIND IT VERY HARD TO BELIEVE.  I THINK

5  THE COURT DOES TOO.  HE KNEW WHY THOSE PEOPLE WERE THERE.

6  HE CERTAINLY KNEW WHY JAMES WHITE WAS THERE AND LINDSEY

7  PHIPPS, AND JAMES WHITE WAS A COOK, AND HE WANTS TO --

8  THAT'S WHY HE INVITED THE MAN TO HIS HOUSE BECAUSE HE

9  BROUGHT METH.  HE AND LINDSEY PHIPPS BY HIS OWN ADMISSION

10  BROUGHT METH IN WHAT HE THINKS IS A PAPER BAG; AND WHEN

11  THEY RAN OUT BECAUSE THEY WERE ALL TAKING IT, IT HAD TO

12  COME FROM SOMEWHERE, AND THAT'S WHY HE GOT IN THE CAR WITH

13  THEM TO GO TO THE DRUG STORE.  EVEN THOUGH HE WAS SMART

14  ENOUGH TO FIGURE OUT THAT HE DIDN'T NEED TO BUY THE

15  SUDAFED, HE CERTAINLY WENT ON THE TRIP.  KIND OF REMINDS

16  ME OF WHEN YOU'RE AT THE LAKE AND YOU RUN OUT OF BEER AND

17  SOMEBODY IS SENT TO THE STORE BECAUSE THEY'RE NOT DRUNK

18  YET.  WELL, HE WAS IN THE BACK SEAT.  HE WASN'T BEHIND THE

19  WHEEL OF THE CAR, BUT HE CLEARLY KNEW THE PURPOSE OF THE

20  TRIP WAS TO BUY BEER TO DRINK AT THE LAKE; AND FOR HIM TO

21  SAY THAT HE DIDN'T KNOW WHAT WAS GOING ON OR THAT PEOPLE

22  WERE GOING TO COOK METH AT HIS HOME, ET CETERA, BOGGLES

23  CREDULITY, AND I WOULD SAY THAT THE PROBATION OFFICER GOT

24  IT RIGHT AND THE OBJECTION SHOULD BE DENIED, YOUR HONOR.

25  THANK YOU.

1          THE COURT:  WAS THERE ANY METH FOUND ON THESE

2   PREMISES WHEN THESE ARRESTS WERE MADE?

3          MS. SMITH:  NO, YOUR HONOR, THERE WAS NOT.  IT

4   WAS -- HE IS CORRECT, IT HAD NOT CONVERTED TO METH YET.  I

5   THINK THEY HAD EVERYTHING READY, AND THAT'S WHY THEY DID

6   THE RUN TO THE CVS.

7          THE COURT:  ALL RIGHT.  AND WHAT TIME DID THE

8   ARRESTS OCCUR ON THE 28TH, IF YOU KNOW?

9          MS. SMITH:  I WOULD HAVE TO PULL UP MY

10  DISCOVERY, YOUR HONOR.  I THINK AROUND MIDNIGHT --

11         MR. MARTIN:  YOUR HONOR, SUBJECT TO BEING

12  CORRECTED, I BELIEVE IT WAS AROUND 11:00 ON OCTOBER THE

13  28TH.

14         MS. SMITH:  P.M.

15         THE WITNESS:  OCTOBER 28TH.

16         MR. MARTIN:  11:00 P.M.

17         THE COURT:  ALL RIGHT.  HAVE EITHER ONE OF YOU

18  FOUND ANY SIXTH CIRCUIT AUTHORITY ON THIS, EITHER AT THE

19  CIRCUIT LEVEL OR DISTRICT COURT LEVEL?

20         MS. SMITH:  NO, YOUR HONOR, I HAVE NOT.

21         MR. MARTIN:  NO, YOUR HONOR.  I HAVE CONDUCTED

22  A DILIGENT SEARCH, BUT I HAVE NOT FOUND ANY AUTHORITY.

23         THE COURT:  WELL, THE COURT IS ASKED TO MAKE A

24  DECISION HERE TODAY THAT DOES NOT APPEAR TO HAVE BEEN

25  ADDRESSED BY ANY OTHER DISTRICT COURT IN THE SIXTH CIRCUIT

OR BY THE SIXTH CIRCUIT ITSELF. JUST AS THE LAWYERS COULD
FIND NO CASES, THE COURT HAS BEEN ABLE TO FIND NO CASES IN
THE SIXTH CIRCUIT THAT ADDRESS THE CIRCUMSTANCES UNDER
WHICH THE CROSS REFERENCE OF SECTION 2D1.2(C) APPLIES.

SOME THINGS ARE RELATIVELY CLEAR FROM THE
GUIDELINE PROVISION ITSELF. FIRST OF ALL, IT'S CLEAR, I
THINK, AND NO DISAGREEMENT ABOUT THIS, THAT SECTION
2D1. -- 2D1.1(2) IS THE GUIDELINE WHICH APPLIES GENERALLY
IN THE CASE OF A DEFENDANT WHO HAS BEEN CONVICTED OF
POSSESSION OF CHEMICALS OR OTHER MATERIALS WHICH MAY BE
USED IN THE MANUFACTURE OF METHAMPHETAMINE, THE OFFENSE
WHICH MR. LANDERS HAS BEEN CONVICTED OF. THE QUESTION,
HOWEVER, IS WHETHER THE CROSS REFERENCE OF SUBSECTION
(C)(1) OR SECTION (C)(1) OF THAT GUIDELINE SECTION
APPLIES.

COMMENTARY TO THE GUIDELINE MAKES IT CLEAR THAT
THE CROSS REFERENCE SHOULD BE APPLIED IF THE DEFENDANT OR
A PERSON FOR WHOSE CONDUCT THE DEFENDANT IS ACCOUNTABLE
UNDER SECTION 1B1.3, THAT IS THE RELEVANT CONDUCT GUIDE-
LINE, COMPLETED THE ACTIONS SUFFICIENT TO CONSTITUTE THE
OFFENSE OF UNLAWFULLY MANUFACTURING A CONTROLLED SUBSTANCE
OR ATTEMPTING TO MANUFACTURE A CONTROLLED SUBSTANCE
UNLAWFULLY. IT SEEMS TO ME TO BE RELATIVELY CLEAR THEN
THAT THE COURT MUST CONSIDER ALL OF MR. LANDERS' RELEVANT
CONDUCT, INCLUDING ANY CONDUCT HE WAS RESPONSIBLE FOR

1　HIMSELF, AS WELL AS ANY ACTS OR OMISSIONS COMMITTED BY

2　THOSE INVOLVED IN A JOINT ENTERPRISE WITH HIM.

3　　　　THE RELEVANT CONDUCT GUIDELINE CLEARLY PROVIDES

4　THAT IN DETERMINING THE GUIDELINE RANGE, OR THE APPRO-

5　PRIATE GUIDELINE SECTION TO BE APPLIED, THE COURT

6　DETERMINES -- OR DOES THAT ON THE BASIS OF CONSIDERING ALL

7　ACTS OR OMISSIONS COMMITTED BY THE DEFENDANT PERSONALLY;

8　AND IN THE CASE OF JOINTLY UNDERTAKEN CRIMINAL ACTIVITY,

9　ALL OF THE REASONABLY FORESEEABLE ACTS OR OMISSIONS OF

10　OTHERS INVOLVED IN THE FURTHERANCE OF THE UNDERTAKEN,

11　JOINTLY UNDERTAKEN CRIMINAL ACTIVITY THAT OCCURRED DURING

12　THE COMMISSION OF THIS OFFENSE.

13　　　　FIRST QUESTION, IT SEEMS TO ME, FOR THE COURT

14　IS TO DETERMINE WHETHER OR NOT THE ACTS OF OTHERS INVOLVED

15　HERE IS IN FACT RELEVANT CONDUCT UNDER THE GUIDELINE.  IN

16　OTHER WORDS, IS IT JOINTLY UNDERTAKEN CRIMINAL ACTIVITY,

17　ACTIVITY, CRIMINAL ACTIVITY IN CONCERT WITH OTHERS WHICH

18　WAS REASONABLY FORESEEABLE.

19　　　　I FRANKLY UNDER THESE CIRCUMSTANCES DON'T SEE

20　HOW THERE'S ANYTHING BUT ONE CONCLUSION TO COME TO THERE.

21　THIS WAS CONCERTED CRIMINAL ACTIVITY.  CLEARLY MR. LANDERS

22　DID NOT PLEAD GUILTY TO A CONSPIRACY, BUT, NEVERTHELESS,

23　THESE ACTS WERE COMMITTED IN CONCERT WITH OTHERS, ALTHOUGH

24　THESE PEOPLE HAD GATHERED AT MR. LANDERS' RESIDENCE,

25　ACCORDING TO HIS TESTIMONY, TO USE DRUGS, HE HAD SEEN

MATERIALS WHICH HE RECOGNIZED AS BEING USED TO MANUFACTURE

METHAMPHETAMINE EARLIER IN THE DAY.  HE SAYS THAT HE TOLD

MR. WHITE TO REMOVE THOSE FROM HIS HOUSE, BUT THERE'S NO

EVIDENCE THAT MR. WHITE DID SO.  IN FACT, THE EVIDENCE IS

CONTRARY TO THAT.

AT SOME POINT DURING THESE EVENTS MR. WHITE

BEGAN TO LOOK FOR A SOURCE OF PSEUDOEPHEDRINE, CLEARLY TO

BE USED IN THE MANUFACTURE OF METHAMPHETAMINE, AND WHICH

MR. LANDERS ACKNOWLEDGES HE KNEW WAS TO BE USED IN THE

MANUFACTURE OF METHAMPHETAMINE.  HE WENT, ACCORDING TO

HIM, OUT OF STUPIDITY ALONG WITH THE TWO PEOPLE WHO

ACTUALLY WENT IN CVS AND WALGREENS TO OBTAIN THAT PSEUDO-

EPHEDRINE.  IT WAS APPARENTLY TAKEN BACK TO HIS RESIDENCE,

BUT NEVER ACTUALLY USED TO MANUFACTURE METHAMPHETAMINE;

BUT IT WAS CLEARLY INTENDED TO BE USED TO MANUFACTURE

METHAMPHETAMINE.  MR. LANDERS KNEW THAT.  I'M NOT SURE IT

IS PARTICULARLY IMPORTANT THAT IT WAS NEVER IN FACT USED

FOR THAT PURPOSE.

AND WHILE THE COURT DIDN'T FIND ANY SIXTH

CIRCUIT PRECEDENT CLEARLY ON POINT, THERE IS AN ELEVENTH

CIRCUIT CASE THAT ADDRESSES THE APPLICATION OF THE CROSS

REFERENCE AND WHICH APPLIED THE CROSS REFERENCE UNDER

CIRCUMSTANCES SIMILAR TO THIS BASED ON A NUMBER OF

FACTORS.  THIS CASE IS UNITED STATES VERSUS -- LET ME GET

BACK TO THE RIGHT PLACE, UNITED STATES VERSUS COALE,

1  C O A L E.  IT IS AN UNREPORTED DECISION OF THE ELEVENTH

2  CIRCUIT FOUND AT 144 FEDERAL APPENDIX 770, DECIDED JULY

3  21, 2005.

4           AND IN THAT PARTICULAR CASE THE ELEVENTH

5  CIRCUIT FOUND RELEVANT THESE FACTORS:  ONE, WHETHER THE

6  DEFENDANT HAD POSSESSED MATERIALS USED IN THE MANUFACTURE

7  OF METHAMPHETAMINE.  CLEARLY MR. LANDERS DID, HE'S

8  ADMITTED THAT.  THAT'S THE OFFENSE HE'S BEEN FOUND GUILTY

9  OF; SECOND, WHETHER THE DEFENDANT ADMITTED TO THE

10  POSSESSION OF THOSE MATERIALS, KNOWING, INTENDING AND

11  HAVING REASONABLE CAUSE TO BELIEVE THAT THOSE MATERIALS

12  WOULD BE USED TO MANUFACTURE METHAMPHETAMINE.  BY HIS OWN

13  ADMISSION HE KNEW THAT THE POSSESSION OF THOSE MATERIALS

14  BY MR. WHITE AND THE POSSESSION OF THE PSEUDOEPHEDRINE

15  WERE TO BE USED IN THE MANUFACTURE OF METHAMPHETAMINE.  HE

16  CLEARLY HAD REASONABLE CAUSE TO BELIEVE THAT, IF NOT

17  ACTUAL BELIEF OF THAT; THIRD, IN THIS PARTICULAR CASE IN

18  THE COALE CASE, LAW ENFORCEMENT HAD IN FACT FOUND IN THAT

19  CASE A DISASSEMBLED METHAMPHETAMINE LABORATORY IN THE

20  APARTMENT WHERE THE DEFENDANT LIVED, CONSISTENT WITH WHAT

21  HAPPENED IN THIS CASE.  AT A VERY MINIMUM WHAT WAS FOUND

22  HERE WERE THE BOTTLES AND THE OTHER APPARATUS USED FOR

23  THESE SHAKE-AND-BAKE-TYPE OF METHAMPHETAMINE MANUFACTURING

24  LABS AND PSEUDOEPHEDRINE, WHICH IS THE PRIMARY PRODUCT,

25  PRODUCT USED IN THE MANUFACTURE.  FOURTH FACTOR FOUND

1  IMPORTANT BY THE ELEVENTH CIRCUIT IN THAT CASE IS THAT A

2  CODEFENDANT ADMITTED TO MANUFACTURING METHAMPHETAMINE, AND

3  IT'S CLEARLY ESTABLISHED IN THIS CASE EITHER BY GUILTY

4  PLEAS OR BY CONFESSIONS THAT A NUMBER OF THESE PEOPLE

5  INVOLVED IN THAT INCIDENT ON THE 27TH AND 28TH OF OCTOBER

6  WERE IN FACT ENGAGED IN THE MANUFACTURE OF METHAMPHETA-

7  MINE.  MR. LANDERS ACKNOWLEDGES THAT HE KNEW THAT PHIPPS

8  AND WHITE WERE SOURCES OF METHAMPHETAMINE, EVEN IF HE

9  DIDN'T KNOW THAT THEY WERE ACTUALLY ENGAGED IN THE MANU-

10 FACTURE OF METHAMPHETAMINE.  HE DID ACKNOWLEDGE, HOWEVER,

11 THAT HE UNDERSTANDS THAT YOU CAN'T BUY METHAMPHETAMINE AT

12 A DRUGSTORE, IT HAS TO BE MANUFACTURED BY SOMEBODY.

13        NOW, THERE WERE TWO OTHER FACTORS THAT THE

14 ELEVENTH CIRCUIT LOOKED AT AND THAT THE ELEVENTH CIRCUIT

15 THOUGHT WERE IMPORTANT, AND THEY DISTINGUISHED THAT CASE A

16 BIT FROM THIS ONE.  NUMBER ONE IN THAT CASE, THE DEFENDANT

17 WAS FOUND IN POSSESSION OF METHAMPHETAMINE.  MR. LANDERS

18 CLEARLY HERE WAS NOT FOUND IN POSSESSION OF METHAMPHETA-

19 MINE; HOWEVER, BY HIS ADMISSION METHAMPHETAMINE WAS

20 PRESENT IN HIS RESIDENCE THROUGHOUT THE DAY ON OCTOBER

21 27TH AND OCTOBER 28TH.  HE HAD SEEN IT; NOT ONLY HAD HE

22 SEEN IT, HE HAD USED IT.  AND, FINALLY, IN THIS COALE CASE

23 THE ELEVENTH CIRCUIT CONSIDERED THAT METHAMPHETAMINE HAD,

24 APPARENTLY AFTER THE FACT DURING THE SUBSEQUENT SEARCH,

25 BEEN FOUND IN THE DEFENDANT'S BEDROOM.  AND THAT'S THE ONE

DISTINGUISHING FACTOR HERE, THERE WAS NO METHAMPHETAMINE
FOUND IN MR. LANDERS' POSSESSION OR ANYBODY ELSE'S POSSES-
SION.  WHAT WAS FOUND WAS APPARENTLY THE PSEUDOEPHEDRINE
THAT WAS PURCHASED EARLIER.  AND WHAT THAT TAKES ME BACK
TO IS THE QUESTION I ADDRESSED EARLIER, WHICH IS THAT
THERE DOESN'T APPEAR TO BE ANY DISPUTE HERE THAT THE
PSEUDOEPHEDRINE OBTAINED DURING THE TRIP TO CVS AND
WALGREENS WAS NEVER ACTUALLY USED IN THE MANUFACTURE OF
METHAMPHETAMINE.  IN THE COALE CASE THE ELEVENTH CIRCUIT
FOUND THE COMBINATION OF ALL THOSE FACTORS I HAVE
MENTIONED TO BE SUFFICIENT TO APPLY THE CROSS REFERENCE OF
SECTION 2D1.1(2)(C)(1).

NOW, OBVIOUSLY THE ELEVENTH CIRCUIT'S DECISION
IS NOT BINDING ON THIS COURT.  THIS IS A DISTRICT COURT
SITTING IN THE SIXTH CIRCUIT.  FURTHER COMPOUNDING THAT
PROBLEM IS THAT THE DECISION IS AN UNPUBLISHED OPINION OF
THE ELEVENTH CIRCUIT.

MR. MARTIN, IF YOU ASSUME THAT I'M RIGHT AND
YOU'RE WRONG, THAT THE ACTS OF THESE OTHER DEFENDANTS WERE
IN FACT PART OF CONCERTED ACTION, PART OF A JOINTLY
UNDERTAKEN CRIMINAL ENTERPRISE, AND I'M NOT GOING TO ASK
YOU TO CONCEDE THAT, OBVIOUSLY, BUT I FIND THAT THEY ARE,
ASSUMING THAT'S THE CASE, CAN YOU REASONABLY ARGUE HERE
THAT THEY DIDN'T COMPLETE THE ACTION SUFFICIENT TO
CONSTITUTE THE OFFENSE OF ATTEMPTING TO MANUFACTURE

METHAMPHETAMINE?

        MR. MARTIN:  WELL, I'M NOT CERTAIN EXACTLY WHAT THE QUESTION IS, YOUR HONOR.

        THE COURT:  WELL, I MEAN, ONCE THEY OBTAIN PSEUDOEPHEDRINE WITH THE INTENT TO MANUFACTURE METHAM- PHETAMINE WITH ALL THE EQUIPMENT THAT WAS NECESSARY TO MANUFACTURE IT, CAN YOU REASONABLY ARGUE THAT THE OFFENSE OF ATTEMPT TO MANUFACTURE WAS NOT COMPLETED?

        MR. MARTIN:  NO.  I DO AGREE THAT THERE WAS AN ATTEMPT TO MANUFACTURE AT THAT POINT, EVEN THOUGH THERE'S NO EVIDENCE THAT THE PSEUDOEPHEDRINE THAT WAS OBTAINED WAS EVER ACTUALLY USED.  YES, I DO AGREE THAT THERE WAS AN ATTEMPT.

        THE COURT:  I MEAN, CLEARLY IN THE COALE CASE THE ELEVENTH CIRCUIT HAD A SITUATION WHERE APPARENTLY METHAMPHETAMINE WAS ACTUALLY, OR A CONTROLLED SUBSTANCE WAS ACTUALLY, IT WASN'T METHAMPHETAMINE, WAS ACTUALLY MANUFACTURED.  HERE THE DIFFERENCE IS THAT THERE IS NO EVIDENCE THAT IT WAS IN FACT MANUFACTURED, ONLY THAT THERE WERE PREPARATIONS MADE FOR ITS MANUFACTURE.

        MS. SMITH, DO YOU AGREE THAT THE GOVERNMENT HAS THE BURDEN ON THIS ISSUE?

        MS. SMITH:  I DO, YOUR HONOR; AND I THINK THAT I'VE MET IT.  I MEAN, I'M NOT, I'M NOT -- PERHAPS I'M MISSING SOMETHING HERE.  FIRST OF ALL, MR. LANDERS SAYS

THAT WHEN HE CAME BACK, HE NOTICED A FUNNY ODOR.  YOU

KNOW, I THINK WE'VE GONE A LITTLE BIT BEFORE --

THE COURT:  SUGGESTING THAT METH HAD BEEN

MANUFACTURED WHILE THEY WERE GONE?

MS. SMITH:  CORRECT, YOUR HONOR.  AND THEN,

SECONDLY, IF YOU LOOK AT PAGE 2 OF THE PLEA AGREEMENT,

PARAGRAPH A, HE ADMITS THAT THE THINGS THAT HE KNOWINGLY

AND POTENTIALLY POSSESSED, THESE INCLUDED PLASTIC SODA

BOTTLES, FINISHED METHAMPHETAMINE, BLISTER PACKS OF

PSEUDOEPHEDRINE, HE LINED THROUGH SOMETHING THAT HE DIDN'T

WANT, AND THEN METH SMOKED -- METH SMOKING SPOONS AND

DEVICES.

SO I THINK EVEN UNDER COALE I'VE GOT IT IN THE

PLEA AGREEMENT. I THINK ALL THIS CAME AFTERWARD, AND IT'S

SORT OF SEEING HOW MANY ANGELS CAN DANCE ON THE HEAD OF A

PIN.  I DON'T THINK ANYONE IS FOOLED HERE AS TO WHAT WAS

GOING ON.  THEY BLEW THROUGH ALL THE METH, AND THEY MADE A

RUN TO THE CVS TO GET SOME MORE SUDAFED AND TO COOK SOME

MORE.  AND AS MR. LANDERS ADMITTED, THE POLICE WERE

WATCHING HIS HOUSE; AND THEY PROBABLY GOT A COMPLAINT FROM

SOME NEIGHBORS, AND THE POLICE CAME AND KIND OF BROKE IT

UP.

I DON'T THINK THE FACT THAT IT WASN'T COMPLETED

SHOULD HELP HIM OUT BECAUSE THE EFFECT WAS THE SAME.  HE

ADMITTED IT WAS QUARANTINED, IT WAS AN UNSAFE SITE; AND IT

1    WAS -- AS YOU POINTED OUT, CLEARLY AN ATTEMPT WAS DONE.

2    BUT IF I'M READING THE PLEA AGREEMENT CORRECTLY, AND HE

3    HAD -- YOU KNOW, HE APPROVED ALL OF THIS, HE ADMITS THAT

4    THAT LAST ONE IS THERE, THE FINISHED METHAMPHETAMINE.  AND

5    THAT WAS CLEARLY NEGOTIATED, YOUR HONOR.

6             MR. MARTIN:  YOUR HONOR, MAY I BE HEARD ON THE

7    POSSESSION ISSUE?

8             THE COURT:  YES, YOU MAY.

9             MR. MARTIN:  YOUR HONOR, THERE'S NO QUESTION

10   BUT THAT MR. LANDERS HAD POSSESSION IN THE SENSE OF THE

11   COMMON LAW MEANING OF THAT TERM.  HE DIDN'T HAVE ACTUAL

12   POSSESSION, BUT CERTAINLY HE HAD CONSTRUCTIVE POSSESSION,

13   VERY POSSIBLY HE WAS WITHIN THE GAMBIT OF THE SIXTH

14   CIRCUIT JOINT POSSESSION CONCEPT.  SO THERE'S NO QUESTION

15   WHAT HE HAD CONSTRUCTIVE POSSESSION, THEY WERE IN HIS

16   HOME, HE KNEW WHAT WAS GOING ON; AND NO QUESTION BUT THAT

17   HE HAD CONSTRUCTIVE POSSESSION, BUT I DON'T BELIEVE

18   THERE'S ANY EVIDENCE THAT HE HAD ACTUAL POSSESSION OF ANY

19   APPARATUS TO MANUFACTURE METHAMPHETAMINE, HAD ACTUAL

20   POSSESSION OF ANY MATERIALS, SUDAFED OR ANYTHING ELSE.

21            THE COURT:  WELL, WHY WOULD THAT -- I MEAN,

22   CONSTRUCTIVE POSSESSION IS SUFFICIENT; ISN'T IT,

23   MR. MARTIN?

24            MR. MARTIN:  YES, IT'S SUFFICIENT TO CONSTITUTE

25   POSSESSION FOR PURPOSES OF THE PLEA AGREEMENT, AND WE

1   ENTERED THE PLEA AGREEMENT.  THE PLEA AGREEMENT SAYS,

2   POSSESSION.  CERTAINLY WE HAD POSSESSION, IT WAS

3   CONSTRUCTIVE POSSESSION.

4           MS. SMITH:  HE ALSO HAD METHAMPHETAMINE IN HIS

5   BODY, YOUR HONOR.  I GUESS THAT'S A METAPHYSICAL

6   POSSESSION, I DON'T KNOW.  I -- AGAIN, I THINK IT'S

7   ESTABLISHED AND --

8           THE COURT:  WELL, THIS IS A SIGNIFICANT

9   QUESTION.

10          MS. SMITH:  IT IS.

11          THE COURT:  BASE OFFENSE LEVEL APPLIED BY THE

12  PROBATION OFFICER BASED ON THE CROSS REFERENCE IS 24.

13  UNDER SECTION 2D1.2 BASE OFFENSE LEVEL IS PROBABLY 9

14  BECAUSE THAT, THAT --

15          MS. SMITH:  THAT'S CORRECT, I THINK.

16          THE COURT:  -- GUIDELINE RANGE PROVIDES FOR A

17  BASE OFFENSE LEVEL OF 9 IF THE DEFENDANT HAD REASONABLE

18  CAUSE TO BELIEVE THAT THE PROHIBITED MATERIAL WAS TO BE

19  USED TO MANUFACTURE A CONTROLLED SUBSTANCE.  THEN THERE

20  ARE CERTAIN OTHER SPECIFIC OFFENSE CHARACTERISTICS THAT

21  MIGHT CAUSE THAT TO BE INCREASED.

22          WELL, I DON'T THINK THE DRAMATIC INCREASE IN

23  THE BASE OFFENSE LEVEL FROM THE APPLICATION OF THE CROSS

24  REFERENCE IS REALLY A QUESTION.  IT MIGHT VERY WELL BE A

25  QUESTION MR. MARTIN WOULD RAISE WITH RESPECT TO WHETHER OR

NOT THE GUIDELINE PROPERLY ACCOUNTS FOR THE SERIOUSNESS OF
THE OFFENSE, BUT THE COURT'S DECISION HERE SHOULD NOT BE
GUIDED BY THE FACT THAT IT'S A VERY SIGNIFICANT INCREASE
IN THE GUIDELINE RANGE, ALTHOUGH THE SIGNIFICANCE OF IT
DOES CAUSE THE COURT TO WANT TO BE VERY CAUTIOUS ABOUT
RULING ON THIS.

THIS IS JUST ONE OF THOSE ISSUES THAT OBVIOUSLY
DOES NOT ARISE VERY OFTEN. I'VE NEVER CONFRONTED THIS
SPECIFIC ISSUE IN TEN YEARS OR PRIOR TO THAT TIME
PRACTICING LAW; AND IF ANY OTHER DISTRICT COURT OR THE
CIRCUIT ITSELF HAS ADDRESSED IT, THEY'VE NOT DONE SO IN AN
OPINION THAT'S AVAILABLE, SO I AM IN COMPLETELY UNCHAR-
TERED TERRITORY WITH THE EXCEPTION THAT THE GUIDANCE THAT
THE ELEVENTH CIRCUIT GIVES IN THIS COALE CASE. AND
UNFORTUNATELY FOR MR. LANDERS, IF I LOOK TO THOSE CIRCUM-
STANCES, IF I LOOK TO THOSE FACTORS APPLYING A PREPON-
DERANCE OF THE EVIDENCE STANDARD, WHICH IS WHAT I APPLY
HERE, NOT A BEYOND A REASONABLE DOUBT STANDARD, IT'S
PREPONDERANCE OF THE EVIDENCE, SIMPLY IS THE GOVERNMENT'S
POSITION HERE MORE LIKELY THAN NOT, I THINK THE GOVERNMENT
HAS MET ITS BURDEN AND THE OFFENSE DID IN FACT INVOLVE
UNLAWFUL MANUFACTURE OR ATTEMPT TO MANUFACTURE A CON-
TROLLED SUBSTANCE, THAT IS METHAMPHETAMINE, BASED ON THE
RELEVANT CONDUCT, IF NOTHING ELSE, FOR WHICH MR. LANDERS
IS ACCOUNTABLE HERE, AND IN MY VIEW THE PROBATION OFFICER

1   HAS PROPERLY APPLIED THE CROSS REFERENCE OF SECTION (C)(1)

2   OF SECTION 2D1.12.  SO THIS OBJECTION IS OVERRULED, AND I

3   WILL APPLY THE CROSS REFERENCE.

4          NOW, MR. MARTIN, THERE ARE TWO OTHER OBJECTIONS

5   HERE.  ONE IS THAT MR. LANDERS' CRIMINAL HISTORY CATEGORY

6   OF 6 OVERSTATES HIS CRIMINAL HISTORY.  LET'S JUST TAKE

7   THAT ONE UP NEXT.

8          MR. MARTIN:  THANK YOU, YOUR HONOR.

9          AS HIS HONOR IS AWARE, THE PRESENTENCE

10  INVESTIGATION REPORT REPORTS A CRIMINAL HISTORY CATEGORY

11  OF 6, AND WE HAVE CONTENDED THAT MR. LANDERS SHOULD BE

12  SENTENCED BASED ON A CRIMINAL HISTORY CATEGORY OF 5

13  INSTEAD OF 6, AND WE SAY THE CATEGORY 6 SIGNIFICANTLY

14  OVERSTATES HIS CRIMINAL HISTORY.

15         AND, YOUR HONOR, I DON'T CARE WHAT YOU SAY,

16  CATEGORY 6 SHOULD BE RESERVED FOR THE MOST SERIOUS

17  OFFENDERS WHO BASICALLY HAVE THE WORST, WORST POSSIBLE

18  CRIMINAL RECORD, INCLUDING MULTIPLE FELONIES.  INCLUDED,

19  THE CRIMINAL RECORD OF THE DEFENDANT IS NOT IN THIS

20  CATEGORY.  IN FACT, MR. LANDERS, HE'S NOT DONE A GOOD JOB

21  OF FOLLOWING THE LAW, THERE'S NO QUESTION ABOUT THAT; BUT

22  HIS CRIMINAL RECORD IS ENTIRELY MISDEMEANORS, YOUR HONOR.

23  HE HAS NEVER COMMITTED A FELONY, MUCH LESS A DRUG FELONY,

24  AND SOMEBODY WHO HAS NEVER COMMITTED A FELONY IN THEIR

25  LIFE SHOULD NOT BE SENTENCED UNDER CATEGORY 6.  WE SAY HE

1  SHOULD BE SENTENCED AT CATEGORY 5.  CATEGORY 6 SHOULD BE

2  RESERVED FOR THE MOST SERIOUS CASES WHICH COME BEFORE THIS

3  COURT.

4          THE COURT:  ALL RIGHT.  MS. SMITH, DO YOU WANT

5  TO BE HEARD ON THAT?

6          MS. SMITH:  WELL, JUST BRIEFLY, YOUR HONOR.  I

7  UNDERSTAND WHERE MR. MARTIN IS COMING FROM.  UNFORTU-

8  NATELY, THAT'S NOT THE LAW; AND THAT MAY BE VERY

9  COMPASSIONATE ON HIS PART, AND I THINK WHAT MAKES IT MORE

10  DIFFICULT IS THAT MR. LANDERS, LIKE SEVERAL OF THE

11  DEFENDANTS IN THIS PARTICULAR CASE, IS VERY YOUNG.  HE'S

12  NOT THE FIRST ONE THAT WE'VE HAD WITH A CRIMINAL HISTORY

13  CATEGORY 6 IN THIS INDICTMENT; AND HE'S A LITTLE BIT

14  OLDER, ACTUALLY, THAN SOME OF THEM, I'M THINKING ABOUT

15  MR. WILEY JUST LAST WEEK WHO I THINK HAD A 5 AND HE WAS

16  ONLY 22.  I ACTUALLY HAVE THAT WITH ME SO I CAN LOOK AT

17  IT.

18          THE POINT IS THAT THERE IS NO AUTHORITY THAT

19  SAYS YOU HAVE TO HAVE COMMITTED A FELONY TO BE IN CRIMINAL

20  HISTORY CATEGORY 6, AND, IN FACT, THAT'S THE WHOLE PURPOSE

21  OF THE POINT SYSTEM IS THAT IT TENDS TO EQUALIZE THINGS;

22  AND YOU AND I BOTH KNOW, AS WELL AS MR. MARTIN KNOW, THAT

23  OFTENTIMES YOUNG PEOPLE ARE CHARGED WITH FELONIES AND THEN

24  ALLOWED TO PLEAD OUT TO MISDEMEANORS BECAUSE THEY ARE IN

25  FACT YOUNG PEOPLE.  I THINK -- BUT TO PUT HIM DOWN IN

CRIMINAL HISTORY CATEGORY 5, WHICH IS WHAT MR. MARTIN ASKS
FOR, YOU WOULD HAVE TO, IN EFFECT, GIVE HIM A DISCOUNT OF
25 PERCENT OF WHAT HE'S GOT.  HE'S GOT 16 POINTS.  TO GET
HIM DOWN TO 12, YOU WOULD HAVE TO GIVE HIM 4 OFF.  THAT IS
VERY SUBSTANTIAL.

          AND, UNFORTUNATELY, THAT'S WHY I ASKED
MR. LANDERS ABOUT HIS, HIS CONVICTION ON A COCAINE AND
HEROIN JUST, YOU KNOW, MAYBE NINE MONTHS AFTER THIS WHOLE
METH INCIDENT AS HIS HOUSE, I JUST DON'T THINK IT'S
WARRANTED HERE.  YOU KNOW, HE VIEWS HIMSELF AS AN ADDICT,
STRICTLY PERHAPS MAYBE EVEN A VICTIM; AND HE IS NOT, HE IS
A VERY SERIOUS OFFENDER.  HE NOW HAS A FELONY, AND MAYBE
PRE-STAGING A LITTLE BIT HERE, BUT I'M VERY TROUBLED BY A
YOUNG PERSON WITH THIS LEVEL OF ADDICTION THAT THE SECOND
TIME HE TAKES METH HE INJECTS IT DIRECTLY INTO HIS VEINS.
THERE'S NO BASIS TO REDUCE HIS CRIMINAL HISTORY CATEGORY,
AND THE OBJECTION SHOULD BE OVERRULED.  THANK YOU.

          THE COURT:  ALL RIGHT.  MR. LANDERS MOVES FOR A
DOWNWARD DEPARTURE HERE BASED ON HIS ARGUMENT THAT THE
CRIMINAL HISTORY CATEGORY, THAT IS 6, OVER REPRESENTS THE
SERIOUSNESS OF HIS CRIMINAL HISTORY.

          FIRST OF ALL, THE COURT WOULD NOTE THAT
MR. LANDERS MISSTATES THE STANDARD BECAUSE THE APPLICABLE
GUIDELINE PROVISION, SECTION 4A1.3(B) PROVIDES FOR A
DOWNWARD DEPARTURE WHEN THE CRIMINAL HISTORY CATEGORY

SUBSTANTIALLY OVER REPRESENTS THE SERIOUSNESS OF THE

DEFENDANT'S CRIMINAL HISTORY; OR, ALTERNATIVELY, WHERE THE

LIKE -- OR THAT IT OVERSTATES THE LIKELIHOOD THAT THE

DEFENDANT WILL COMMIT OTHER CRIMES.

IT APPEARS TO ME THAT THE SENTENCING COMMISSION

HAS IN FACT CONSIDERED AND REJECTED THE VERY ARGUMENTS

THAT MR. MARTIN HAS MADE HERE TODAY; THAT IS THAT CRIMINAL

HISTORY CATEGORY 6 SHOULD BE RESERVED FOR THE MOST SERIOUS

OFFENDERS.  THE SENTENCING COMMISSION MADE A FAR DIFFERENT

DETERMINATION.  THE SENTENCING COMMISSION SIMPLY MADE A

DETERMINATION THAT DEFENDANTS WITH A -- WITH CRIMINAL

HISTORY POINTS OF 13 OR MORE SHOULD BE CRIMINAL HISTORY

CATEGORY 6 AND MADE NO DISTINCTION BETWEEN WHAT ONE MIGHT

CONSIDER MORE SERIOUS OFFENSES AND LESS SERIOUS OFFENSES,

EXCEPT TO THE EXTENT THAT THAT INFLUENCES THE WAY POINTS

ARE ASSESSED, OBVIOUSLY, LESS SERIOUS OFFENSES OFTEN

RECEIVE FEWER POINTS, CRIMINAL HISTORY POINTS.

THE REAL PROBLEM HERE IS THE LIKELIHOOD THAT

THE DEFENDANT WILL COMMIT OTHER CRIMES.  MR. LANDERS IS,

OF COURSE, 24 YEARS OF AGE.  IT IS UNUSUAL, ALTHOUGH

BECOMING MUCH MORE COMMON, FOR THIS COURT TO SEE A

DEFENDANT IN HIS OR HER EARLY TWENTIES WITH A CRIMINAL

HISTORY CATEGORY OF 6.  MR. LANDERS' CRIMINAL HISTORY

OCCUPIES 14 PARAGRAPHS OF THE PRESENTENCE REPORT.  HE HAS

NOT BEEN ASSESSED CRIMINAL HISTORY POINTS FOR ALL OF THOSE

1   CONVICTIONS.  THERE ARE AT LEAST FIVE CONVICTIONS HERE FOR

2   WHICH NO CRIMINAL HISTORY POINTS WERE ASSESSED.  HE WAS ON

3   PROBATION WHEN THIS OFFENSE WAS COMMITTED.  HE HAS, AS

4   SIMPLY AS I CAN PUT IT, SINCE THE AGE OF 18 COMMITTED ONE

5   OFFENSE AFTER ANOTHER, SOME FAIRLY MINOR OFFENSES, SOME

6   MORE SERIOUS OFFENSES.

7          HIS CRIMINAL HISTORY BEGINS WITH A JUVENILE

8   ADJUDICATION WHICH RESULTED IN HIS BEING ADJUDICATED

9   DELINQUENT, I GUESS, IN THE GENERAL SESSIONS COURT AS THE

10  RESULT OF ARRANGING THE SALE OF MARIJUANA ON SCHOOL

11  PROPERTY AND CONTINUES WITH WHAT ONE MIGHT CONSIDER FAIRLY

12  MINOR OFFENSES, EXCEPT THAT AT AGE 18 MR. LANDERS WAS

13  CONVICTED OF AN ASSAULT ON A FAMILY MEMBER.  AT AGE 19

14  LATER THE SAME -- WELL, THE VERY SAME OCCASION, A SECOND

15  ASSAULT ON A FAMILY MEMBER.  HE HAS CONVICTIONS FOR

16  OBSTRUCTION OF JUSTICE, FOR DESTROYING EVIDENCE.  HE HAS

17  CONVICTIONS FOR LARCENY, FOR THEFT, FOR ATTEMPTED BURGLARY

18  AND FRAUDULENT USE OF A CREDIT CARD, NUMEROUS COUNTS, FOR

19  RECEIVING STOLEN GOODS AND, FINALLY, FOR POSSESSION OF

20  HEROIN.

21          IT IS, FRANKLY, THE LIKELIHOOD OF THE

22  COMMISSION OF FUTURE CRIMES WHICH IS CAPTURED IN THE

23  CRIMINAL HISTORY CATEGORY 6, NOT NECESSARILY THE

24  SERIOUSNESS OF THE OFFENSE, ALTHOUGH -- OF EACH OF THOSE

25  OFFENSES, ALTHOUGH THE CUMULATIVE EFFECT OF ALL THAT IS A

1    VERY, VERY SERIOUS CRIMINAL HISTORY, ALL OF WHICH WAS

2    ACCUMULATED IN ROUGHLY SIX YEARS, BETWEEN THE AGES OF 18

3    AND THE AGE OF 24.

4          WITH RESPECT TO THE OTHER ARGUMENT MADE BY

5    MR. MARTIN THAT THERE ARE NO FELONY CONVICTIONS HERE, THAT

6    IS REFLECTED IN THE WAY CRIMINAL HISTORY POINTS ARE

7    ASSESSED.  THE FACT THAT THERE'S NO PRIOR FELONY DRUG

8    OFFENSE HERE IS NOT PARTICULARLY RELEVANT EITHER.  IN MOST

9    CASES WHERE THERE IS A PRIOR FELONY DRUG OFFENSE CONGRESS

10   HAS IN FACT PROVIDED FOR ENHANCED PENALTIES.

11          SO I CANNOT FIND HERE, AS I WOULD BE REQUIRED

12   TO DO IN ORDER TO DEPART DOWNWARDLY UNDER THE GUIDELINES,

13   THAT THE CRIMINAL HISTORY CATEGORY OF 6 SUBSTANTIALLY OVER

14   REPRESENTS THE SERIOUSNESS OF THE DEFENDANT'S CRIMINAL

15   HISTORY, ESPECIALLY WHEN CONSIDERED IN TOTAL, BUT MORE

16   SPECIFICALLY THE LIKELIHOOD THAT HE WILL COMMIT OTHER

17   CRIMES.  HAVING SAID THAT, THE OBJECTION UNDER SECTION

18   4A1.1(3)(B) IS OVERRULED.  THAT CLEARLY, AS IN THE PRIOR

19   CIRCUMSTANCE, IS A FACTOR THAT THE DEFENDANT CAN ARGUE IF

20   HE WISHES IN FAVOR OF A VARIANCE FROM THE GUIDELINE RANGE

21   HERE.

22          NOW, FINALLY, WE COME TO THE OBJECTION OF THE

23   DEFENDANT WITH RESPECT TO A MITIGATING ROLE ADJUSTMENT

24   UNDER SECTION 3B1.2.  ON THIS ONE, MR. MARTIN, I THINK YOU

25   HAVE THE BURDEN OF ESTABLISHING ENTITLEMENT TO THE

1    MITIGATING ROLE.

2            MR. MARTIN:  YES, YOUR HONOR.  MAY I ADDRESS

3    THAT ISSUE?

4            THE COURT:  YES.

5            MR. MARTIN:  YES, YOUR HONOR, WE HAVE CONTENDED

6    THAT MR. LANDERS SHOULD RECEIVE A DOWNWARD ADJUSTMENT

7    BASED ON A MITIGATING ROLE IN THE OFFENSE; AND AS A

8    THRESHOLD MATTER, WE ARE AWARE OF THE CAMPBELL CASE WHICH

9    HOLDS THAT A DEFENDANT IS NOT ENTITLED TO A MITIGATING

10   ROLE REDUCTION IF THE DEFENDANT IS HELD ACCOUNTABLE ONLY

11   FOR THE QUANTITY OF DRUGS ATTRIBUTABLE TO HIM.  AND WE SAY

12   THE CAMPBELL CASE, YOUR HONOR, IS FACTUALLY

13   DISTINGUISHABLE FROM THIS CASE.

14           NOW, THE CAMPBELL CASE I DON'T THINK EXPLICITLY

15   SAYS SO, BUT WE SAY THE CASE SHOULD BE INTERPRETED AS

16   APPLYING ONLY TO THE QUANTITY OF DRUGS FOR WHICH THE

17   DEFENDANT WAS ACTUALLY INVOLVED AS WAS SET OUT IN A PLEA

18   AGREEMENT OR FOUND BY A JURY; AND IN THIS CASE MR. LANDERS

19   WAS NOT ACTUALLY INVOLVED WITH ANY AMOUNT OF DRUGS.  HE,

20   HE ENTERED A PLEA TO AN AGREED AMOUNT OF DRUGS, BUT

21   THERE'S NO RECORD THAT HE EVER HAD POSSESSION OF ANY

22   DRUGS, AND SO WE SAY THE CAMPBELL CASE IS FACTUALLY

23   DISTINGUISHABLE FROM THIS PARTICULAR SITUATION.

24           THE COURT:  HERE IT WAS BASED ON THE

25   PSEUDOEPHEDRINE PURCHASED BY OTHERS --

1          MR. MARTIN:  YES, YES.

2          THE COURT:  -- AND CONVERTED TO A QUANTITY OF

3   MARIJUANA AND THEN THE MARIJUANA QUANTITY USED TO

4   ESTABLISH THE GUIDELINE RANGE.

5          MR. MARTIN:  YES, YOUR HONOR.  WE JUST SAY THAT

6   HE WAS -- THE CAMPBELL CASE SHOULD BE LIMITED TO THE

7   AMOUNT THAT THEY WERE ACTUALLY INVOLVED WITH, AND IN THIS

8   CASE MR. LANDERS WAS NOT ACTUALLY INVOLVED, DIDN'T

9   PURCHASE ANY PSEUDOEPHEDRINE, JUST SIMPLY ENTERED A PLEA

10  TO AN AGREED AMOUNT.  SO WE SAY THE CAMPBELL CASE IS

11  FACTUALLY DISTINGUISHABLE.

12         YOUR HONOR, FURTHER ADDRESSING THE DOWNWARD

13  ADJUSTMENT FOR MITIGATING ROLE, SECTION 3B1.2(A), OF

14  COURSE, PROVIDES FOR A FOUR LEVEL DOWNWARD ADJUSTMENT

15  BASED ON BEING A MINIMAL PARTICIPANT IN THE OFFENSE; AND

16  COMMENT FOUR NOTES THAT, THE DEFENDANT'S LACK OF KNOWLEDGE

17  OR UNDERSTANDING OF THE SCOPE AND STRUCTURE OF THE

18  ENTERPRISE AND OF THE ACTIVITIES OF OTHERS IS INDICATIVE

19  OF A ROLE AS A MINIMAL PARTICIPANT.  AND, YOUR HONOR, WE

20  CONTEND THE TESTIMONY OF MR. LANDERS HAS ESTABLISHED FACTS

21  WHICH PROVE HIS LACK OF KNOWLEDGE OR UNDERSTANDING OF BOTH

22  THE SCOPE AND THE STRUCTURE OF THE ENTERPRISE AND

23  ACTIVITIES OF OTHERS.  HE TESTIFIED THAT THERE WERE ONLY

24  THREE PEOPLE HE EVEN KNEW.  HE HAD NO IDEA WHAT THESE

25  OTHER PEOPLE WERE DOING.

1    COMMENT (3)(A) TO SECTION 3B1.2, YOUR HONOR,

2    STATES THAT THE SECTION APPLIES, AND THAT'S 3B1.2, IF THE

3    DEFENDANT IS ONLY RESPONSIBLE FOR HIS OWN CONDUCT, AND WE

4    SAY THE TESTIMONY OF MR. LANDERS HAS ESTABLISHED A FACTUAL

5    BASIS FOR THE COURT TO CONCLUDE THAT HE WAS ACCOUNTABLE

6    ONLY FOR HIS OWN ACTIONS.  AND COMMENT (3)(A) TO THIS

7    SECTION, YOUR HONOR, ALSO STATES THAT SECTION 3B1.1(A)

8    APPLIES IF THE DEFENDANT PERFORMS A LIMITED FUNCTION IN

9    THE OFFENSE, AND WE SAY THE TESTIMONY OF MR. LANDERS HAS

10   CLEARLY ESTABLISHED THAT HE, HE PERFORMED A LIMITED

11   FUNCTION IN THE OFFENSE.  THANK YOU.

12          THE COURT:  ALL RIGHT, MR. MARTIN.

13          ALL RIGHT.  MS. SMITH'S, THE GOVERNMENT'S

14   RESPONSE TO THAT.

15          MS. SMITH:  WELL, BY HIS ADMISSION THERE WERE

16   NINE PEOPLE AT HIS HOUSE THAT DAY DOING METH, SO, YOU

17   KNOW, I PERHAPS SHOULD HAVE OBJECTED AND ASKED FOR AN

18   AGGRAVATING ROLE ENHANCEMENT UNDER 3B1.1(A) OR (B) BECAUSE

19   HE HAS EXCEED THE FIVE OR MORE PARTICIPANTS THRESHOLD

20   HERE; AND I THINK HE'S ALREADY TOLD US THAT THERE -- ALL

21   NINE OF THEM WERE DOING METH THAT DAY.

22          AS REGARDS THE MITIGATING ROLE, YOUR HONOR, I

23   DON'T KNOW HOW YOU CAN CONSIDER PROVIDING A PLACE FOR METH

24   TO BE COOKED AND, YOU KNOW, THE PARTY HOUSE AS A MITI-

25   GATING ROLE.  HE, HE WENT WITH HIM IN THE CAR, HE'S

 1  ALREADY SAID HE DIDN'T HAVE TO GO WITH THEM IN THE CAR, HE
 2  JUST WENT BECAUSE HE WAS STUPID.  I DON'T KNOW WHAT THAT
 3  MEANS EXACTLY, BUT HE -- THOSE PEOPLE STAYED THERE, SOME
 4  OF THEM STAYED THERE FOR TWO DAYS.  HE WAS THE HOST.  HE
 5  WAS -- HE MADE THE DRUG DEN AVAILABLE, AND THAT IS NOT A
 6  MINIMAL PARTICIPATION.
 7          I THINK WHAT HE'S LOOKING AT HERE -- YOU KNOW,
 8  HE GOT THE VERY, THE VERY LOWEST QUANTITY, YOUR HONOR,
 9  THAT I COULD JUSTIFY.  AND -- I DON'T KNOW WHAT THAT IS,
10  IS THAT ME?
11          THE COURT:  I'M NOT SURE WHAT THAT IS.  WE'RE
12  GETTING FEEDBACK FROM SOMEWHERE.
13          MS. SMITH:  IT'S YOU, OKAY, THAT'S GOOD.  THANK
14  YOU.
15          I DON'T KNOW, YOU KNOW, WHERE HE THINKS HE'S A
16  MINOR PARTICIPANT WHEN HE PROVIDED THE STUFF.  AND, AGAIN,
17  IF WE LOOK AT HIS PLEA AGREEMENT, YOUR HONOR, WHAT HE
18  ADMITTED TO WAS THE POSSESSION OF THINGS THAT WERE USED IN
19  METH, PLASTIC BOTTLES, FINISHED METHAMPHETAMINE, BLISTER
20  PACKS OF SUDAFED AND METH SMOKING SPOONS AND DEVICES;
21  THAT'S WHAT HE PROVIDED, HIS HOME AND ALL OF THOSE THINGS,
22  AND THAT IS NOT A MINIMAL ROLE.
23          I'M ALSO CONCERNED, YOUR HONOR, YOU KNOW, I TRY
24  VERY HARD TO BE CONSISTENT IN OUR PLEA POLICY, AND IF HE
25  GETS A MINOR ROLE OR SOME SORT OF MITIGATION ROLE WHEN HE

1   PROVIDES A PLACE WHERE METH WILL BE COOKED AND WHERE METH

2   IS INGESTED, THEN WE'RE GOING TO HAVE SOME REAL PROBLEMS

3   FOR MR. BREWER AND FOR MR. WHITE WHO HAVE YET TO BE

4   SENTENCED WHO WERE PRESENT AT THE SAME TIME.

5           THE COURT:  WELL, YOU'VE AGREED TO THE MINOR

6   ROLE ADJUSTMENT WITH RESPECT TO MR. BREWER; HAVEN'T YOU?

7           MS. SMITH:  I DID, YOUR HONOR, RIGHT.  I DID

8   WITH HIM.

9           NOW, HIS STORY -- OF COURSE, HE'S NOT HERE

10  TODAY, AND I DIDN'T ASK MR. LANDERS ABOUT IT, BUT IF

11  MR. BREWER DECIDES TO TESTIFY, HIS STORY IS SO

12  DIAMETRICALLY OPPOSED TO WHAT MR. LANDERS TESTIFIED TO.

13  ACCORDING TO MR. BREWER, HE HAD NEVER MET THESE PEOPLE

14  UNTIL THE DAY BEFORE WHEN HE MET THEM AT SOME PARTY IN

15  NORTH CAROLINA, AND HE DIDN'T EVEN KNOW THEY WERE GOING TO

16  BUY METH, YOU KNOW.  SO THEY'RE ALL, ALL CLAIMING THAT

17  THEY DIDN'T HAVE ANYTHING TO DO.  AND I TOOK THE REPRE-

18  SENTATIONS THAT MR. BREWER MADE TO ME AT FACE VALUE, AND I

19  MAY REGRET THAT; BUT I DID NOT MAKE A SIMILAR ADJUSTMENT

20  FOR MR. LANDERS BASED ON THE FACTS OF THE CASE.

21          THE COURT:  IS THERE ANY DIFFERENCE BETWEEN

22  MR. LANDERS' CASE AND AMANDA LOWE'S CASE OTHER THAN THE

23  FACT THAT THIS ALL OCCURRED AT MR. LANDERS' RESIDENCE?

24          MS. SMITH:  I'LL HAVE TO LOOK, YOUR HONOR.  I'M

25  SORRY.  IF YOU'LL GIVE ME JUST A MINUTE, I --

1          THE COURT:  IN AMANDA LOWE, THE MINOR

2    ADJUSTMENT ROLE ALSO APPLIED, AND SHE PLED GUILTY TO THIS

3    SAME OFFENSE AND THE SAME QUANTITY.

4          MS. SMITH:  SHE DID.

5          NO, YOUR HONOR, I -- IT WAS A DIFFERENT SET OF

6    FACTS, BUT I THINK SHE -- I'M SORRY, I'M SO OUT OF IT

7    RIGHT HERE.  IT'S KIND OF --

8          THE COURT:  TAKE YOUR TIME.

9          MS. SMITH:  THAT'S ALL RIGHT.  LET ME LOOK AT

10   HER PLEA AGREEMENT AS WELL.  SHE PLED TO 84(3)(A)(6) AS

11   WELL, YOUR HONOR.

12         THE COURT:  SHE DID, YES.

13         MS. SMITH:  YES.

14         THE COURT:  AND WHILE YOU AGREED TO THAT

15   ADJUSTMENT IN MR. BREWER'S CASE, YOU DIDN'T SPECIFICALLY

16   IN THE PLEA AGREEMENT AGREE TO IT, BUT THE PROBATION

17   OFFICER APPLIED IT, AND THERE WAS NO GOVERNMENT OBJECTION.

18         MS. SMITH:  UH-HUH.  NO, I DIDN'T.

19         THAT'S CORRECT, IT WAS NOT AT HER HOME, YOUR

20   HONOR, IT WAS AT ANOTHER LOCATION, AND THAT WOULD BE THE

21   ONLY FACTUAL DISTINCTION.  EVERYTHING ELSE IS EQUAL AND

22   THAT WOULD BE -- IT WAS THE SAME QUANTITY FOR HER AS WELL,

23   AND IT WAS ATTRIBUTABLE AS WELL BECAUSE THERE WAS NO

24   RECORD OF HER BUYING SUDAFED.

25         THE COURT:  ONE OTHER QUESTION, MS. SMITH.

1    MR. LANDERS HAS TESTIFIED TODAY THAT HE ONLY KNEW A VERY

2    LIMITED NUMBER OF ALL THESE CONSPIRATORS, WAS INVOLVED IN

3    THIS FOR A VERY LIMITED PERIOD OF TIME, DID NOT EVER

4    MANUFACTURE METH, HAD NEVER -- HAD NEVER DISTRIBUTED METH,

5    IS THERE ANYTHING THAT WAS UNCOVERED IN THE GOVERNMENT'S

6    INVESTIGATION HERE THAT CONTRADICTS ANY OF THAT?

7            MS. SMITH:  NO, YOUR HONOR, THERE WAS NOT.  OF

8    COURSE, HE WAS ONLY HELD ACCOUNTABLE FOR 9.6.  HE DIDN'T

9    EVEN COME CLOSE TO THE 128 OR THE 240 FOR, YOU KNOW, THE

10   VERY LARGE QUANTITIES; BUT, NO, WE HAD TRIED TO BE

11   CONSISTENT AND ONLY PEGGED THEM WITH WHAT THEY SHOULD BE

12   HELD ACCOUNTABLE FOR.

13           THE COURT:  AND THE 9.6 GRAMS IS THE AMOUNT OF

14   PSEUDOEPHEDRINE FOUND AT THE RESIDENCE ON THE 28TH OF

15   OCTOBER?

16           MS. SMITH:  ACTUALLY, YOUR HONOR, THAT IS A

17   PURELY COMPROMISED QUANTITY.

18           THE COURT:  COMPROMISED.

19           MS. SMITH:  YES, SIR.  AND I'LL BE VERY FRANK

20   ABOUT THAT, THAT'S WHY IT'S DONE THAT.  IT IS THE VERY

21   BEST I CAN DO.

22           THE COURT:  OKAY.  ALL RIGHT.

23           ALL RIGHT.  THE ISSUE HERE IS WHETHER OR NOT

24   MR. LANDERS IS ENTITLED TO A MITIGATING ROLE ADJUSTMENT

25   UNDER SECTION 3B1.2 OF THE GUIDELINES WHICH PROVIDES FOR A

DECREASE IN THE OFFENSE LEVEL OF FOUR LEVELS IF THE

DEFENDANT WAS A MINIMAL PARTICIPANT, TWO LEVELS IF HE WAS

A MINOR PARTICIPANT IN CRIMINAL ACTIVITY, OR IN CASES THAT

FALL IN BETWEEN A THREE LEVEL REDUCTION.  THE GUIDELINE

COMMENTARY MAKES IT CLEAR THAT THIS SECTION OF THE GUIDE-

LINES IS INTENDED TO PROVIDE AN ADJUSTMENT IN THE CASE OF

A DEFENDANT WHO IS LESS CULPABLE, IF YOU WILL, WHO PLAYS A

SMALLER ROLE, LESS OF A ROLE IN COMMITTING THE OFFENSE

THAN THE SUBSTANTIAL -- THE AVERAGE PARTICIPANT DOES.

          IN DETERMINING WHETHER THE MINIMAL PARTICIPANT

ROLE ADJUSTMENT APPLIES, THE GUIDELINES INDICATE THAT THE

SECTION IS INTENDED TO COVER THOSE WHO ARE PLAINLY THE

LEAST CULPABLE OF ALL THOSE INVOLVED IN THE CONDUCT OF THE

GROUP.  IN APPLYING THAT PARTICULAR ADJUSTMENT, THE COURT,

AMONG OTHER THINGS, LOOKS TO THE DEFENDANT'S LACK OF

KNOWLEDGE OR UNDERSTANDING OF THE SCOPE AND STRUCTURE OF

THE ENTERPRISE AND OF THE ACTIVITIES OF OTHERS.  A MINOR

PARTICIPANT IS SIMPLY DEFINED BY THE GUIDELINE AS A

PARTICIPANT WHO IS LESS CULPABLE THAN MOST OTHER PARTICI-

PANTS, BUT WHOSE PARTICIPATION COULD NOT BE DESCRIBED AS

MINIMAL.  NOT OF VERY MUCH HELP TO THE COURT.

          SOME THINGS ARE RELATIVELY UNDISPUTED HERE.

FIRST OF ALL, MR. LANDERS' PARTICIPATION IN THE CONCERTED

CRIMINAL ACTIVITY WAS OF A VERY SHORT DURATION.  THERE WAS

NO PROOF THAT IT EXTENDED BEYOND OCTOBER 27 AND OCTOBER

1  28TH. THERE IS NO PROOF HERE THAT HE KNEW MOST OF THE

2  DEFENDANTS INVOLVED IN THIS CONSPIRACY. MY RECOLLECTION

3  IS THAT HE TESTIFIED THAT HE KNEW ONLY THREE, AND HIS

4  CONTACT WITH THOSE THREE WAS RELATIVELY LIMITED, MOSTLY TO

5  THE EVENTS OF OCTOBER 27 AND 28.

6           THIS WAS A LARGE SCALE CONSPIRACY CASE INVOLV-

7  ING A NETWORK OF PEOPLE WHO WERE RATHER LOOSELY CONNECTED.

8  THERE CERTAINLY WAS NOT SIGNIFICANT STRUCTURE TO THIS

9  CONSPIRACY, SO I THINK IT'S ESTABLISHED HERE TODAY, OR AT

10 LEAST UNCONTESTED, THAT MR. LANDERS ALSO HAD FAIRLY

11 LIMITED KNOWLEDGE AND UNDERSTANDING OF THE SCOPE AND

12 STRUCTURE OF THIS ENTERPRISE AND THAT HE KNEW VERY LITTLE

13 ABOUT THE ACTIVITIES OF OTHERS INVOLVED, EXCEPT FOR CER-

14 TAINLY MR. WHITE AND MS. PHIPPS, WHOM HE CLEARLY DESCRIBED

15 AS SUPPLIERS OF METHAMPHETAMINE.

16           THE GUIDELINE MAKES IT CLEAR AS WELL THAT A

17 DEFENDANT WHO IS HELD ACCOUNTABLE UNDER SECTION 1B1.3 FOR

18 RELEVANT CONDUCT ONLY FOR THE CONDUCT HE WAS PERSONALLY

19 INVOLVED WITH IS NOT PRECLUDED FROM THE ADJUSTMENT. THAT

20 APPEARS TO BE A PROVISION OF THE COMMENTARY THAT HAS NOT

21 BEEN APPLIED BY THE SIXTH CIRCUIT. THE SIXTH CIRCUIT

22 APPEARS TO SAY, THEY SAID IT IN CAMPBELL AND THEY'VE SAID

23 IT IN AN OPINION SINCE THAT TIME WHERE THEY HAVE CITED

24 CAMPBELL WITH APPROVAL, THAT AS A GENERAL MATTER A

25 DEFENDANT WHO HAS BEEN HELD ACCOUNTABLE ONLY FOR HIS

1  PERSONAL INVOLVEMENT IS, IN FACT, GENERALLY PRECLUDED

2  FROM, FROM THE ADJUSTMENT.

3         THE GUIDELINE DOES IN FACT GIVE AN EXAMPLE OF A

4  DEFENDANT WHOSE ROLE IN THE OFFENSE WAS SIMPLY LIMITED TO

5  TRANSPORTING OR STORING DRUGS AND WHO HAS BEEN HELD

6  ACCOUNTABLE ONLY FOR THE QUANTITY HE WAS PERSONALLY

7  INVOLVED IN TRANSPORTING OR STORED IS -- OR STORING IS NOT

8  PRECLUDED FROM CONSIDERATION.  IT MAY WELL BE THAT IN A

9  CASE OF TRANSPORTATION OR STORAGE, WHEN THAT WAS THE ONLY

10 INVOLVEMENT, THAT EVEN IN THE SIXTH CIRCUIT THAT THAT

11 ADJUSTMENT MIGHT, MIGHT APPLY.

12        THE PROBLEM HERE, MR. LANDERS, FOR ME IS THAT

13 I'M BOUND BY CAMPBELL, AND THE OTHER CASES THAT HAVE CITED

14 CAMPBELL WITH APPROVAL IN THE SIXTH CIRCUIT.  ALTHOUGH IT

15 IS A COMPROMISED AMOUNT, THERE IS NO REAL SUGGESTION

16 HERE -- I DON'T KNOW HOW MUCH PSEUDOEPHEDRINE WAS FOUND AT

17 THAT RESIDENCE ON OCTOBER 28 OR HOW MUCH WAS PURCHASED AT

18 CVS AND WALGREEN EARLIER THAT DAY.  IT APPEARS, HOWEVER,

19 THAT YOU HAVE BEEN HELD ACCOUNTABLE ONLY FOR THAT WHICH

20 COULD REASONABLY BE ATTRIBUTED TO YOU PERSONALLY OR FOR

21 WHICH YOU WERE PERSONALLY INVOLVED.  UNDER CAMPBELL AND

22 THE CASES THAT COME AFTER IT, IT APPEARS TO ME THAT IN THE

23 SIXTH CIRCUIT YOU ARE NOT ENTITLED TO THE ROLE ADJUSTMENT

24 UNDER THE GUIDELINES, AND I'M COMPELLED, I THINK, UNDER

25 CURRENT EXISTING SIXTH CIRCUIT CASE LAW TO OVERRULE THAT

1   OBJECTION.  HOWEVER, AGAIN, IT CLEARLY IS A MATTER THAT

2   THE COURT CAN CONSIDER IN DETERMINING THE ULTIMATE

3   SENTENCE HERE BECAUSE I'M NOT BOUND BY THE RESULTING

4   GUIDELINE RANGE; BUT I FEEL COMPELLED BY THE LAW TO

5   OVERRULE THE OBJECTION UNDER SECTION 3B1.2.

6            HAVING RESOLVED ALL THOSE OBJECTIONS THEN, I

7   WILL ADOPT THIS PRESENTENCE REPORT AS THE COURT'S FINDINGS

8   IN THIS CASE.  I WILL APPLY AN ADVISORY RANGE OF 77 TO 96

9   MONTHS.  BY STATUTE MR. LANDERS FACES A MAXIMUM TERM OF

10  10, 10 YEARS.

11           ALL RIGHT.  MS. SMITH, THE GOVERNMENT ARGUES

12  FOR A BOTTOM OF THE GUIDELINE RANGE SENTENCE HERE?

13           MS. SMITH:  I DO, YOUR HONOR.  AND WITH ALL DUE

14  RESPECT, I HAVE NOTHING MORE TO ADD THAN WHAT'S IN MY

15  SENTENCING MEMORANDUM AND WHAT I'VE ALREADY SAID.  THANK

16  YOU.

17           THE COURT:  THANK YOU.

18           ALL RIGHT.  MR. MARTIN, I'VE ALSO READ YOUR

19  SENTENCING MEMORANDUM, I KNOW MUCH OF IT WAS PREMISED ON

20  YOUR OBJECTIONS, BUT --

21           MR. MARTIN:  YES, YOUR HONOR; AND I'LL NOT

22  REPEAT ANY OF THE 3553 MATERIAL UNLESS THE COURT HAS A

23  PARTICULAR INTEREST, BUT WE SAY A MINIMUM SENTENCE OF 77

24  MONTHS WOULD BE APPROPRIATE, YOUR HONOR.  THERE WAS NO

25  VIOLENCE ASSOCIATED WITH THE OFFENSE, THERE WAS NO FIREARM

1  ASSOCIATED WITH THE OFFENSE.  MR. LANDERS WAS CLEARLY NOT

2  THE LEADER OF THE OFFENSE AND PLAYED, TO BE, I WOULD SAY

3  HE PLAYED A LIMITED ROLE.

4          THE COURT:  ALL RIGHT.  MR. LANDERS, WOULD YOU

5  COME UP TO THE PODIUM, PLEASE, WITH YOUR ATTORNEY.

6          THE DEFENDANT:  YES, SIR.

7          THE COURT:  MR. LANDERS, IS THERE ANYTHING

8  FURTHER YOU WOULD LIKE TO SAY TO THE COURT TODAY BEFORE I

9  IMPOSE SENTENCE IN THIS CASE?

10         THE DEFENDANT:  NO, SIR.

11         THE COURT:  MR. LANDERS, I HOPE YOU REALIZE

12  THAT YOUR CRIMINAL CONDUCT CANNOT CONTINUE.

13         THE DEFENDANT:  YES, SIR.

14         THE COURT:  YOU'VE, YOU'VE DUG YOURSELF A HUGE

15  HOLE HERE.

16         THE DEFENDANT:  YES, SIR.  I KNOW.

17         THE COURT:  AND THERE'S AN OLD CLICHE, AND I

18  HESITATE TO USE IT, BUT I HOPE YOU KNOW THE RULE IS THAT

19  WHEN YOU FIND YOURSELF IN A HOLE, THE FIRST THING YOU DO

20  IS TO STOP DIGGING, AND YOU JUST CONTINUE TO DIG THIS HOLE

21  DEEPER AND DEEPER BY COMMITTING CRIMINAL OFFENSES.

22         THE DEFENDANT:  YES, SIR.

23         THE COURT:  AND IT APPEARS TO ME THERE ARE SOME

24  CONTRIBUTING FACTORS HERE, THE BIGGEST ONE BEING DRUG

25  ABUSE, AND THAT HAS TO STOP.

1           THE DEFENDANT:  YES, SIR.

2           THE COURT:  YOU ARE A VERY YOUNG MAN.  I DON'T

3   WANT TO SEE YOU SPEND A BIG PART OF THE PRODUCTIVE YEARS

4   OF YOUR LIFE IN A FEDERAL PRISON.

5           THE DEFENDANT:  ME NEITHER, SIR.

6           THE COURT:  THE CRIMINAL HISTORY NEEDS STOP

7   RIGHT HERE, TODAY.  IT'S --

8           THE DEFENDANT:  YES, SIR.

9           THE COURT:  I'M GOING TO RECOMMEND A LOT OF

10  PROGRAMS FOR YOU --

11          THE DEFENDANT:  PLEASE DO, I NEED THEM.

12          THE COURT:  -- WHILE YOU ARE IN THE BUREAU OF

13  PRISONS, BUT ULTIMATELY YOU'LL HAVE TO DECIDE WHETHER YOU

14  WANT TO COMPLETE THOSE PROGRAMS OR NOT AND WHETHER YOU

15  WANT TO DO WHAT IS REQUIRED FOR YOU TO DEVELOP THE TOOLS

16  THAT YOU NEED; BUT IF YOU DON'T, MR. LANDERS, I FEAR THAT

17  THE FUTURE IS NOT TOO BRIGHT.

18          THE DEFENDANT:  YES, SIR.

19          THE COURT:  MR. LANDERS, WHAT I'M REQUIRED TO

20  DO HERE TODAY BY STATUTE IS TO IMPOSE A SENTENCE THAT'S

21  SUFFICIENT BUT NOT GREATER THAN NECESSARY TO COMPLY WITH

22  THE PURPOSES OF SENTENCING ESTABLISHED BY THE UNITED

23  STATES CONGRESS.  THOSE PURPOSES ARE LISTED AT TITLE 18,

24  UNITED STATES CODE, SECTION 3553(A).  CONGRESS HAS ALSO

25  IDENTIFIED A NUMBER OF FACTORS I'M REQUIRED TO CONSIDER.

1   THEY ARE SET OUT IN THAT CODE SECTION AS WELL, AND I BEGIN

2   MY CONSIDERATION OF THOSE FACTORS WITH THE ADVISORY

3   GUIDELINE RANGE THAT APPLIES TO YOUR CASE.

4           NOW, I HAVE DETERMINED HERE AFTER HEARING YOUR

5   OBJECTIONS THIS MORNING, MR. LANDERS, THAT THE ADVISORY

6   GUIDELINE RANGE WHICH APPLIES TO THIS CASE IS A RANGE OF

7   77 TO 96 MONTHS.  NOW, THAT IS ADVISORY.  WHAT THAT MEANS

8   IS I'M NOT REQUIRED TO SENTENCE WITHIN THAT RANGE.

9   REGARDLESS OF WHAT RULING I'VE MADE ON YOUR OBJECTIONS,

10  I'M SIMPLY REQUIRED TO DETERMINE THE RANGE, AND THEN IT'S

11  AN ADVISORY RANGE.

12          AND WHAT THAT MEANS IS THAT I HAVE CONSIDERABLY

13  MORE DISCRETION THAN THAT RANGE WOULD SUGGEST.  MY

14  DISCRETION IS ESTABLISHED HERE BY THE STATUTE.  THIS IS AN

15  OFFENSE WHICH CARRIES A MAXIMUM TERM OF 10 YEARS.  THAT

16  MEANS I HAVE THE DISCRETION TO VARY CONSIDERABLY BELOW THE

17  BOTTOM OF THAT GUIDELINE RANGE OR IN APPROPRIATE CIRCUM-

18  STANCES TO VARY ABOVE THE GUIDELINE RANGE AS WELL AND

19  IMPOSE THE STATUTORY MAXIMUM SENTENCE, BUT THERE'S

20  CERTAINLY BEEN NO SUGGESTION HERE THAT I SHOULD CONSIDER

21  ANYTHING ABOVE THE GUIDELINE RANGE.  IN FACT, THE

22  GOVERNMENT DOES NOT ADVOCATE FOR ANYTHING ABOVE THE BOTTOM

23  OF THIS GUIDELINE RANGE HERE.  SO THE REAL QUESTION FOR ME

24  HERE TODAY, MR. LANDERS, IS WHETHER THE 3553(A) FACTORS

25  WOULD SUGGEST SOME SENTENCE OF LESS THAN 77 MONTHS.

1    NOW, HAVING SAID ALL THAT TO YOU, THIS GUIDE-

2 LINE RANGE IS AN IMPORTANT FACTOR.  IT'S IMPORTANT FOR

3 THIS REASON, IT, IT IS A RANGE THAT WAS ESTABLISHED BY THE

4 UNITED STATES SENTENCING COMMISSION WHICH HAS BEEN DOING

5 WORK RELATED TO THESE GUIDELINE RANGES NOW FOR NEARLY 30

6 YEARS, AND ENACTED IN ESTABLISHING THE GUIDELINE RANGES

7 UNDER A MANDATE FROM THE UNITED STATES CONGRESS WHICH

8 DIRECTED THE SENTENCING COMMISSION TO ESTABLISH THE RANGE,

9 BUT TO DO SO ONLY AFTER THOROUGH CONSIDERATION OF ALL OF

10 THE 3553(A) FACTORS.  SO IN A SENSE WHAT CONGRESS TOLD THE

11 SENTENCING COMMISSION TO DO IS THE SAME THING CONGRESS HAS

12 TOLD ME TO DO, LOOK AT ALL THE 3553(A) FACTORS, THEN

13 DETERMINE WHAT SENTENCE IS SUFFICIENT BUT NOT GREATER THAN

14 NECESSARY.  IN MY CASE, OBVIOUSLY, I'M THE FINAL, FINAL

15 SAY ON THAT UNLESS THE SIXTH CIRCUIT INTERVENES.

16    THE SENTENCING COMMISSION HAS JUST MADE A

17 RECOMMENDATION, BUT GENERALLY SPEAKING IT'S BEEN MY

18 EXPERIENCE THAT THE SENTENCING COMMISSION HAS GENERALLY

19 DONE WHAT CONGRESS TOLD IT TO DO.  IT HAS IN FACT CON-

20 SIDERED THE 3553(A) FACTORS, AND IT HAS IN MOST CASES,

21 MR. LANDERS, RECOMMENDED A RANGE THAT IS IN FACT

22 REFLECTIVE OF THOSE 3553(A) FACTORS.

23    NOW, THERE'S AN ARGUMENT HERE, MR. LANDERS,

24 THAT THIS GUIDELINE RANGE BASED ON THE OFFENSE LEVEL --

25 THE BASE OFFENSE LEVEL THAT'S BEING USED HERE IS NOT TRULY

REFLECTIVE OF YOUR INVOLVEMENT IN THIS PARTICULAR OFFENSE,
AND I WANT TO ADDRESS THAT JUST A MINUTE BECAUSE EVEN
THOUGH THE GUIDELINE RANGE IS GENERALLY IN MY VIEW
REFLECTIVE, THIS GUIDELINE RANGE, AS WE HAVE DISCUSSED,
HAS BEEN ARRIVED AT BY APPLYING THE BASE OFFENSE LEVEL OF
24 FROM SECTION 2D1.1, NOT THE MUCH LOWER OFFENSE LEVEL,
BASE OFFENSE LEVEL WHICH WOULD HAVE BEEN APPLIED AT
SECTION IF 2D1.12 APPLIED.  IN FACT, IT'S A CONSIDERABLE
DIFFERENCE.

          AS WE WERE CONSIDERING IT A FEW MINUTES AGO, I
LOOKED AT THE POTENTIAL ENHANCEMENTS IN THAT BASE OFFENSE
LEVEL, AND YOU MIGHT HAVE ENDED UP WITH A BASE OFFENSE
LEVEL OF 11 OR 12 HAD SECTION, SUBSECTION 12 BEEN APPLIED
RATHER THAN SUBSECTION 1; BUT IT'S A SIGNIFICANT DIF-
FERENCE.  IT'S, IN EFFECT, A BASE OFFENSE LEVEL THAT IS
DOUBLE OR MORE WHAT IT WOULD BE UNDER SECTION 2D1.12;

          AND ALTHOUGH I THINK I CAME TO THE RIGHT
DECISION UNDER THE CASE LAW AS WE HAVE DISCUSSED, THE
CROSS REFERENCE APPLIED IN THAT SECTION IS ONE WHICH HAS
NOT BEEN AT ISSUE SO FAR AS I CAN TELL IN A DISTRICT COURT
OR THE SIXTH CIRCUIT COURT OF APPEALS.  THERE'S NO CASE
LAW TO GUIDE ME IN MAKING THAT DETERMINATION.  I HAVE
BASED THAT DETERMINATION ON THE LITERAL LANGUAGE OF THE
GUIDELINE ITSELF WITH SOME HELP FROM AN ELEVENTH CIRCUIT
OPINION, WHICH, OF COURSE, IS NOT BINDING ON THIS COURT,

1  BUT WHICH GIVES ME AN INDICATION OF WHAT AN APPEALS COURT

2  MIGHT DO IN THAT SITUATION.

3          I THINK WHAT THAT RAISES IS WHETHER OR NOT THE

4  GUIDELINE RANGE TRULY OVERSTATES THE SERIOUSNESS OF THIS

5  OFFENSE.  AND IN MY VIEW, MR. LANDERS, IT MAY VERY WELL DO

6  THAT, MUCH FOR THE SAME REASON THAT YOUR ROLE IS CONCEDED

7  TO BE A LESS CULPABLE ROLE IN THIS PARTICULAR OFFENSE.  IT

8  IS CLEAR THAT YOU WERE NOT PERSONALLY INVOLVED IN THE

9  MANUFACTURE OF METHAMPHETAMINE, EXCEPT TO THE EXTENT THAT

10  YOU MADE YOUR HOME AVAILABLE ON THE 27TH AND/OR 28TH OF

11  OCTOBER FOR OTHERS THAT YOU REASONABLY KNEW MIGHT USE IT

12  FOR THAT PURPOSE --

13          THE DEFENDANT:  YES, SIR.

14          THE COURT:  -- YOUR PERSONAL INVOLVEMENT IN

15  OBTAINING PSEUDOEPHEDRINE THAT DAY; BUT BEYOND THAT, THE

16  SCOPE OF YOUR INVOLVEMENT HERE IS VERY LIMITED, BOTH IN

17  TIME AND IN THE QUALITATIVE NATURE OF IT.  THE QUANTITY OF

18  PSEUDOEPHEDRINE IS FAIRLY SMALL; AND I DON'T MEAN TO

19  MINIMIZE THE FACT THAT METHAMPHETAMINE COULD HAVE BEEN

20  MANUFACTURED FROM THAT PSEUDOEPHEDRINE, AND AS YOU KNOW

21  METHAMPHETAMINE IS A SIMPLY HORRIBLE DRUG.

22          THE DEFENDANT:  YES, SIR.

23          THE COURT:  MS. SMITH IS PROBABLY RIGHT, IT IS

24  THE MOST ADDICTIVE DRUG OF ALL THOSE THAT THIS COURT SEES.

25  I'VE HAD MANY PEOPLE STAND WHERE YOU ARE STANDING AND TELL

1  ME THAT AFTER THEY USED METHAMPHETAMINE ONE TIME, THEY

2  WERE SIMPLY HOOKED ON IT.

3        THE DEFENDANT:  YES, SIR.

4        THE COURT:  I'M A LITTLE BIT AMAZED, AS

5  MS. SMITH WAS, THAT YOU ACTUALLY INJECTED METHAMPHETAMINE

6  THE FIRST TIME YOU APPARENTLY EVER USED IT.  I GUESS I

7  UNDERSTAND THAT IN THE CONTEXT OF THE FACT THAT YOU'VE

8  BEEN DOING THAT WITH OTHER DRUGS PREVIOUSLY, BUT IT'S A

9  VERY DANGEROUS THING TO DO, MR. LANDERS.  YOU ARE DEALING

10  WITH A VERY DANGEROUS DRUG AND A VERY HIGHLY DANGEROUS

11  PROCESS FOR THE MANUFACTURING OF THAT DRUG.

12        THERE WAS A DEFENDANT HERE RECENTLY, AND I

13  DON'T REMEMBER WHETHER HE WAS IN ONE OF THESE CASES OR

14  NOT, HE MIGHT HAVE BEEN, I BELIEVE HE WAS --

15        MS. SMITH:  HE WAS, YOUR HONOR, MR. TUCKER.

16        THE COURT:  -- WHERE A LAB VERY SIMILAR TO THIS

17  EXPLODED, AND THAT MAN EXPERIENCED SERIOUS BURNS OVER 70

18  PERCENT OF HIS BODY FROM THE EXPLOSION.  NOW, THAT'S WHAT

19  CAN HAPPEN WHEN YOU FOOL WITH THIS STUFF, MR. LANDERS.

20        THE DEFENDANT:  YES, SIR.

21        THE COURT:  NO GOOD CAN COME OF MANUFACTURING

22  OR USING METHAMPHETAMINE.  SO I DON'T MEAN IN ANY WAY TO

23  MINIMIZE THE SERIOUSNESS OF THE UNDERLYING OFFENSE --

24        THE DEFENDANT:  YES, SIR.

25        THE COURT:  -- BECAUSE IT RESULTED IN OR

1   CERTAINLY COULD HAVE IN THIS CASE HAVE RESULTED IN THE

2   MANUFACTURE OF METHAMPHETAMINE, AND AS MS. SMITH POINTS

3   OUT, THERE IS SOME EVIDENCE THAT SOME METHAMPHETAMINE MAY

4   HAVE BEEN MANUFACTURED IN YOUR HOUSE WHILE YOU WERE GONE

5   THAT DAY BECAUSE OF THE ODOR THAT YOU NOTICED WHEN YOU

6   RETURNED.

7           THE DEFENDANT:  YES, SIR.

8           THE COURT:  AND HAD YOU NOT BEEN SO ANXIOUS TO

9   OBTAIN METHAMPHETAMINE AND NOT UNDER THE INFLUENCE OF

10  METHAMPHETAMINE, IF YOUR BRAIN WERE FUNCTIONING NORMALLY

11  AND REASONABLY, YOU WOULD HAVE UNDERSTOOD THAT.

12          THE DEFENDANT:  YES, SIR.

13          THE COURT:  AND NOT ONLY WOULD YOU HAVE TOLD

14  THEM TO GET OUT OF YOUR HOUSE, BUT YOU WOULD HAVE CALLED

15  THE POLICE.

16          THE DEFENDANT:  YES, SIR.

17          THE COURT:  SO I THINK THERE IS A LEGITIMATE

18  ARGUMENT TO BE MADE HERE, MR. LANDERS, THAT THIS GUIDELINE

19  RANGE WE'VE ARRIVED AT DOES IN FACT OVERSTATE THE

20  SERIOUSNESS OF THE OFFENSE BECAUSE OF THE CROSS REFERENCE

21  THAT'S APPLIED TO SECTION 2D1.1.

22          THERE'S ANOTHER REASON THOUGH WHY THIS GUIDE-

23  LINE RANGE IS IMPORTANT TO ME, THAT IS BECAUSE IT RELATES

24  TO ANOTHER OF THE 3553(A) FACTORS, (A)(6).  (A)(6)

25  REQUIRES THIS COURT TO CONSIDER THE NEED FOR UNIFORMITY IN

1  SENTENCING.  UNIFORMITY IN SENTENCING SIMPLY MEANS TREAT-

2  ING SIMILARLY SITUATED DEFENDANTS, THAT IS DEFENDANTS WHO

3  HAVE COMMITTED THE SAME OR SIMILAR CRIMINAL OFFENSE AND

4  WHO HAVE THE SAME OR SIMILAR CRIMINAL HISTORY, ROUGHLY THE

5  SAME WAY WHEN IT COMES TO SENTENCING.  I THINK YOU WILL

6  AGREE WITH ME THAT THAT IS A MATTER OF BASIC FAIRNESS.

7           THE DEFENDANT:  YES, SIR.

8           THE COURT:  I THINK MOST PEOPLE WOULD AGREE

9  WITH THAT, AND CONGRESS WAS ARGUABLY MOTIVATED SOLELY BY

10 THAT FACTOR WHEN IT PASSED THE SENTENCING REFORM ACT.  THE

11 REASON I SAY THAT IS THAT THE CONGRESS ORIGINALLY MADE

12 THESE GUIDELINES MANDATORY IN THE FEDERAL COURTS.  THEY'RE

13 NO LONGER MANDATORY, AS WE HAVE DISCUSSED.  AND THE REASON

14 THE GUIDELINE RANGE RELATES TO THAT FACTOR IS THAT THE

15 GUIDELINE RANGE IN MY OPINION IS, IS THE ONLY GUIDE THAT A

16 DISTRICT COURT JUDGE HAS TO TRY TO ACHIEVE UNIFORMITY IN

17 SENTENCING.  IT'S THE ONLY WAY THAT I HAVE OR ANY OTHER

18 DISTRICT JUDGE HAS TO TRY TO ACHIEVE FAIRNESS IN SENTENC-

19 ING, IF YOU WILL, BETWEEN SIMILARLY SITUATED INDIVIDUALS.

20 INDEED, THE SIXTH CIRCUIT HAS RECOGNIZED THAT IN A NUMBER

21 OF OPINIONS.  SO IT'S IMPORTANT BECAUSE IT FURTHERS THAT

22 GOAL OF SENTENCING ESTABLISHED BY CONGRESS; AND I THINK

23 YOU UNDERSTAND, MR. LANDERS, WHAT I'M SAYING, BUT WHAT

24 THAT MEANS IS THAT CONGRESS HAS EXPRESSED A VERY STRONG

25 PREFERENCE THAT DEFENDANTS WHO ARE CONVICTED OF THIS

OFFENSE AND WHO HAVE THE KIND OF CRIMINAL HISTORY THAT YOU
HAVE OUGHT TO GET ROUGHLY THE SAME SENTENCE.  AND IT IS,
AFTER ALL, THE CRIMINAL HISTORY HERE THAT IS DRIVING THIS
WHOLE RANGE.  EVEN USING THE RANGE -- EXCUSE ME, EVEN
USING THE OFFENSE LEVEL THAT WE'VE USED HERE, WHICH IS A
TOTAL OF 21 AFTER REDUCING IT FOR ACCEPTANCE OF RESPONSI-
BILITY, IF YOU WERE A CRIMINAL HISTORY CATEGORY 1 IN THIS
CASE, MR. LANDERS, INSTEAD OF A CRIMINAL HISTORY CATEGORY
6, THE GUIDELINE RANGE WOULD NOT BE 77 TO 96 MONTHS, BUT
37 TO 46.  SO YOU CAN SEE HOW YOUR CRIMINAL HISTORY IS
AFFECTING WHAT'S HAPPENING HERE --

    THE DEFENDANT:  YES, SIR.

    THE COURT:  -- IN TERMS OF THE DETERMINING THE
GUIDELINE RANGE.

    NOW, YOU'RE ALREADY A CRIMINAL HISTORY CATEGORY
6, WHICH IS THE HIGHEST CRIMINAL HISTORY CATEGORY THAT YOU
CAN GET IN THE FEDERAL SYSTEM.

    THE DEFENDANT:  YES, SIR.

    THE COURT:  BUT THERE IS SUCH A THING AS AN
UPWARD DEPARTURE; SO IF YOU CONTINUE TO ACCUMULATE
CRIMINAL HISTORY AND YOU END UP BACK IN THIS COURT AGAIN
CONVICTED OF AN OFFENSE, IT CAN ONLY GET WORSE.

    THE DEFENDANT:  YES, SIR.

    THE COURT:  THE GUIDELINE RANGE IS IMPORTANT
FOR THAT REASON.

1          THEN, MR. LANDERS, I HAVE TO LOOK AT THE OTHER

2     3553(A) FACTORS WITH AN EYE TO DETERMINING WHETHER OR NOT

3     THERE IS ONE OR MORE OF THOSE FACTORS THAT'S NOT PROPERLY

4     ACCOUNTED FOR IN THE GUIDELINE RANGE.  I GENERALLY BEGIN

5     WITH THE SERIOUSNESS OF THE OFFENSE.  BECAUSE THE OFFENSE

6     RESULTED OR HAD THE POTENTIAL OF RESULTING IN THE

7     MANUFACTURE OF METHAMPHETAMINE, IT IS BY DEFINITION A

8     SERIOUS OFFENSE, AND YOU DID CLEARLY FACILITATE THAT.  YOU

9     MADE YOUR HOME AVAILABLE --

10          THE DEFENDANT:  YES, SIR.

11          THE COURT:  -- TO PEOPLE THAT YOU KNEW OR

12     CERTAINLY SHOULD HAVE KNOWN WANTED TO MANUFACTURER

13     METHAMPHETAMINE, AND YOU PARTICIPATED TO SOME DEGREE, AT

14     LEAST, IN OBTAINING THE MATERIALS; AND YOU WERE CERTAINLY

15     IN CONSTRUCTIVE POSSESSION OF THE MATERIALS NEEDED TO

16     MANUFACTURE THAT.  YOU CHARACTERIZED THAT AS STUPIDITY.

17          THE DEFENDANT:  IT DEFINITELY IS.

18          THE COURT:  I THINK IT CAN CLEARLY BE CATE-

19     GORIZED AS THAT, BUT IT'S A BIT BEYOND THAT.  YOU'RE

20     ASKING FOR TROUBLE, MR. LANDERS, IF YOU ALLOW THIS KIND OF

21     ACTIVITY TO TAKE PLACE IN YOUR HOME AND ALLOW THESE KINDS

22     OF PEOPLE TO ASSEMBLE THERE.

23          NOW, THE OVERALL SCOPE OF THIS CONSPIRACY WAS

24     VERY LARGE.  A VERY LARGE QUANTITY OF METHAMPHETAMINE

25     ENDED UP BEING MANUFACTURED AND MUCH OF IT DISTRIBUTED AS

1 A RESULT OF WHAT ALL THE PEOPLE INVOLVED IN THIS CON-

2 SPIRACY DID.  AS WE'VE TALKED, YOU'RE NOT BEING HELD

3 ACCOUNTABLE FOR WHAT ALL OF THESE PEOPLE DID; ALTHOUGH IF

4 YOU HAD GONE TO TRIAL, YOU MIGHT HAVE BEEN.  AND IN A

5 CONSPIRACY, AS MR. MARTIN I'M SURE HAS EXPLAINED TO YOU,

6 IT'S NOT NECESSARY THAT YOU KNOW EVERYBODY ELSE INVOLVED

7 OR KNOW WHAT THEY'RE DOING, YOU SIMPLY HAVE TO AGREE WITH

8 ONE OTHER PERSON TO JOIN THE CONSPIRACY WITH THE INTENT

9 THAT THE CONSPIRACY'S ULTIMATE GOAL BE CARRIED OUT; THAT

10 IS MANUFACTURING METHAMPHETAMINE.  NOW, YOU DIDN'T PLEAD

11 GUILTY TO, WEREN'T FOUND GUILTY OF CONSPIRACY.  THAT'S

12 WHAT I'M SAYING TO YOU IS YOU COULD HAVE BEEN.

13         I ALSO HAVE TO BE CONCERNED WITH THE NEED TO

14 PROMOTE RESPECT FOR THE LAW, AND HERE'S WHERE YOUR

15 CRIMINAL HISTORY COMES IN.  NOT ONLY COULD I NOT FIND AN

16 OVERREPRESENTATION OF CRIMINAL HISTORY BY THIS CRIMINAL

17 HISTORY CATEGORY OF 6, YOUR CRIMINAL HISTORY IS A

18 SIGNIFICANT FACTOR HERE.  SIXTEEN CRIMINAL HISTORY POINTS,

19 THAT'S THREE MORE THAN NECESSARY TO BE CRIMINAL HISTORY

20 CATEGORY 6, A WHOLE HOST OF CONVICTIONS OVER A SIX YEAR

21 PERIOD OF TIME, SOME OF THEM SERIOUS, SOME OF THEM

22 INVOLVING VIOLENCE, CERTAINLY RECKLESS CONDUCT; A NUMBER

23 OF CONVICTIONS HERE FOR WHICH NO CRIMINAL HISTORY POINTS

24 WERE ASSESSED, AND IT'S TROUBLING THAT YOU WERE ON

25 PROBATION WHEN THIS OFFENSE OCCURRED.

1        YOU'RE PLACED ON PROBATION, MR. LANDERS,

2   SUBJECT TO GOOD BEHAVIOR.

3        THE DEFENDANT:  YES, SIR.

4        THE COURT:  BY NO STRETCH OF THE IMAGINATION

5   CAN YOU CONSIDER WHAT HAPPENED ON OCTOBER 27TH AND 28TH TO

6   BE GOOD BEHAVIOR.

7        THE DEFENDANT:  YES, SIR.

8        THE COURT:  AND SO THAT SUGGESTS TO ME THAT

9   UNLESS SOMETHING CHANGES SIGNIFICANTLY IN YOUR LIFE, THAT

10  SUPERVISION, THAT IS PROBATION OR SUPERVISED RELEASE, IS

11  NOT GOING TO BE TERRIBLY EFFECTIVE HERE.

12       THE DEFENDANT:  YES, SIR.

13       THE COURT:  BUT THE NUMBER OF CRIMINAL HISTORY

14  POINTS, CERTAINLY THE NUMBER OF CONVICTIONS THEMSELVES

15  ILLUSTRATE THE NEED TO PROMOTE RESPECT FOR THE LAW HERE.

16  MR. LANDERS, YOU HAVE TO FOLLOW THE RULES.

17       THE DEFENDANT:  YES, SIR.

18       THE COURT:  THESE RULES HAVE TO BE LAWS PASSED

19  BY THE CONGRESS OR LEGISLATURE; BUT YOU WILL FIND, IF YOU

20  HAVEN'T ALREADY LEARNED IT, THAT THERE ARE RULES THAT

21  APPLY TO EVERYTHING YOU DO IN LIFE.

22       THE DEFENDANT:  YES, SIR.

23       THE COURT:  YOU WILL NEVER HAVE THE COMPLETE

24  FREEDOM TO DO ANYTHING YOU WANT TO DO WITHOUT BEARING SOME

25  CONSEQUENCES FOR THE BAD DECISIONS YOU MAKE.  YOU'VE

1    SIMPLY GOT TO FOLLOW THE LAW.

2          THE DEFENDANT:  YES, SIR, I KNOW.

3          THE COURT:  AND THERE HAS TO BE A RESULT HERE

4    THAT ENCOURAGES THAT, THAT PROMOTES IT; NOT JUST WITH YOU,

5    BUT WITH OTHERS AS WELL.

6          THERE'S ALSO A NEED TO PROMOTE ADEQUATE

7    DETERRENCE BY THE SENTENCE IMPOSED HERE.  MR. LANDERS, I

8    INDICATED A FEW MINUTES AGO THAT THERE ARE SOME CON-

9    TRIBUTING FACTORS HERE.  YOU HAVE A SERIOUS UNDERLYING

10   MENTAL HEALTH CONDITION.  AS I UNDERSTAND IT, YOU'VE BEEN

11   DIAGNOSED AS BIPOLAR.

12         THE DEFENDANT:  YES, SIR.

13         THE COURT:  THAT IS A SIGNIFICANT MENTAL ILL-

14   NESS THAT GENERALLY REQUIRES ONGOING TREATMENT AND OFTEN

15   MEDICATION, NOT IN CONJUNCTION WITH ALL THESE ILLEGAL

16   DRUGS YOU'RE TAKING THOUGH.

17         THE DEFENDANT:  YES, SIR.

18         THE COURT:  MANY OF THEM JUST MAKE THE SITUA-

19   TION WORSE.  AND YOU SUFFER FROM A VERY SERIOUS SUBSTANCE

20   ABUSE PROBLEM THAT BEGAN APPARENTLY AT THE AGE OF 13?

21         THE DEFENDANT:  YES, SIR.

22         THE COURT:  I MEAN, THERE'S BEEN A HISTORY HERE

23   OF DAILY USE OF MARIJUANA, OF DAILY USE OF HEROIN, OF

24   FREQUENT USE OF COCAINE.  YOU'VE BEEN IN A METHADONE

25   PROGRAM, AS I RECALL.

1          THE DEFENDANT:  YES, SIR.

2          THE COURT:  JUST A VERY, VERY SERIOUS HISTORY

3    OF DRUG ABUSE.

4          NOW, THIS RELATES TO ONE OF THE RECOMMENDATIONS

5    I'M GOING TO MAKE HERE, MR. LANDERS.  I'M GOING TO

6    RECOMMEND YOUR PARTICIPATION IN THE MOST INTENSIVE DRUG

7    TREATMENT PROGRAM THAT THE BUREAU OF PRISONS CAN OFFER.

8          THE DEFENDANT:  THANK YOU.

9          THE COURT:  IT'S A VOLUNTARY PROGRAM; AND EVEN

10   IF I HAD THE AUTHORITY, I WOULDN'T REQUIRE YOU TO DO IT

11   BECAUSE IT'S GOT TO BE DONE BECAUSE YOU WANT TO DO IT.

12         THE DEFENDANT:  YES, SIR.

13         THE COURT:  BUT I'M GOING TO RECOMMEND THAT FOR

14   YOU; BUT THE SIMPLE FACT OF THE MATTER IS I'M ALSO GOING

15   TO RECOMMEND A FULL MENTAL HEALTH EVALUATION AND APPRO-

16   PRIATE TREATMENT THERE AS WELL, AND THEY GO HAND IN HAND.

17   SIMPLE FACT OF THE MATTER IS THAT UNLESS YOU ADDRESS THESE

18   SERIOUS MENTAL HEALTH ISSUES AND THESE SERIOUS SUBSTANCE

19   ABUSE ISSUES, YOU ARE -- YOU WILL CONTINUE TO BE

20   DANGEROUS, BOTH TO YOURSELF AND TO OTHERS, AND YOU WILL

21   CONTINUE TO BE A RISK TO COMMIT CRIMINAL ACTS.

22         NOW, ONE OF THE FACTORS LISTED IN 3553(A) IS

23   THE NEED TO PROVIDE YOU WITH NEEDED EDUCATIONAL OR

24   VOCATIONAL TREATMENT OR OTHER KINDS OF TREATMENT,

25   REHABILITATIVE TREATMENT.  THE UNITED STATES SUPREME COURT

1   HAS MADE IT CLEAR NOW THAT I CAN'T CONSIDER YOUR NEED FOR

2   MENTAL HEALTH TREATMENT OR YOUR NEED FOR SUBSTANCE ABUSE

3   OR OTHER REHABILITATIVE KINDS OF TREATMENT IN DETERMINING

4   WHETHER TO SEND YOU TO PRISON OR THE LENGTH OF THE TIME.

5   I WOULD SIMPLY SAY FOR THE RECORD HERE THAT CERTAINLY ANY

6   SENTENCE WITHIN THIS GUIDELINE RANGE AND A SENTENCE EVEN

7   BELOW THIS GUIDELINE RANGE WILL AFFORD YOU ADEQUATE

8   OPPORTUNITY, ADEQUATE TIME TO GET THOSE PROGRAMS.

9           THE DEFENDANT:  YES, SIR.

10          THE COURT:  NOW, MR. LANDERS, I HAVE SOME HOPE,

11  DESPITE THE HISTORY HERE, THAT IF YOU GET APPROPRIATE

12  MENTAL HEALTH EVALUATION AND TREATMENT AND IF YOU FOLLOW

13  THE DIRECTIVES GIVEN YOU BY THE DOCTORS -- THAT'S CRITI-

14  CAL; AND ANY DOCTOR THAT TREATS YOU FOR THAT CONDITION

15  WILL TELL YOU TO STAY ON THAT MEDICATION PRESCRIBED, BUT

16  DO NOT USE ANYTHING ELSE, INCLUDING MARIJUANA.

17          THE DEFENDANT:  YES, SIR.

18          THE COURT:  IT JUST MAKES THE SITUATION WORSE.

19  AND IF YOU GET SUBSTANCE ABUSE TREATMENT OF AN INTENSIVE

20  NATURE, WHICH IS WHAT I THINK IS REQUIRED HERE, THEN I

21  WOULD HOPE THAT THE NEED TO SPECIFICALLY DETER YOU FROM

22  FURTHER CRIMINAL CONDUCT IS REDUCED.

23          THE DEFENDANT:  YES, SIR.

24          THE COURT:  HOPEFULLY TO THE POINT THAT YOU

25  WILL NOT CONTINUE TO COMMIT CRIMINAL ACTS.

1          THE DEFENDANT:  YES, SIR.

2          THE COURT:  AND IT'S, IT'S BEYOND QUESTION HERE

3    THAT YOUR CRIMINAL ACTIVITY OCCURRED RATHER CONTEM-

4    PORANEOUSLY WITH YOUR SUBSTANCE ABUSE.  AND YOUR CRIMINAL

5    HISTORY BEGINS AS A JUVENILE, YOUR SUBSTANCE ABUSE BEGAN

6    AS A JUVENILE AS WELL; AND YOU HAVE COMMITTED MANY OF THE

7    KINDS OF OFFENSES THAT DRUG ADDICTS TYPICALLY COMMIT,

8    INCLUDING PROPERTY OFFENSES.  PROPERTY OFFENSES, BY THE

9    WAY REPRESENT THE MOST SERIOUS RISK OF REPEAT OFFENSES OF

10   ANY CATEGORY CRIMINAL OFFENSES.  DOJ STATISTICS, THE LAST

11   ONES I SAW, AT LEAST, INDICATE THAT ABOUT THREE-FOURTHS OF

12   THE PEOPLE WHO COMMIT PROPERTY OFFENSES WILL COMMIT

13   ANOTHER ONE AFTER THEY'RE RELEASED FROM PRISON, A VERY

14   SIGNIFICANT NUMBER; AND DRUG ADDICTION CONTRIBUTES TO

15   THAT.

16          GENERAL DETERRENCE IS A LITTLE DIFFERENT ISSUE,

17   MR. LANDERS.  GENERAL DETERRENCE GOES TO THE QUESTION OF

18   WHAT SENTENCE IS NECESSARY TO DETER OTHERS; AND WITH THESE

19   METHAMPHETAMINE OFFENSES ESPECIALLY THERE MUST BE A

20   GENERAL DETERRENCE.  THE COURT MUST SEND A MESSAGE TO

21   OTHERS THAT AT LEAST IN THIS COURT THESE OFFENSES ARE

22   CONSIDERED TO BE VERY SERIOUS OFFENSES AND THERE WILL BE

23   CONSEQUENCES FROM THE COMMISSION OF THESE OFFENSES.

24          THE DEFENDANT:  YES, SIR.

25          THE COURT:  I ALSO HAVE A RESPONSIBILITY TO

1  IMPOSE A SENTENCE HERE THAT WILL PROTECT THE PUBLIC; THAT

2  WILL PROTECT THE PUBLIC FROM YOUR CONTINUED COMMISSION OF

3  THESE CRIMINAL OFFENSES.  MR. LANDERS, GIVEN THIS CRIMINAL

4  HISTORY AND GIVEN THE NATURE OF THIS CRIMINAL HISTORY,

5  THERE WILL COME A TIME IF SOMETHING DOESN'T CHANGE HERE

6  WHEN A JUDGE WILL SAY, I'VE EITHER GOT TO LOCK THIS YOUNG

7  MAN UP FOR A LONG, LONG TIME OR PUT THE PUBLIC AT RISK;

8  AND WHEN THAT BECOMES THE FINAL QUESTION, YOU KNOW WHICH

9  SIDE OF THAT A JUDGE IS GOING TO COME DOWN ON.

10          THE DEFENDANT:  YES, SIR.

11          THE COURT:  THEY'RE GOING TO PROTECT THE

12  PUBLIC.

13          THE DEFENDANT:  YES, SIR.

14          THE COURT:  HOPEFULLY I CAN IMPOSE A SENTENCE

15  HERE TODAY THAT WILL CONSTITUTE NOT ONLY A JUST PUNISHMENT

16  FOR YOU, AND PUNISHMENT IS AN ELEMENT OF THE SENTENCE TO

17  BE IMPOSED, BUT WILL ALSO APPROPRIATELY PROTECT THE PUBLIC

18  IN THE FUTURE BECAUSE YOUR CONDUCT, SIMPLY AS I KNOW HOW

19  TO TELL YOU THIS, MR. LANDERS, YOUR CONDUCT IS JUST NOT

20  ACCEPTABLE, PERIOD.

21          THE DEFENDANT:  YES, SIR.

22          THE COURT:  IT ENDANGERS THE PUBLIC, IT

23  ENDANGERS YOU, PUTS PEOPLE'S LIVES AND SAFETY AT JEOPARDY,

24  PUTS THEIR PROPERTY IN JEOPARDY.  YOU JUST CAN'T CONTINUE

25  IT.

1              THE DEFENDANT:  YES, SIR.

2              THE COURT:  I ALSO HAVE TO CONSIDER HERE THE

3    NATURE AND CIRCUMSTANCES OF YOUR INVOLVEMENT IN THIS

4    OFFENSE; AND I'VE DISCUSSED THIS SOME WITH RESPECT TO, TO

5    YOUR REQUEST OR HEAR YOUR OBJECTION WITH RESPECT TO THE

6    MITIGATING RULE, AND I HAVE FOUND THAT -- MITIGATING ROLE

7    ADJUSTMENT, I SHOULD HAVE SAID -- AND I HAVE FOUND THAT

8    UNDER THE CASE LAW AND UNDER THE FACTS AND CIRCUMSTANCES

9    OF THE CASE THAT YOU'RE NOT LEGALLY ENTITLED TO THAT, BUT

10   I CAN'T ESCAPE THE FACT THAT YOUR INVOLVEMENT HERE WAS

11   PRETTY LIMITED --

12             THE DEFENDANT:  YES, SIR.

13             THE COURT:  -- FOR THE REASONS I'VE ALREADY

14   MENTIONED.  IF THERE WERE EVIDENCE HERE THAT YOU WERE

15   MANUFACTURING METHAMPHETAMINE OR ENGAGED IN THE DIS-

16   TRIBUTION OF METHAMPHETAMINE OR ASSISTING OTHERS IN DOING

17   SO, THEN THIS WOULD BE A DIFFERENT CASE IN THAT RESPECT;

18   BUT YOUR ROLE HERE CLEARLY WAS LIMITED.

19             NOW, THAT DOESN'T EXCUSE YOUR CONDUCT, BUT IT

20   WAS LIMITED.  AND I, I ASKED MS. SMITH ABOUT THE

21   COMPARISON TO OTHER, OTHER DEFENDANTS.  MS. SMITH HAS

22   PROVIDED ME EARLIER WITH HER OFFICE'S ASSESSMENT OF THE

23   RELEVANT CULPABILITY OF ALL THE DEFENDANTS INVOLVED IN

24   THIS CASE, AND I THINK IT'S SIGNIFICANT, QUITE FRANKLY,

25   THAT THE NAME AT THE BOTTOM OF THE LIST IS JOHN LANDERS.

1   THE QUANTITY YOU WERE HELD ACCOUNTABLE FOR HERE IS ALSO

2   THE LEAST QUANTITY ANYBODY WAS HELD ACCOUNTABLE FOR.

3   THERE WERE TWO OTHER DEFENDANTS WHO WERE HELD ACCOUNTABLE

4   FOR THIS SAME QUANTITY.  SO THAT MAKES YOU CLEARLY AMONG

5   THE LEAST CULPABLE WITH RESPECT TO THIS PARTICULAR

6   CONSPIRACY.  IN TERMS OF DURATION, IN TERMS OF ACTUAL

7   INVOLVEMENT, IN TERMS OF THE QUANTITY OF DRUGS.

8           NOW, I'M SURE THERE ARE SOME DIFFERENCES.  I'VE

9   NOTED THAT ONE OF THOSE DEFENDANTS, MS. LOWE, DID IN FACT

10  RECEIVE A MINOR ROLE ADJUSTMENT, NOT A MINIMAL ROLE

11  ADJUSTMENT, BUT A MINOR ROLE ADJUSTMENT.  THE OTHER

12  DEFENDANT IN THE SAME CATEGORY AS YOU WITH RESPECT TO

13  QUANTITY IS, IT LOOKS LIKE, MR. WHITE; AND I'VE NOT YET

14  SENTENCED HIM, SO I DON'T KNOW WHAT'S GOING ON WITH HIS

15  CASE.  AND YOU HEARD WHAT I SAID TO, TO MS. SMITH ABOUT

16  MR. BREWER, WHO GOT THE MINOR ROLE ADJUSTMENT.  I THINK

17  THERE IS SOME VALIDITY HERE IN TAKING INTO ACCOUNT YOUR

18  RELATIVE DEGREE OF CULPABILITY HERE WHEN COMPARED TO ALL

19  THE OTHERS IN THIS CONSPIRACY; AND I SHUDDER TO THINK,

20  MR. LANDERS, WHAT WOULD HAVE HAPPENED IF THE POLICE HADN'T

21  SHOWN UP AT YOUR HOUSE ON THE 28TH OF OCTOBER WITH A

22  WARRANT FOR MR. WHITE.

23          THE DEFENDANT:  YES, SIR.

24          THE COURT:  I DON'T KNOW WHAT WOULD HAVE

25  OCCURRED.  I FEAR THAT YOU WOULD BE IN FAR GREATER TROUBLE

1  THAN YOU ARE NOW BECAUSE YOU APPEAR TO ME TO HAVE BEEN AT

2  THAT POINT SIMPLY INTERESTED IN GETTING DRUGS AND WILLING

3  TO ASSOCIATE WITH WHOEVER AND DO WHATEVER WAS NECESSARY TO

4  GET THEM.

5          THE DEFENDANT:  YES, SIR.

6          THE COURT:  SO IN ONE SENSE IT MIGHT HAVE BEEN

7  IN YOUR BENEFIT, LONG RUN BENEFIT, THAT THE POLICE SHOWED

8  UP WHEN THEY DID.

9          NOW, YOUR PERSONAL HISTORY AND CHARACTERISTICS

10  ARE ALSO SOMETHING THAT I HAVE TO CONSIDER.  UNDER THE

11  GUIDELINES THEMSELVES THOSE PERSONAL CHARACTERISTICS ARE

12  GENERALLY NOT RELEVANT TO SENTENCING, BUT UNDER ADVISORY

13  GUIDELINES THEY, THEY CLEARLY SHOULD BE.  OTHER THAN THE

14  DRUG ADDICTION AND THE MENTAL, UNDERLYING MENTAL ILLNESS

15  ISSUES, THERE'S NOTHING HERE THAT I SEE THAT'S TERRIBLY

16  SIGNIFICANT ABOUT YOUR PERSONAL HISTORY AND CHARAC-

17  TERISTICS.  YOUR CRIMINAL HISTORY OBVIOUSLY IS.  IT'S

18  PROBABLY BEEN ONLY IN THE LAST TWO OR THREE YEARS,

19  MR. LANDERS, THAT I'VE BEGUN TO SEE A WHOLE HOST OF

20  DEFENDANTS IN THEIR EARLY TWENTIES, ONE I CAN REMEMBER WHO

21  HADN'T YET REACHED TWENTY WITH A CRIMINAL HISTORY CATEGORY

22  OF 6; AND THAT'S UNFORTUNATE, BUT WHAT THAT MEANS IS THAT

23  THE STATE COURTS HAVE NOT PROPERLY IN MY VIEW APPROACHED

24  THESE ISSUES BECAUSE WHILE YOU'VE GOT 13 OR 14 PARAGRAPHS

25  OF CRIMINAL HISTORY HERE, IT'S CLEAR YOU'VE NEVER SPENT A

1    LOT OF TIME IN JAIL FOR ANY OF THOSE.

2            THE DEFENDANT:  YES, SIR.

3            THE COURT:  AND THE STATE COURT JUDGES WOULD

4    HAVE SERVED YOUR INTEREST AND THE PUBLIC'S INTEREST FAR

5    BETTER IF THEY HAD GOTTEN YOUR ATTENTION AND GOTTEN YOU

6    INTO SOME KIND OF DRUG TREATMENT PROGRAM EARLIER THAN THIS

7    AND YOU DON'T FIND YOURSELF STANDING HERE BEFORE A FEDERAL

8    JUDGE WITH A CRIMINAL HISTORY CATEGORY OF 6 UNDER FEDERAL

9    LAW.

10            SO THAT BRINGS ME TO THE QUESTION, MR. LANDERS,

11   OF WHAT SENTENCE IS APPROPRIATE IN THIS CASE.  THE

12   GOVERNMENT HAS CONSISTENTLY ADVOCATED HERE BOTH IN THE

13   SENTENCING MEMORANDUM AND HERE TODAY FOR A SENTENCE AT THE

14   BOTTOM OF THE ADVISORY GUIDELINE RANGE, 77 MONTHS.  IN THE

15   SENTENCING MEMORANDUM MR. MARTIN ARGUED FOR A SENTENCE

16   MUCH LESS THAN THAT, OBVIOUSLY BASED ON THE OBJECTIONS HE

17   MADE, AND HAS SUGGESTED TO ME HERE TODAY THAT CERTAINLY A

18   SENTENCE NOT ANY GREATER THAN THE 77 MONTH BOTTOM OF THE

19   GUIDELINE RANGE WOULD BE APPROPRIATE.

20            IT SEEMS TO ME, MR. LANDERS, THAT THE GUIDELINE

21   RANGE ITSELF TAKES INTO ACCOUNT THE 3553(A) FACTORS WITH

22   THE EXCEPTION OF WHAT I'VE SAID.  I CONCLUDE BASED ON

23   WHAT'S HAPPENED WITH THE CROSS REFERENCE HERE THAT THIS

24   GUIDELINE RANGE DOES IN FACT UNDER THE CIRCUMSTANCES OF

25   THIS PARTICULAR CASE, I DON'T MAKE THE FINDING GENERALLY,

1  BUT UNDER THE CIRCUMSTANCES OF THIS PARTICULAR CASE DOES

2  OVERSTATE THE SERIOUSNESS OF THE OFFENSE; AND I ALSO FIND

3  THAT WHILE YOU MAY NOT QUALIFY FOR A FORMAL ROLE ADJUST-

4  MENT UNDER THE GUIDELINES, THAT YOUR INVOLVEMENT HERE WAS

5  IN FACT LIMITED IN TERMS OF SCOPE AND DURATION; THAT

6  THERE'S NOTHING TO INDICATE THAT YOU WERE, KNEW OF OR WERE

7  INVOLVED IN THE OVERALL SCOPE OF THIS CONSPIRACY.  WHAT

8  YOU DID WAS FACILITATE THE PRODUCTION OF METHAMPHETAMINE;

9  AND SO I FIND BASED ON ALL THAT THAT A BELOW GUIDELINE

10 RANGE SENTENCE IS APPROPRIATE HERE, AND I DO THAT WITH

11 SOME RELUCTANCE, MR. LANDERS, IN VIEW OF YOUR CRIMINAL

12 HISTORY.

13         THE DEFENDANT:  THANK YOU, SIR.

14         THE COURT:  THE QUESTION FOR ME IS WHERE BELOW

15 THAT GUIDELINE RANGE TO SENTENCE YOU.

16         YOU TURNED YOURSELF IN TO THE MARSHALS ON THE

17 29TH OF OCTOBER; RIGHT?

18         THE DEFENDANT:  YES, SIR.

19         THE COURT:  YOU WERE NOT IN STATE CUSTODY?

20         THE DEFENDANT:  NO, I WAS NOT IN STATE CUSTODY.

21         THE COURT:  MR. LANDERS, THIS IS A DIFFICULT

22 DECISION FOR ME.  I'M SURE MR. MARTIN WILL TELL YOU, OR

23 PROBABLY HAS ALREADY TOLD YOU, THAT MORE OFTEN THAN NOT I

24 SENTENCE WITHIN THE GUIDELINE RANGE --

25         THE DEFENDANT:  YES, SIR.

1          THE COURT:  -- BECAUSE I GENERALLY FIND THAT

2     THE GUIDELINE RANGE PROPERLY REFLECTS ALL THE FACTORS I AM

3     REQUIRED TO CONSIDER.  YOU ARE A YOUNG MAN.  I WANT YOU TO

4     HAVE AN OPPORTUNITY; AND THIS MAY BE THE LAST OPPORTUNITY

5     YOU GET, MR. LANDERS, BUT I WANT YOU TO HAVE AN

6     OPPORTUNITY TO DEAL WITH THIS DRUG PROBLEM, DEAL WITH THE

7     UNDERLYING MENTAL HEALTH ISSUES, DEVELOP SOME JOB SKILLS;

8     AND I'M GOING TO RECOMMEND SOME PROGRAMS IN THAT RESPECT

9     TOO.  YOU HAVE A GED, BUT YOU OBVIOUSLY DON'T HAVE MARKET-

10    ABLE JOB SKILLS, YOU HAVE LIMITED EDUCATION.  YOU HAVE

11    LIMITED SOCIAL SKILLS, FRANKLY, THAT YOU NEED TO ADDRESS.

12          THE DEFENDANT:  YES, SIR.

13          THE COURT:  AND I'M GOING TO GIVE YOU THE

14    CHANCE THROUGH THESE BOP PROGRAMS TO TRY TO ADDRESS ALL

15    THOSE THINGS; AND I HOPE THAT ONCE YOU HAVE DONE ALL THAT,

16    YOU CAN IN FACT TURN THIS ALL AROUND.

17          I'M GOING TO TELL YOU THAT AFTER YOU SERVE THIS

18    TERM OF IMPRISONMENT, YOU WILL CONTINUE TO BE UNDER THE

19    SUPERVISION OF THIS COURT, AND IT WON'T BE LIKE WHAT

20    YOU'VE EXPERIENCED IN STATE COURT.

21          THE DEFENDANT:  GOOD.

22          THE COURT:  THE SUPERVISION WILL BE STRICTER.

23          THE DEFENDANT:  YES, SIR.

24          THE COURT:  AND VIOLATIONS OF THAT SUPERVISION

25    WILL RESULT IN MUCH MORE SERIOUS CONSEQUENCES, PUNISHMENT,

1    IF YOU WILL --

2              THE DEFENDANT:  YES, SIR

3              THE COURT:  -- THAN WOULD BE IMPOSED IN STATE

4    COURT.

5              WHAT I'M GOING DO HERE, MR. LANDERS, IS IMPOSE

6    A 60 MONTH SENTENCE, WHICH IS 17 MONTHS BELOW THE BOTTOM

7    OF THE GUIDELINE RANGE --

8              THE DEFENDANT:  THANK YOU, SIR.

9              THE COURT:  -- 17 MONTHS BELOW WHAT THE

10   GOVERNMENT HAS ASKED ME TO DO IN THIS CASE.  I'M GOING TO

11   RECOMMEND THE 500 HOUR PROGRAM, RECOMMEND, MAKE THE OTHER

12   RECOMMENDATIONS THAT I HAVE SAID I WOULD MAKE.  AND I WANT

13   TO TELL YOU ONE OTHER THING, MR. LANDERS, THERE'S A WAY TO

14   EVEN GET SOME OF THAT REDUCED.  NOW I'VE, TOLD YOU ABOUT

15   THIS INTENSIVE DRUG TREATMENT PROGRAM.  I WANT YOU TO

16   PARTICIPATE IN THAT PROGRAM BECAUSE YOU WANT TO PARTICI-

17   PATE IN IT BECAUSE YOU WANT DO SOMETHING ABOUT IT, ABOUT

18   THE DRUG ADDICTION PROBLEM; BUT THERE'S A SIDE BENEFIT TO

19   YOU OF DOING THAT, THERE IS A REDUCTION IN THIS SENTENCE

20   THAT CAN BE OBTAINED BECAUSE YOU HAVE PARTICIPATED IN AND

21   COMPLETED THAT DRUG TREATMENT PROGRAM.  AND THAT'S NOT THE

22   REASON WHY YOU OUGHT TO DO IT --

23             THE DEFENDANT:  RIGHT.

24             THE COURT:  -- BUT IT IS A SIDE BENEFIT.  AND

25   THERE'S ALSO SOME REDUCTION IN SENTENCE HERE THAT CAN BE

1  ACHIEVED THROUGH GOOD BEHAVIOR.  I DON'T SEE ANYTHING HERE

2  THAT INDICATES THAT YOU CAN'T BEHAVE YOURSELF WHILE IN

3  CUSTODY; BUT THE SIMPLE FACT OF THE MATTER IS THAT WHILE

4  YOU'RE IN BOP CUSTODY, YOU NEED TO CONCENTRATE ON THE

5  VOCATIONAL AND EDUCATIONAL PROGRAMS, YOU NEED TO CONCEN-

6  TRATE ON THE MENTAL HEALTH TREATMENT AND COUNSELING, YOU

7  NEED TO TAKE CLASSES THAT WILL HELP YOU DEVELOP SKILLS

8  THAT CAN BE APPLIED WHEN YOU GET OUT; AND THEN WHEN YOU

9  GET TO THE DRUG TREATMENT PROGRAM, YOU NEED TO CONCENTRATE

10  ON IT.

11          THE DEFENDANT:  YES, SIR.

12          THE COURT:  IF YOU DO ALL THAT, THERE WON'T BE

13  ANY TIME FOR BAD BEHAVIOR; BUT YOU WILL LOSE YOUR GOOD

14  TIME REDUCTION IF YOU DON'T ENGAGE IN GOOD BEHAVIOR WHILE

15  IN THE BUREAU OF PRISONS CUSTODY AND YOU WILL MISS THE

16  OPPORTUNITY TO TAKE FULL ADVANTAGE OF THESE PROGRAMS.

17          NOW, MR. LANDERS, HAVING SAID ALL THAT -- AND

18  YOU STRIKE ME AS A RELATIVELY INTELLIGENT YOUNG MAN.

19          THE DEFENDANT:  THANK YOU.

20          THE COURT:  FRANKLY, I'VE WATCHED YOU DURING

21  EVERYTHING THAT I'VE SAID, AND I'VE TALKED LONGER THAN I

22  SHOULD HAVE, I SUPPOSE, BUT YOU MADE EYE CONTACT WITH ME,

23  YOU HAVE ACKNOWLEDGED YOUR UNDERSTANDING OF WHAT I HAVE

24  SAID TO YOU.  I THINK YOU FULLY UNDERSTAND THE PROBLEM.

25          THE DEFENDANT:  YES, SIR.

1            THE COURT:  I THINK YOU FULLY UNDERSTAND WHAT'S

2    EXPECTED OF YOU.  I THINK AS YOU STAND THERE TODAY YOU

3    WANT TO PARTICIPATE IN THESE PROGRAMS.

4            THE DEFENDANT:  YES.

5            THE COURT:  AND I HOPE, SINCERELY, THAT YOU,

6    YOU REALLY WANT TO CHANGE THE WAY YOU'VE BEEN LIVING.

7            THE DEFENDANT:  YES, SIR.

8            THE COURT:  AND I DON'T KNOW WHETHER I'LL BE

9    HERE WHEN YOU FINISH ALL THAT AND COME BACK OR NOT, BUT,

10   MR. LANDERS, I'LL REMEMBER ALL THAT IF YOU FINISH THIS

11   SENTENCE AND YOU START THIS KIND OF CONDUCT AGAIN AND I

12   SEE YOU ON A SUPERVISED RELEASE REVOCATION.

13           THE DEFENDANT:  YES, SIR.

14           THE COURT:  MR. LANDERS, HAVING CONSIDERED THE

15   NATURE AND CIRCUMSTANCES OF THE OFFENSE COMMITTED HERE,

16   HAVING CONSIDERED YOUR HISTORY AND CHARACTERISTICS, HAVING

17   CONSIDERED THE ADVISORY GUIDELINE RANGE WHICH APPLIES TO

18   THIS CASE AND ALL THE OTHER FACTORS LISTED IN TITLE 18,

19   UNITED STATES CODE, SECTION 3553(A), AND PURSUANT TO THE

20   SENTENCING REFORM ACT OF 1984, IT IS THE JUDGMENT OF THIS

21   COURT THAT AS TO COUNT 13, THE DEFENDANT, JOHN FRANKLIN

22   LANDERS, II, IS HEREBY COMMITTED TO THE CUSTODY OF THE

23   BUREAU OF PRISONS TO BE IN PRISON FOR A TERM OF 60 MONTHS.

24           I WILL RECOMMEND THAT YOU RECEIVE 500 HOURS OF

25   SUBSTANCE ABUSE TREATMENT FROM THE BOP INSTITUTION

RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM.

I WILL FURTHER RECOMMEND THAT YOU RECEIVE A COMPLETE MENTAL HEALTH EVALUATION AND NEEDED TREATMENT WHILE IN THE CUSTODY OF THE BUREAU OF PRISONS.

I WILL FURTHER RECOMMEND TO THE BUREAU OF PRISONS THAT YOU HAVE MADE AVAILABLE TO YOU A FULL RANGE OF EDUCATIONAL AND/OR VOCATIONAL PROGRAMS.

I WILL RECOMMEND TO THE BUREAU OF PRISONS IN ADDITION THAT YOU RECEIVE CREDIT FOR ALL TIME SERVED SINCE YOUR ARREST AND DETENTION ON OCTOBER 29, 2012.

UPON YOUR RELEASE FROM IMPRISONMENT, YOU SHALL BE PLACED ON SUPERVISED RELEASE FOR A TERM OF 3 YEARS.

WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU OF PRISONS, YOU SHALL REPORT IN PERSON TO THE PROBATION OFFICE IN THE DISTRICT TO WHICH YOU ARE RELEASED.

WHILE ON SUPERVISED RELEASE YOU SHALL NOT COMMIT ANOTHER FEDERAL, STATE OR LOCAL CRIME.  YOU SHALL COMPLY WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY THIS COURT IN LOCAL RULE 83.10, AND YOU SHALL NOT ILLEGALLY POSSESS A CONTROLLED SUBSTANCE.  YOU SHALL NOT POSSESS A FIREARM, A DESTRUCTIVE DEVICE OR ANY OTHER DANGEROUS WEAPON.  YOU SHALL COOPERATE IN THE COLLECTION OF DNA AS DIRECTED.

IN ADDITION, YOU SHALL COMPLY WITH THE FOLLOW-

ING SPECIAL CONDITIONS:  FIRST, YOU SHALL PARTICIPATE IN A

PROGRAM OF TESTING AND TREATMENT FOR DRUG AND/OR ALCOHOL

ABUSE AS DIRECTED BY THE PROBATION OFFICER UNTIL SUCH TIME

AS YOU ARE RELEASED FROM THE PROGRAM BY THE PROBATION

OFFICER; AND, SECOND, YOU SHALL PARTICIPATE IN A PROGRAM

OF MENTAL HEALTH TREATMENT AS DIRECTED BY THE PROBATION

OFFICER UNTIL SUCH TIME AS YOU ARE RELEASED FROM THAT

PROGRAM BY THE PROBATION OFFICER.  YOU SHALL WAIVE ALL

RIGHTS TO CONFIDENTIALITY REGARDING MENTAL HEALTH

TREATMENT IN ORDER TO PROVIDE RELEASE OF INFORMATION TO

THE SUPERVISING UNITED STATES PROBATION OFFICER AND TO

AUTHORIZE OPEN COMMUNICATION BETWEEN THE PROBATION OFFICER

AND THE MENTAL HEALTH TREATMENT PROVIDER.

            IT IS FURTHER ORDERED THAT YOU SHALL PAY TO THE

UNITED STATES A SPECIAL ASSESSMENT OF $100 PURSUANT TO

TITLE 18, UNITED STATES CODE, SECTION 3013, WHICH SHALL BE

DUE IMMEDIATELY.

            I FIND BASED UPON THE RECORD BEFORE THE COURT

THAT YOU DO NOT HAVE THE ABILITY TO PAY A FINE, THE COURT,

THEREFORE, WILL WAIVE ANY FINE IN THIS CASE.

            THE DEFENDANT:  THANK YOU.

            THE COURT:  I HAVE REVIEWED YOUR PLEA AGREEMENT

WITH THE GOVERNMENT, THAT PLEA AGREEMENT IS NOW ACCEPTED

BY THE COURT.  PURSUANT TO THE PLEA AGREEMENT AND UPON

MOTION OF THE UNITED STATES THE REMAINING COUNTS OF THIS

1    INDICTMENT ARE DISMISSED AS TO YOU.

2              TITLE 18, UNITED STATES CODE, SECTIONS 3565(B)

3    AND 3583(G) REQUIRE MANDATORY REVOCATION OF EITHER

4    PROBATION OR SUPERVISED RELEASE FOR POSSESSION OF A

5    CONTROLLED SUBSTANCE OR A FIREARM OR FOR REFUSAL TO COMPLY

6    WITH DRUG TESTING.

7              MR. MARTIN, DOES THE DEFENDANT WANT ME TO

8    RECOMMEND A FACILITY?

9              MR. MARTIN:  YES, YOUR HONOR.  WE'D LIKE TO BE

10   PLACED AT THE CLOSEST FACILITY THAT IS SUITABLE FOR

11   PROVIDING HIS MENTAL HEALTH NEEDS AND HIS MEDICAL NEEDS.

12             THE COURT:  MR. LANDERS, WHAT DO YOU CONSIDER

13   HOME TO BE?  WHERE DO YOU CONSIDER HOME TO BE?

14             THE DEFENDANT:  COLEMAN -- OH, HOME, RICHMOND,

15   VIRGINIA.

16             THE COURT:  RICHMOND?

17             THE DEFENDANT:  YES, SIR.

18             THE COURT:  IS THAT WHERE YOU INTEND TO LOCATE

19   ONCE THIS IS BEHIND YOU?

20             THE DEFENDANT:  I HAVE A SON IN FLORIDA.  I'LL

21   PROBABLY GO TO FLORIDA WHEN I GET OUT OF HERE, HONESTLY,

22   BUT THAT'S WHERE MY FATHER IS AT RIGHT NOW.

23             THE COURT:  DO YOU WANT ME TO RECOMMEND A

24   FACILITY IN FLORIDA --

25             THE DEFENDANT:  YES, SIR, IF YOU WOULD.

1          THE COURT:  -- OR NEAR THAT?

2          ALL RIGHT.  MR. LANDERS, I WILL RECOMMEND A

3   FACILITY SOMEWHERE IN OR NEAR THE STATE OF FLORIDA TO

4   FACILITATE ANY VISITATION THAT MIGHT OCCUR WITH YOUR

5   SON --

6          THE DEFENDANT:  THANK YOU, SIR.

7          THE COURT:  -- AND OTHER FAMILY MEMBERS, BUT

8   NEEDS TO BE A FACILITY WHERE YOU CAN GET ALL THESE

9   PROGRAMS.

10         THE DEFENDANT:  DEFINITELY.

11         THE COURT:  PURSUANT TO RULE 32 OF THE FEDERAL

12  RULES OF CRIMINAL PROCEDURE, THE COURT ADVISES YOU THAT

13  YOU MAY HAVE THE RIGHT TO APPEAL YOUR CONVICTION OR THE

14  SENTENCE IMPOSED IN THIS CASE.  THAT'S, OF COURSE, SUBJECT

15  TO ANY WAIVERS YOU'VE AGREED TO IN THIS PLEA AGREEMENT.  A

16  NOTICE OF APPEAL MUST BE FILED WITHIN 14 DAYS OF THE ENTRY

17  OF THE JUDGMENT.  IF YOU REQUEST AND SO DESIRE, THE CLERK

18  OF THE COURT CAN PREPARE AND FILE THE NOTICE OF APPEAL FOR

19  YOU.

20         DOES EITHER PARTY HAVE ANY OBJECTION TO THE

21  SENTENCE JUST PRONOUNCED THAT'S NOT BEEN PREVIOUSLY

22  RAISED?

23         MS. SMITH:  NO, YOUR HONOR.  THANK YOU.

24         MR. MARTIN:  NO, YOUR HONOR.

25         THE COURT:  NOW, MR. MARTIN, I ASSUME YOU WILL

1 DISCUSS WITH MR. LANDERS THE POSSIBILITY OF FILING A

2 NOTICE OF APPEAL.

3          MR. MARTIN:  YES, I WILL.

4          THE COURT:  ALL RIGHT.  MR. LANDERS, AS I'VE

5 SAID TO YOU, YOU CERTAINLY HAVE A RIGHT TO DO THAT, AND

6 YOU'VE RAISED AT LEAST ONE ISSUE HERE TODAY THAT THE SIXTH

7 CIRCUIT HAS NEVER ADDRESSED, SO I'LL LEAVE THAT TO YOU AND

8 MR. MARTIN TO DECIDE.

9          I'VE SPENT A LOT OF TIME HERE TODAY ON THIS

10 CASE, MORE, I THINK, THAN MOST JUDGES WOULD SPEND, MORE

11 THAN I USUALLY SPEND.  SO, MR. LANDERS, YOU'RE 24 YEARS OF

12 AGE, I WANT YOU TO UNDERSTAND WHY I'VE DONE WHAT I'VE

13 DONE, AND I NEED TO MAKE A RECORD FOR THE SIXTH CIRCUIT SO

14 THAT THE SIXTH CIRCUIT WILL UNDERSTAND WHAT I'VE DONE IF

15 THIS CASE GOES UP THERE; BUT I REALLY WANT YOU TO UNDER–

16 STAND WHAT I'VE DONE, AND I WANT YOU TO UNDERSTAND THAT

17 DESPITE THE FACT THAT I'VE IMPOSED A SENTENCE OF

18 IMPRISONMENT HERE TODAY, I WANT YOU TO DO WELL.

19          THE DEFENDANT:  THANK YOU, SIR.

20          THE COURT:  I WANT YOU TO GET ALL OF THIS STUFF

21 BEHIND YOU, GET ON WITH YOUR LIFE.  YOU CAN HAVE A

22 PROMISING FUTURE IF YOU DO.  GOOD LUCK TO YOU.

23          THE DEFENDANT:  I APPRECIATE IT.

24          THE COURT:  YOU WILL BE REMANDED TO THE UNITED

25 STATES MARSHAL TO SERVE YOUR SENTENCE.

1             MR. MARTIN:  THANK YOU, YOUR HONOR.

2             THE COURT:  THANK YOU, MR. MARTIN.

3             I KNOW IT'S GETTING LATE, LET'S TAKE A FIVE

4    MINUTE RECESS AND THEN I'LL START THE PLEAS.

5        (PROCEEDINGS ARE CONCLUDED AT 11:34 P.M.)

6    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

7    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9

10   KAREN J. BRADLEY/S                        8/21/13
     SIGNATURE OF COURT REPORTER                 DATE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2
    DEFENDANT'S WITNESSES          DIRECT CROSS REDIRECT RECROSS
3   JOHN FRANKLIN LANDERS, II      5       27

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25